## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STEPHEN SIEBER, *Pro-se*
1805 45th Street N.W.
Washington D.C. 20007

    and

DERRICK SIEBER, Individually,
10905 Oakwood Street
Silver Spring, MD 20910

    Plaintiffs

     v.

THE DISTRICT OF COLUMBIA                Case No. _____
A Municipal Corporation
441 Fourth Street N.W.
Washington D.C. 20001

    and

KARL RACINE, Individually
Jones Day 51 Louisiana Ave. N.W.
Washington D.C. 20001

    and

BRIAN SCHWALB, Individually
400 Sixth Street N.W.
Washington D.C. 20001

    and

TIMOTHY SHIREY, Individually
400 Sixth Street N.W.
Washington D.C. 20001

    and

JENNIFER JONES, Individually
400 Sixth Street N.W.
Washington D.C. 20001

 and

ADAM TEITELBAUM, Individually
400 Sixth Street N.W.
Washington D.C. 20001

 and

KEVIN VERMILLION, Individually
400 Sixth Street N.W.
Washington D.C. 20001

 and

LINDSAY MARKS, Individually
400 Sixth Street N.W.
Washington D.C. 20001

 and

MARGARET ULLE, Individually
400 Sixth Street N.W.
Washington D.C. 20001

 and

THE SUPERIOR COURT FOR
THE DISTRICT OF COLUMBIA
500 Indiana Avenue N.W.
Washington D.C. 20001

 and

JASON PARK, ASSOCIATE JUDGE
500 Indiana Avenue N.W.
Washington D.C. 20001

 and

JULIET McKENNA, ASSOCIATE JUDGE
500 Indiana Avenue N.W.
Washington D.C. 20001

and

TODD EDELMAN,  ASSOCIATE JUDGE
500 Indiana Avenue N.W
Washington D.C. 20001

and

ANITA JOSEY-HERRING, CHIEF JUDGE
500 Indiana Avenue N.W.
Washington D.C. 20001

and

THOMAS HEDGEPETH, Individually
500 Indiana Avenue N.W.
Washington D.C. 20001

and

AMERICAN UNIVERSITY
4400 Massachusetts Ave
Washington D.C. 20016                              \

and

WASHINGTON D.C. METROPOLITIAN
AREA UNIVERSITY RADIO
4401 Connecticut Ave. N.W
Washington D.C. 20008

and

NATALIE DELGADILLO, Individually
1802 Vernon Street N.W.
Washington, DC 20009-1217

and

ANGI
130 E Washington St,
Indianapolis, IN 46204-4605

and

KENNETH VOGEL, Individually
1642 R Street N.W.
Washington D.C. 20001

    Defendants

# COMPLAINT

## VIOLATIONS OF 42 U.S. CODE § 1983

### INTRODUCTION

It is understood most Defendants in this 42 U.S Code § 1983 lawsuit are D.C.

Government officials who acted under color of law. Some of the Defendants named in this

lawsuit are private actors who conspired with D.C. Government officials under color of law.  The

Complaint arises from D.C. government officials in the executive branch, as well as the D.C.

Superior Court and some of its judges in the judicial branch, and private actor Defendants

conspiring under color of law to violate the constitutional rights of Plaintiffs before, during, and

after a jury trial in the D.C. Superior Court that began on May 13, 2024. (*Case 2019 CA 005047*

*B, brought under the D.C. Consumer Protection Procedures Act by the District Government*

*against Plaintiffs)* This Complaint is being filed prior to judgement in the D.C. Superior Court

litigation, as the jury verdict has not yet been affirmed by the Court, and motions to dismiss

and/or a mistrial and/or for a new trial, as well as the Court's resolution of the remedies phase of

the litigation are still pending.

This Complaint challenges the constitutional standing of provisions in D.C. Code § 28

3904 "Unfair or deceptive trade practices" found in the District of Columbia's Consumer

Protection Procedures Act, ("CPPA"). The Complaint also challenges the unlawful enforcement

of the CPPA by the D.C. Attorney General ("OAG") when no injury, damages, harm or loss

occurs within a consumer to merchant transaction.

Defendants acted in a malicious manner when bringing and conspiring to bring their CPPA lawsuit against Plaintiffs that included internet distribution of knowingly false publications specifically designed to harm Plaintiffs. American University and Washington D.C. Metropolitan Area University Radio ("WAMU") also conspired with OAG through DCist reporter Natalie Delgadillo to publish more knowingly false claims about OAG's lawsuit that were solely intended to destroy Plaintiffs with no injury, no damages no harm and no losses to consumers having occurred. This after Defendants published and re-publish scandalous statements of fact across the internet claiming massive injury, damages, and losses to consumers caused by Plaintiffs, all untrue.

The CPPA provisions challenged in this Complaint violated Plaintiffs First Amendment right to free speech, among other constitutional rights.  Abstention regarding federal jurisdiction in this case is not discretionary because its claims are based on flagrantly unconstitutional state laws dealing with First Amendment free speech. In _City of Houston v Hill_, 482 U.S. 451, 107 S. Ct. 2502, 96 L. Ed. 2d 398, 1987 U.S.  LEXIS 2617 (1987) the Supreme Court considered whether abstention was appropriate when plaintiff was challenging a local ordinance that criminalized the "interruption of a police officer."  The State argued the Supreme Court should abstain from deciding the question to allow the State Court an opportunity to resolve the challenge. The Supreme Court disagreed and held that in cases involving a facial challenge to a statute, the pivotal question when determining whether abstention is appropriate is whether the statute may be interpreted to render unnecessary the federal constitutional question.

The Supreme Court found there was simply no way in which to define speech that constituted the interruption of a police officer, and therefore, the ordinance was unconstitutional on its face. Under such circumstances, the Court concluded that abstention was inappropriate

creating the doctrine known as "Colorado River Abstention" that mimic the constitutional challenges to D.C. Code § 28 3904 provisions pled in this 42 U.S Code § 1983 Complaint as unconstitutional. In other instances, Government Officials in the executive branch, including the current D.C. Attorney General Brian Schwalb and his OAG lawyers, colluded with two of its judges in the D.C. Superior Court to violate the constitutional rights of Plaintiffs and in doing so, crassly violated the Separation of Powers Doctrine embedded in the U.S. Constitution.

## PARTIES

1.      Plaintiff Stephen Sieber ("S. Sieber") is a citizen of the District of Columbia representing himself *pro-se* and resides in 1805 45th Street N.W. Washington D.C. 20007 and is a professional musician and the father of Derrick Sieber.

2.      Plaintiff Derrick Sieber ("D. Sieber") is a citizen of the State of Maryland residing at 10905 Oakwood Street, Silver Spring, MD 20910 and was the sole proprietor of Precision Contracting Solutions ("PCS"), a licensed D.C. Contractor from 2007 until 2020 until having to file bankruptcy.

3.      Defendant District of Columbia ("D.C. Government") is a municipal corporation empowered to sue and be sued and is the local government for the territory constituting the seat of government for the United States.

4.      Defendant Karl A. Racine ("Mr. Racine") is the former Attorney General for D.C. with address located at 400 Sixth Street N.W. Washington D.C. 20001.

5.      Defendant Brian Schwalb ("Mr. Schwalb") is the current Attorney General for D.C. with address located at 400 Sixth Street N.W. Washington D.C. 20001.

6.      Defendant Timothy Shirey ("Mr. Shirey") is a fraud investigator for the D.C. Office of the Attorney General with address located at 400 Sixth Street N.W. Washington D.C. 20001.

7.      Defendant Jenifer Jones (Ms. Jones") is the current Deputy Attorney General for Public Advocacy with address located at 400 Sixth Street N.W. Washington D.C. 20001.

8.      Defendant Adam Teitelbaum ("Mr. Teitelbaum") is the current Director of Consumer Protection for the D.C. Attorney General's Office with address located at 400 Sixth Street N.W. Washington D.C. 20001.

9.      Defendant Kevin Vermillion ("Mr. Vermillion") is an attorney for the Office of the D.C. Attorney General with address located at 400 Sixth Street N.W. Washington D.C. 20001.

10.     Defendant Lindsay Marks ("Ms. Marks") is an attorney for the Office of the D.C. Attorney General with address located at 400 Sixth Street N.W. Washington D.C. 20001.

11.     Defendant Margaret Ulle is an attorney for the Office of the D.C. Attorney General with address located at 400 Sixth Street N.W. Washington D.C. 20001.

12.     All past and present government employees identified in ¶ 4, ¶ 5, ¶6, ¶ 7, ¶ 8, ¶ 9, ¶ 10 and ¶ 11 above, shall be collectively identified in this Complaint as ("Government Officials"), always acting under color of law.

13.     Defendant District of Columbia Superior Court is a tribunal that adjudicates legal matters in D.C. located at 500 Indiana Ave NW. Washington D.C 20001.

14.     Defendant Jason Park ("Judge Park") is an Associate Judge of the D.C. Superior Court located at 500 Indiana Ave NW. Washington D.C. 20001.

15.     Defendant Juliet McKenna ("Judge McKenna") is an Associate Judge of the D.C. Superior Court located at 500 Indiana Ave NW. Washington D.C. 20001.

16.    Defendant Todd Edelman ("Judge Edelman") is an Associate Judge of the D.C. Superior Court located at 500 Indiana Ave NW. Washington D.C. 20001.

17.    Defendant Anita M. Josey-Herring ("Judge Josey-Herring") is an Associate Judge of the D.C. Superior Court located at 500 Indiana Ave NW. Washington D.C. 20001 and was the Chief Judge during events alleged herein.

18.    Defendant Thomas Hedgepeth ("Mr. Hedgepeth") is the Chief Security Officer for the D.C. Superior Court located at 500 Indiana Ave NW. Washington D.C. 20001.

19.    Defendant American University ("AU") is a private College located at 4400 Massachusetts Ave. in Washington D.C. 20016 who owns the WAMU news and communications platform and who employed reporter Natalie Delgadillo in one of their subsidiaries, DCist.

20.    Defendant Washington D.C. Metropolitan Aera University Radio ("WAMU") is a broadcasting organization owned by AU located at 4401 Connecticut Ave. in Washington D.C. 20008 who managed the DCist online news website and who employed reporter Natalie Delgadillo.

21.    Defendant Angi Inc. ("ANGI") is an online consumer ratings and review service located at 130 E Washington St, Indianapolis, IN 46204-4605 that also owns HomeAdvisor.

22.    Defendant Natalie Delgadillo ("Ms. Delgadillo") was a reporter and employee of AU, WAMU and DCist, with current address located at 1802 Vernon Street N.W. Washington, D.C. 20009-1217

23.    Defendant Kenneth Vogel ("Mr. Vogel") is a D.C. Lawyer located at 1642 R Street N.W. Washington D.C. 20001.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction for all causes of action arising under

United States Code 28 USC 1331.

25.     This Court has *in personam* jurisdiction over defendants in this matter since the

District is a municipal corporation in this jurisdiction and defendants work in the Moultrie

Courthouse, 500 Indiana Avenue N.W., Washington D.C. 20001 or elsewhere in the District.

26.     This Court has *in personam* jurisdiction over Defendant ANGI because ANGI is

doing business in the District by connecting D.C. consumers to licensed D.C. home improvement

contractors.

27.     Venue is proper in this Court because all actions giving rise to this Complaint

occurred in the District of Columbia ("D.C.")

## PRE-TRIAL FACTS

28.     In October 2018, the OAG launched an investigation under the CPPA into

Precision Contracting Solutions ("PCS"), a licensed home improvement contractor in D.C., and

its owner D. Sieber, and non-owner S. Sieber, hereinafter collectively referred to as the

("Precision Parties"), with S. Sieber and D. Sieber also referred to collectively as ("Plaintiffs")

for the purposes of this Complaint.

29.     When OAG's investigation began in late 2018, PCS had maintained an A+ rating

at the Better Business Bureau ("BBB") for nine consecutive years with no complaints at the

Department of Consumer and Regulatory Affairs. ("DCRA")

**Statutory Provisions in the District of Columbia's CPPA D.C. Code § 28 3904 are
Unconstitutional on Their Face**

30.     The D.C. Consumer Protection Procedures Act ("CPPA") was enacted in 1976 to

address unfair and deceptive trade practices of merchants when dealing with D.C. consumers.

31.     As presently legislated, the CPPA does not require a showing of consumer injury or damage to prove that an unfair or deceptive trade practice has occurred, DC Code § 28-3904.

32.     Under § 28-3909 (a), the D.C. Attorney General may seek restitution for D.C. consumers without having to prove injury or damage to consumers.

33.     Awarding restitution is functionally the same as awarding damages because restitution is defined as "making whole" a customer for his or her losses.

34.     To be awarded damages, due process requires that a plaintiff must first prove that he or she suffered an injury, meaning they must demonstrate a legally recognized harm that resulted in damage caused by a merchant's actions.

35.     In allowing for awards of restitution, due process requires a plaintiff must first prove that he or she suffered an injury, meaning they must demonstrate a legally recognized harm that caused damage.

36.     The Federal Trade Commission ("FTC") does not bring consumer protection actions against a merchant when no injury, damages or loss to consumers has occurred.

37.     FTC lawsuits against a merchant require "substantial injury" to consumers to constitute an unfair and deceptive trade practice.

38.     The Government selectively bringing a CPPA lawsuit against a D.C. merchant, seeking any form of monetary relief to consumers when no injury, damage, harm or loss to has occurred is unconstitutional.

39.     D.C. Code § 28 3904 "It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged"

40.    Plaintiffs claim this provision is substantially overbroad and provides the D.C. government with selective and unconstitutional enforcement discretion to bring lawsuits against D.C. merchants for legal First Amendment speech that caused no injury, damages, harm, or loss to consumers. This statutory provision is therefore unconstitutional on its face under the First Amendment.

41.    D.C. Code § 28 3904 (e) "misrepresent as to a material fact which has a tendency to mislead"

42.    Plaintiffs claim this provision is substantially overbroad and provides the D.C. government with selective and unconstitutional enforcement discretion to bring lawsuits against D.C. merchants for legal First Amendment speech that caused no injury, damages, harm, or loss to consumers. This statutory provision is therefore unconstitutional on its face under the First Amendment.

43.    D.C. Code § 28 3904 (f) "fail to state a material fact if such failure tends to  mislead"

44.    Plaintiffs claim this provision is substantially overbroad and provides the D.C. government with selective and unconstitutional enforcement discretion to bring lawsuits against D.C. merchants for omissions that are legal and that caused no injury, damages, harm or loss to consumers. This statutory provision is therefore unconstitutional on its face.

45.    D.C. Code § 28 3904 (f-1) "use innuendo or ambiguity as to a material fact, which has a tendency to mislead"

46.    Plaintiffs claim this provision is substantially overbroad and provides the D.C. government with selective and unconstitutional enforcement discretion to bring lawsuits against D.C. merchants for legal First Amendment speech that caused no injury, damages, harm, or loss

to consumers. This statutory provision is therefore unconstitutional on its face under the First

Amendment.

47.    D.C. Code § 28 3904 (m) "harass or threaten a consumer with any act other

than legal process, either by telephone, cards, letters, or any form of electronic or social media."

48.    Plaintiffs claim this provision is substantially overbroad and provides the D.C.

government with selective and unconstitutional enforcement discretion to bring lawsuits against

D.C. merchants for legal First Amendment speech that caused no injury, damages, harm, or loss

to consumers. This statutory provision is therefore unconstitutional on its face under the First

Amendment.

**OAG Launched Their Investigation into the Precision Parties Under Color of Law Based on Knowingly False Claims by D.C. Lawyer Kenneth Vogel**

49.    OAG opened their investigation into the Precision Parties based on knowingly

false claims provided by D.C. lawyer Kenneth Vogel, who was representing commercial real

estate developer Lamar Toland in a contract dispute with PCS.

50.    Mr. Vogel had filed a lawsuit in D.C. Superior Court masquerading as his client

*"pro-se"* claiming in a "Verified Complaint" that both S. Sieber and D. Sieber were shills and

planting fake consumer reviews on the HomeAdvisor website. *(Toland v. Sieber, et al., Case No.*

*2016 CA 006458 B in 2016)*

51.    Mr. Vogel's Complaint was dismissed with prejudice in the D.C. Superior Court

by the honorable Judge John Mott for lack of evidentiary support in 2017.

52.    Mr. Vogel later took his dismissed Verified Complaint, using Mr. Toland's *pro-se*

identity, to OAG and complained that Plaintiffs were planting fake D.C. consumer ratings and

reviews about PCS on the HomeAdvisor website, owned by ANGI, and were therefore

defrauding D.C. consumers.

53.     At the time of Mr. Vogel's false claims, PCS had "54" 5-star ratings and reviews on the HomeAdvisor website, "51" 5-star ratings and reviews on ANGI, and dozens of additional 5-star consumer reviews on the DCRA consumer ratings portal, with a combined 140 D.C. consumer ratings and reviews posted on the internet regarding PCS with an average star rating of 4.5 stars of a possible 5 stars.

**OAG, ANGI, HomeAdvisor and Mr. Vogel Colluded Under Color of Law to Violate the Commercial Free Speech Rights of Plaintiffs**

54.     Notices are posted on both the HomeAdvisor and ANGI websites informing the public that contractor reviews posted by consumers can be trusted because they are "Verified" with "Safeguards" to prevent fraudulent postings.

55.     During their nine-month investigation, OAG worked directly with Mr. Vogel, ANGI and HomeAdvisor to verify who had posted reviews about PCS on their platforms to see if Mr. Vogel's claims of fraud were true.

56.     OAG used consumer contracts turned over by Plaintiffs, pursuant to a documents subpoena, to contact consumers to verify the validity of all consumer ratings and reviews posted about PCS.

57.     All PCS ratings and reviews were found to be true and authentic D.C. consumer postings after OAG's investigation was complete.

58.     Mr. Vogel was approaching D.C. consumers directly making the same false claims of Plaintiffs planting fake D.C. consumer reviews on ANGIE and HomeAdvisor in attempts to generate business for Mr. Vogel's D.C. law firm through legal representation of consumers.

59.     Home Advisor and ANGI assisted in OAG's investigation by verifying the truthfulness of all consumer postings on their websites using email address verification required

when posting a review, and then contacting those consumers directly for second-step verification to confirm D.C. consumers had in fact posted the PCS ratings and reviews on their websites.

60.     All PCS ratings and reviews posted by D.C. consumers on HomeAdvisor and ANGI were found to be true and authentic after an intense investigation by OAG, HomeAdvisor and ANGI.

61.     OAG, ANGI, HomeAdvisor and Mr. Vogel, however, after being fully aware that the PCS ratings and reviews posted by D.C. consumers were true and authentic, colluded under color of law to take down the PCS public pages on the ANGI and HomeAdvisor websites, and in doing so, removed all the authentic consumer reviews Plaintiffs were promoting to the public using First Amendment commercial speech rights.

62.     Removing the PCS Profile pages from both ANGIE and HomeAdvisor websites, including the legitimate D.C. consumer reviews, gave the defamatory impression that authentic PCS consumer reviews were fake which was the goal of the conspirators.

63.      OAG, HomeAdvisor and ANGIE conspiring to remove authentic PCS ratings and reviews also violated the First Amendment free speech rights of D.C. consumers who had posted those reviews about the performance of PCS.

64.      Removing legitimate D.C. consumer ratings and reviews violated the First Amendment commercial speech rights to promote PCS whose reviews its owner D. Sieber had earned through hard work and stellar business performance for over a decade in the D.C. community.

65.     OAG, Angie, HomeAdvisor and Mr. Vogel conspired to violate the constitutional rights of Plaintiff's guaranteed by the First  Amendment through knowingly false statements of fact, as well as the removal of  legitimate D.C. consumer ratings and reviews.

66.    Mr. Vogel conspired with OAG to bring a CPPA lawsuit under the unconstitutional claims pled in ¶ 39, ¶ 41, ¶ 43, ¶ 45 and ¶ 47 above because Mr. Vogel had a vested financial interest in the lawsuit when fraudulently claiming that Mr. Toland, a commercial real estate developer, was a consumer under the CPPA and entitled to restitution of which percentage Mr. Vogel would get paid.

67.    OAG unlawfully withheld evidence pled in ¶ 55, ¶ 56, ¶ 57, ¶ 58, ¶ 59, ¶ 60, and ¶ 61  above that was favorable to the Precision Parties at trial that violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial.

68.    Judge Edelman unlawfully struck evidence containing the online reviews that D.C. consumers had posted on the HomeAdvisor website by ordering the redaction of the text of authentic consumer reviews which violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs to a fair trial.

69.    Judge Edelman's violations of Plaintiffs Fifth, Seventh, and Fourteenth Amendment rights prejudiced the jury by giving them the untrue and unjust impression that the redacted PCS ratings and reviews, admitted <u>not</u> for the truth asserted, were fake.

**OAG Investigator Timothy Shirey Committed Felony Home Invasion Under Color of Law When Serving a Documents Subpoena of Which Criminal Conduct was Covered-Up by Then D.C. Attorney General Karl Racine**

70.    Senior OAG fraud investigator Timothy Shirey (" investigator Shirey"), was assigned to the PCS investigation and forcibly entered the residence of S. Sieber illegally on October 19, 2018, when serving a documents subpoena violating S. Sieber's Fourth Amendment rights by slamming open the front door, damaging property, and verbally assaulting S. Sieber in front of several witnesses when stating "your time has come".

71. Attorney Edward Lyle, representing D. Sieber and his company PCS, and S. Sieber, representing himself *pro-se,* contacted OAG to report the criminal conduct of investigator Shirey and demanded Mr. Shirey be criminally charged, and removed from any investigation into PCS but OAG refused.

72. In a declaration submitted as part of the case, investigator Shirey admitted to unlawfully entering the residence of S. Sieber.

73. After OAG failed to enforce the law regarding the Shirey home invasion, S. Sieber filed a criminal Complaint against investigator Shirey with the D.C. Police Department, and also against then D.C Attorney General Karl Racine ("AG. Racine") for the cover-up of the criminal conduct of investigator Shirey that violated the Fourth Amendment rights of S. Sieber.

74. Weeks later, S. Sieber went down to the District 2 D.C. Metropolitan Police Department to check on the status of the criminal Complaint he had filed and was informed that AG Racine had quashed the Complaint and the matter was closed without any investigation having taken place, violating the Fourth, Fifth, Seventh and Fourteenth Amendment rights of S. Sieber to redress his of grievances in court.

75. OAG retaliated against Plaintiffs for the filing of S. Sieber's criminal Complaint against investigator Shirey and AG Racine by issuing a press release with their CPPA Complaint attached to it on July 31, 2019, that was filled with knowingly false and damaging statements of fact about PCS and Plaintiffs. ("Racine Press Release")

**The Racine Press Release Contained Knowingly False Statements of Fact Published with Malice to Intentionally Harm Plaintiffs and not Protect of D.C. Consumers**

76. OAG published, with malice, false statements of fact about Plaintiffs in OAG's press release with their Complaint attached to it. ("Racine Press Release")

77.     The Precision Parties denied all CPPA violations in their answer to the OAG

Complaint and alleged that several of the statements of fact in the Racine Press Release were

"knowingly false" with no evidentiary support to make such outrageous claims that intentionally

defamed and injured Plaintiffs, with malice, that was in retaliation for the filing of criminal

Complaints against investigator Shirey and AG Racine.

78.     The Racine Press Release did not name a single consumer.

79.     The Racine Press Release published the following knowingly false statement:

> "In 2017, PCS entered into a contract with a homeowner for a full renovation of
> their property. Two years later, and after the full sums requested by PCS had been
> paid, the consumer was left with an unfinished property and PCS continued to
> demand sums far in excess of the original contract to complete the project"

80.     The Racine Press Release published the following knowingly false statement:

> " [PCS] leaves jobsites unsecured resulting in consumer homes being trespassed
> and burglarized"

81.     The Racine Press Release contained the following knowingly false statement:

> "Defendant S. Sieber previously did business as Sieber Contracting Solutions
> where he was barred by the Montgomery Office of Consumer Affairs for
> operating as a contractor for false advertising, inferior workmanship, operating
> businesses under corporate charters that had been revoked by the State of
> Maryland and falsely stating that he employed registered and certified engineers
> in his firm".

82.     The Racine Press Release published the following knowingly false statement:

> "Defendants violations of the Construction Code has also resulted in damage to
> neighboring properties. In one example during a basement renovation of a
> consumers' property, Defendants damaged the neighboring property by failing to
> perform underpinning which resulted in water damage to the neighbor's basement
> and foundation."

83.     The Racine Press Release published the following knowingly false statement:

> " In another example, Defendant's construction work caused the foundation of the
> neighboring property to shift, causing major cracks in the walls. Residents of the
> neighboring properties were evacuated."

84.     The Racine Press Release published the following knowingly false statement:

" DCRA inspected the property and issued a Stop Work Order that resulted in a Notice of Infraction being issued by DCRA. DCRA determined that renovation work had been performed (1) without the required permits, (2) that failed to maintain proper construction safeguards, (3) that failed to protect the adjoining property, and (4) that failed to comply with proper site treatment under the Construction Code"

85.     The knowingly false statements of fact that appeared in the Racine Press Release listed in ¶ 79, ¶ 80, ¶ 81, ¶ 82, ¶ 83 and ¶ 84 above violated Plaintiffs constitutional right to freedom from defamation, which is protected under the First Amendment in this circumstance based of knowingly false statements of fact being published by the D.C. Government, with malice, and pre-meditation to protect their own interests and not those of D.C. consumers.

86.     These knowingly false statements have remained undisputed by OAG throughout the litigation, with OAG claiming they are authorized to make knowingly false statements of fact pursuant to D.C. Code § 28 3909 (c)(7) and are shielded from liability by way of government immunity, which Plaintiffs plead to be an unconstitutional privilege asserted.

87.     The knowingly false claims  found in ¶ 79, ¶ 80, ¶ 81, ¶ 82, ¶ 83 and ¶ 84 above were never raised at trial because they never occurred.

88.     When PCS or Plaintiffs are searched on the internet, the Racine Press Release and Complaint comes to the top of the search engine proclaiming massive damages, injury and losses to consumers with neighboring properties having to be evacuated, all of which were knowingly false statements of fact made up by OAG in retaliation for S. Sieber filing a criminal Complaint against investigator Shirey and AG Racine for violating his Fourth Amendment rights.

**After the Racine Press Release was Published, OAG Withdrew all Claims of Injury, Damages and Loss to Consumers**

89.     After making egregious knowingly false, unconstitutional, and damaging public statements of fact about PCS and Plaintiffs in the Racine Press Release, OAG withdrew all claims of injury, damages, harm or loss to consumers from the litigation one year before trial, knowing well OAG had intentionally lied to consumers and the world about the actions and character of PCS and Plaintiffs.

90.     After dismissing all injury, damage and loss claims, OAG based their entire case on unconstitutional CPPA statutory provisions identified by Plaintiffs in ¶ 39, ¶ 41, ¶ 43, ¶ 45 and ¶ 47 above.

91.     At trial, the jury did not find any injury, damages, harm or loss to consumers. However, OAG still seeks over three million dollars in restitution, injunctive relief and legal fees that are still pending in D.C. Superior Court, even though ¶ 53 in the OAG's Complaint below predicated their entire CPPA lawsuit and claims for relief on consumer injury that OAG has admitted never happened, and, withdrew from the litigation a year before trial.

**OAG Complaint Paragraph ¶ 53 stated**: "Award such relief that the Court finds necessary to redress "injury to consumers" resulting from Defendant's violations of the CPPA including restitution from defendants based on their unlawful conduct and/or requiring Defendants to pay damages to consumers."

92.     OAG's Complaint proceeded to trial in the face continuing motions to dismiss by Plaintiffs arguing that ¶ 53 in the OAG Complaint was fatal to OAG continuing with their CPPA lawsuit because D.C. consumers incurred no injury, no damages, no harm and no losses because of the acts and/or omissions of the Precision Parties.

**OAG Colluded with American University and WAMU Reporter Natalie Delgadillo to Publish More Knowing False Claims**

93.     The same day the Racine Press Release was published, a news article written by reporter Natalie Delgadillo, ("Delgadillo Article") was also published by DCist, an online news platform owned by AU and managed by WAMU, echoing the same knowingly false statements of fact found in the Racine Press Release.

94.     Ms. Delgadillo agreed to assist OAG in her July 31, 2019, news article by allowing OAG to co-author it on three separate occasions that included injecting more knowingly false statements that appeared in the Racine Press Release that violated Plaintiffs constitutional right to be free from defamation protected by the First Amendment in this circumstance.

95.     Ms. Delgadillo filed a declaration in the litigation and swore under oath that her articles were released three separate times after OAG made edits to them, including fictitious claims of consumers being injured by shoddy PCS work that her article claimed resulted in horrendous injury, damages and loss to consumers that caused neighbors to evacuate their homes, all of which were knowingly false public statements of fact.

96.     All these knowingly false statements of fact in the Delgadillo Article were published in a coordinated scheme with OAG, under color of law, to defame Plaintiffs for filing criminal Complaints against investigator Shirey and AG Racine.

97.     After OAG dropped all claims of injury, damage, harm, and loss to consumers from the litigation a year prior to trial, Plaintiffs sent both OAG and AU counsel Charles Tobin a letter demanding the removal of the false and defamatory content from the internet, or face further litigation.

98.    OAG refused to remove their knowingly false publications that are is still on the internet today, that continue to violate the constitutional rights of Plaintiffs to freedom from defamation, which is protected under the First Amendment in this circumstance based on cover of law constitutional violations.

99.    American University shut down DCist on February 24, 2024, and finally removed the Delgadillo Article from the internet that contained an avalanche of knowingly false statements of fact after years of catastrophic injury to Plaintiffs.

100.    AU, WAMU and Ms. Delgadillo are named co-conspirators who acted with the D.C. Government under color of law to violate the constitutional rights of Plaintiffs to freedom from defamation, which is protected under the First Amendment in this circumstance.

**Judge Park Violated Plaintiffs Constitutional Right to Free Speech in His February 2023 Summary Judgement Order**

101.    In a February 2023 summary judgement Order, Judge Jason Park, who presided over the litigation earlier, held that the Precision Parties had threatened customers in a manner that violated D.C. Code § 28 3904 (m) by threatening to charge D.C. consumer Emmy Levens for work she did not pay for.

102.    Judge Park's Order violated the constitutional rights of Plaintiffs by infringing on Plaintiffs' First Amendment right to legal free speech, while also placing unlawful prior restraint on free speech by Plaintiffs in the future, therefore making D.C. Code § 28 3904 (m) unconstitutional on its face.

**Judges McKenna and Edelman Violated the Constitutional Rights of Plaintiffs by Striking Defense Trial Exhibits that Proved OAG Consumer Witnesses Had Reasons to Fabricate Their Testimony**

103.    In its pre-trial exhibit list, the Precision Parties listed the Racine Press Release, the Delgadillo Article, the Shirey Declaration and the Delgadillo declaration as defense exhibits

to be presented at trial in support of their defense to show the jury those publications gave consumers supporting OAG's case reasons to fabricate their testimony.

104.    Both Judges McKenna and Edelman in pretrial hearings struck from the trial the Racine Press Release, the Delgadillo Article, the Delgadillo declaration and the Shirey declaration as irrelevant, which was an unlawful judicial act that violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial.

105.    The Precision Parties had protected constitutional rights to admit into evidence, in support of its defense, exhibits identified in ¶ 103 above because they were both relevant and critical to impeaching the credibility of OAG consumer witnesses at trial and to show the jury that OAG consumer witnesses had reasons to fabricate their testimony after being exposed to the knowingly false Racine Press Release and Delgadillo Article.

**Judges McKenna and Edelman Violated the Constitutional Rights of Plaintiffs by Striking Defense Witnesses that Would Have Proven OAG Consumer Witnesses Had Reasons to Fabricate Their Testimony**

106.    In its pre-trial witness list, the Precision Parties listed Mr. Vogel, Mr. Racine, Mr. Shirey and  Ms. Delgadillo as well as other OAG personal as defense witnesses to show the jury that consumer witness testimony had been tampered with by D.C. Government misconduct making the same knowingly false statements to consumers that appeared in the Racine Press Release and  Delgadillo Article to non-complaining consumers, while also making promises to them of windfall restitution in exchange for their testimony at trial.

107.    S. Sieber served subpoenas for testimony at trial to Mr. Vogel, Mr.  Racine, Ms. Delgadillo and Mr. Shirey as well as other OAG personal in accordance with Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial.

108.    Both Judges McKenna and Edelman in pretrial hearings violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights by quashing the witness subpoenas previously served upon Mr. Vogel, Mr. Racine, Mr. Shirey and Ms. Delgadillo, as well as other OAG personal, all of whom had direct communications with consumer witnesses and tampered with their trial testimony.

109.    Judges McKenna and Edelman violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial by quashing any testimony from D. Sieber to impeach the knowingly false statements that appeared in the Racine Press Release and Delgadillo Article that were both read by testifying consumers.

110.    D. Sieber had a protected constitutional right under the Fifth, Seventh and Fourteen Amendments to testify and impeach the intentional false statements in the Racine Press Release and Delgadillo Article.

111.    The Precision Parties listed D.C. consumer Carolyn Torsell on its witness list and Judge Edelman preemptively struck from her testimony allegations of OAG arm twisting tactics that were alleged as ongoing that exposed OAG witness tampering and promises of windfall restitution in exchange for manipulated trial testimony from satisfied PCS customers.

112.    Judge Edelman's ruling, preemptively striking critical testimony from Ms. Torsell, violated the Fifth, Seventh and Fourteen Amendment rights of Plaintiffs to a fair trial.

**Judge McKenna Violated S. Sieber's Eighth Amendment Rights by Ordering Sanctions Against him for Serving a Trial Witness Subpoena Upon American University Reporter Natalie Delgadillo**

113.    Over a year prior to trial, S. Sieber served a witness subpoena upon Ms. Delgadillo for testimony at trial regarding the under-oath declaration she had signed during the litigation, and for allowing OAG to edit her articles about the Racine Press Release three

separate times, and about agreements Ms. Delgadillo made with OAG that were already made public by way of Ms. Delgadillo's sworn declaration.

114.    In pleadings regarding the serving of the Delgadillo witness subpoena and attempts to quash it,  S. Sieber made it clear to Judge McKenna that Plaintiffs were not seeking any protected or privileged information, but rather to examine Ms. Delgadillo on what she had already made public.

115.    Judge McKenna quashed the Delgadillo witness subpoena and sanctioned S. Sieber for serving it, for which S. Sieber had a protected constitutional right to do under his Fifth, Seventh and Fourteenth Amendment rights.

116.    In her May 2, 2023, Sanctions Order, Judge McKenna violated the Eighth Amendment by issuing excessive fines in the amount of $20,804.96 to S. Sieber that was requested by AU / Delgadillo counsel Mr. Charles Tobin.

117.    No protective order was in place when Judge McKenna issued her sanctions against S. Sieber and with no legal basis to order S. Sieber to pay money, as a punitive fine in the amount of $20,804.96, for something he had a constitutionally protected right to do.

118.    When handing down her sanctions order that violated the Eighth Amendment, Judge McKenna glared down at S. Sieber and stated, "you have filed an appalling amount of litigation".

**Judge Edelman Ruled in Pre-Trial Hearings that Hearsay News Articles About S. Sieber from 17 Years Earlier Were Highly Prejudicial and Then Willy-Nilly Reversed That Decision at the Whims of OAG.**

119.    It is undisputed that S. Sieber, D. Sieber's father, has never been an owner in PCS.

120.    Back in 2007, seventeen-years prior, S. Sieber was a general contractor in D.C. and had some online squabbles with consumers in the new era of consumers posting on the internet and OAG decided to introduce those articles in support of their case.

121.    During the 10+ years S. Sieber was a licensed contractor in D.C. from 1996 until 2006 he had no DCRA consumer complaints or administrative actions or notices of infraction filed or adjudicated against him or his company.

122.    The following transcript citations are from a pre-trial conference wherein Judge Edelman explains to OAG trial counsel Kevin Vermillion, in detail, why the admission of hearsay news articles about S. Sieber from 2007 are highly prejudicial and not admissible at trial. Plaintiffs are pleading the statements below as facts in this Complaint.

> THE COURT: . . . "I agree with the point that Mr. Sieber is making; that that is highly prejudicial. You know, and I guess it is a little bit probative on your point about materiality, but it's certainly not essential to your point about materiality. And I don't see how Mr. Sieber could fairly rebut the impact of a newspaper article from 2007, where, again, it's complicated to tell a jury, this is not coming in for the truth of the matter, don't take it for the truth of the matter, but the consumers had a right to take it for the truth of the matter, right?"

123.    Then, in an impromptu hearing on the day trial began, with nothing having changed, OAG pressed Judge Edelman to do a total about face and Judge Edelman capitulated by ruling "willy-nilly" that the highly prejudicial news articles about S. Sieber from 17 years earlier he had previously struck, could now come into evidence for the truth of the matter asserted.

124.    All this after Judge Edelman was crystal clear with OAG counsel Vermillion about why those same news articles about S. Sieber from17 years earlier were so highly prejudicial that S. Sieber could not fairly rebut.

125.    Judge Edelman violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights by allowing into evidence highly prejudicial and unredacted hearsay news articles "for the truth of the matter asserted" from 17 years earlier that had absolutely nothing to do with PCS, his son D. Sieber's business or the merits of the case.

126.    Throughout pre-trail, when OAG wanted something from Judge Edelman, they got it, in the face of objection after objection that was correct on the law and the rules of evidence and this 42 U.S Code § 1983 lawsuit will reveal the truth about what really happened in OAG's § 28 3904 CPPA lawsuit that was unconstitutional to the extreme.

**TRIAL FACTS**

127.    After investigating the Precision Parties for 66 months, including interviewing every consumer PCS ever did business with since 2012,  OAG limped into D.C. Superior Court with five consumer witnesses willing to testify in support of OAG's case, two of which were employed by OAG before and during the case.

128.    One of these consumer witnesses employed by OAG then, and now, is Richard Sobiecki.  After the cross examination of Mr. Sobiecki by S. Sieber at trial, Mr. Sobiecki was caught lying under oath about receiving his building permit from PCS, and after his testimony concluded Mr. Sobiecki withdrew any claims for relief on his behalf from the litigation, reducing OAG's case to four testifying witnesses.

129.    The other consumer witness who had a vested financial interest in fabricating her testimony, based on her sub-contract employment with OAG was D.C. lawyer Emmy Levens, who also lied under oath when stating the only reason she was testifying at trial was to "protect other consumers", when in fact it was revealed under cross examination by S. Sieber that Ms.

Levens had been covertly offered windfall restitution by OAG in exchange for her trial testimony.

130.    None of the five OAG consumer witnesses who testified at trial ever filed a complaint with DCRA.

131.    None of the five OAG consumer witnesses who testified at trial ever posted a negative review on the internet about PCS or Plaintiffs.

132.     None of the five OAG consumer witnesses who testified at trial ever filed a complaint with the BBB regarding PCS or Plaintiffs.

133.    None of the five OAG consumer witnesses who testified at trial ever had a notice of infraction adjudicated on their property for improper or non-compliant construction work by PCS or had any other violations of the D.C. Code adjudicated against PCS on their projects.

134.    All the five OAG consumer witnesses who testified at trial had the proper permits obtained by PCS and the proper inspections approved by DCRA for their projects.

135.    OAG did not allege, nor did the jury find in their verdict, that any of the five OAG consumer witnesses suffered any injury, damages, harm or losses because of the acts and omissions of PCS or Plaintiffs.

**Judge Edelman Admitted into Evidence Exhibits That Were Previously Struck by Judge McKenna that Violated Plaintiffs' Constitutional Right to a Fair Trial**

136.    The Jury was intentionally exposed through Judge Edelman's judicial malfeasance and prejudicial mindset to contrived, untrue, and outrageously prejudicial hearsay exhibits that should have never been admitted into evidence based on Judge McKenna's prior sanctions Order, a year earlier, striking those same exhibits from trial based on repeated OAG misconduct.

137.    The striking of OAG's unlawful exhibits by Judge McKenna was for reasons she explained in detail in her sanctions Order against OAG that included; those exhibits never appearing on any party's witness list; thwarting any chance of Plaintiffs intuiting discovery, or any remote possibility for Plaintiffs to fairly challenge any of the grossly out of time and fabricated exhibits Judge McKenna had struck from the proceeding.

138.    In the face of Judge McKenna's Order of April 27, 2023, Judge Edelman, in violation of Plaintiffs Fifth, Seventh and Fourteenth Amendment rights admitted, for the truth of the matter asserted, exhibits that Judge McKenna had struck from the proceeding a year earlier making it impossible to cure the intentional prejudice Judge Edelman knowingly created.

139.    Judge Edelman allowed Ms. Levens, an OAG subcontract employee, to ramble on endlessly over the objections of Plaintiffs, about previously struck hearsay exhibits regarding her project that critically prejudiced Plaintiffs and polluted the jury's verdict.

140.    After the damage was done, by the jury being exposed to evidence and testimony that violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs', Judge Edelman refused to allow S. Sieber to cross-examine Ms. Levens on her new testimony and the unlawfully admitted exhibits.

141.    Judge Edelman's egregious violations of the Fifth, Seventh, and Fourteenth Amendment rights of Plaintiffs of allowing previously struck exhibits into the trial and not allowing the fundamental right of cross-examination rises to the level of intentional judicial misconduct, judicial incompetence, judicial malfeasance that begs the question as to how many other times Judge Edelman has resorted to these unconstitutional actions when presiding over OAG litigation or when *pro-se* litigants are present?

**Judge Edelman Intentionally Failed to Instruct the Jury on the Weight and Standing of Notices of Infraction That Were Unconstitutionally Admitted for the Truth of the Matter Asserted**

142.    Judge Edelman, in violation of Plaintiff's Fifth, Seventh and Fourteenth Amendment rights, admitted into evidence Notices of Infraction ("NOI's") for the truth of the matter asserted against Plaintiffs when those NOI's had nothing whatsoever to do with the actions of Plaintiffs, but rather were adjudicated against testifying consumer Vicky More, who was acting as her own General Contractor.

143.    The D.C. Office of Administrative Hearings (OAH) is an independent agency that holds hearings on NOI's.

144.    OAH decides cases involving building, health, and fire code violations, as well as other public benefits, public space, and professional and business license matters.

145.    The due process requirements for OAH hearings are noticed to the public in https://oah.dc.gov/page/notice-infraction.

146.    An NOI informs a party that an alleged infraction of the D.C. Code has been reported against them to the D.C. Government.

147.    After an NOI is issued, the scheduling of an administrative hearing in front of an Administrative Law Judge ("ALJ") is set, wherein due process is followed as a matter of constitutional right with an evidentiary hearing on the infraction required prior to final judgement.

148.    OAG never followed due process requirements to obtain an OAH judgment for an NOI that had anything to do with the Precision Parties causing violations of the construction codes on any D.C. consumer property, including those who testified at trial.

149.    To cure this deficiency Judge Edelman could have, but did not, undertake a separate evidentiary hearing within the trial on each alleged NOI in conformance with due process, so the jury was correctly informed about the standing and the weight of NOI evidence OAG and Judge Edelman were admitting into the proceeding against the Precision Parties.

150.    Instead, Judge Edelman ignored due process and let the misrepresentations of OAG about PCS liability for NOI's into the record of the case, for the truth of the matter asserted, that violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial.

151.    Judge Edelman's failed to instruct the jury as to how NOI evidence was to be evaluated prior to jury deliberations that intentionally prejudiced Plaintiffs in violation of their Fifth, Seventh and Fourteenth constitutional rights to a fair trial.

152.    The jury, because of the continuing judicial blunders of Judge Edelman, combined with OAG's willful deception of the NOI evidence presented, intentionally prejudiced Plaintiffs in the face of objection after objection from the Precision Parties at trial.

153.    OAG misrepresented to the jury, through innuendo and deception, that Plaintiffs had liability for NOI's during trial violated the Fifth, Seventh and Fourteenth Amendment rights, as Judge Edelman stood idly by in support of OAG's unconstitutional misconduct by OAG trial counsel Vermillion.

> Mr. Vermillion OAG Closing Arguments: "Now, Mr. Sieber also got up here and said, "You've seen no notice of infractions." Well, you'll have these exhibits with you back in the jury room. Exhibit 39 and Exhibit 45, those are notices of infractions. They were issued for Vicky More's property, including one that lists Precision Contracting Solutions on it."

154.    Judge Edelman admitting prejudicial NOI evidence "for the truth of the matter asserted" and without a proper jury instruction regarding legal liability violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs to a fair trial.

**The Highly Prejudicial Cross-Examination of S. Sieber *"Pro-se"* by OAG Counsel Kevin Vermillion Combined with Judge Edelman's Facilitation of that Misconduct Violated the Constitutional Right of S. Sieber to a Fair Trial**

155.    OAG trial counsel Kevin Vermillion cross examined *pro-se* litigant S. Sieber on subjects that had nothing at all to do with the direct testimony that Judge Edelman allowed to continue after continuing objections from both S. Sieber and PCS counsel Edward Lyle that intentionally prejudiced the jury.

156.    Judge Edelman's rulings allowed Mr. Vermillion to introduce a mountain of irreverent prejudicial hearsay exhibits in the face of objections from Plaintiffs one after another.

157.    Judge Edelman's overtly prejudicial rulings allowed forced questioning of S. Sieber about highly prejudicial and totally irreverent hearsay exhibits, none of which having anything to do with any CPPA violations of testifying witnesses, or the adjudication of CPPA claims or the merits.

**The Grossly Improper Closing Arguments of Ms. Ulle and Mr. Vermillion, That Judge Edelman Allowed to Continue Were Unconstitutional**

158.    During the closing arguments of Ms. Ulle and Mr. Vermillion, both violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial, as Judge Edelman stood idly, again, watching OAG misrepresent the facts and the law to the jury with OAG repeatedly attacking the character of Plaintiffs instead of arguing the facts and the law.

159.    OAG emphasized in their closing arguments slanted opinions on the credibility of defendant's testimony and character with derogatory remarks about business plans of deception, taking people's money while doing no work that gave the jury the unmistakable impression that Plaintiffs were engaging in continuing fraud as well as injurious and damaging conduct bordering on criminal behavior when dealing with D.C. consumers as part of OAG's unlawful ruse.

160.    All the intentional misrepresentations to the jury by OAG were made without any evidence or testimony whatsoever in the record to support the outlandish and highly prejudicial statements of fact made by OAG lawyers that repeatedly violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs to a fair trial.

161.    OAG statements to the jury in closing arguments stated the following of which statements are pled as facts in this Complaint:

> Mr. Vermillion Closing Argument Rebuttal: "It was PCS's business model to deceive consumers, to take their money, and then not do the job. And not only when they didn't do the job, when consumers started complaining about that, what did they do? They bullied, threatened, and harassed them. That was the Precision Contracting Solution's business model."
>
> Mr. Vermillion Closing Argument: "This is not complicated. It doesn't require an expert to say, "I hired Precision Contracting Solutions in February. And by the next year, they still haven't done anything that I paid them to do."
>
> Ms. Ulle Closing Argument: "First, PCS and the Siebers lured homeowners into signing contracts with them. And they did that by misrepresenting their qualifications and experience in construction and remodels."

162.    The closing arguments of Mr. Vermillion and Ms. Ulle to the jury consisted of reprehensible personal attacks that intentionally misrepresented the facts, evidence and testimony, and then OAG lawyers supplemented the lies with repeated character assassination, generally attempting to convince the jury to find for OAG based on bad character and scare tactics rather than arguing the facts and evidence presented at trial.

163.    Mr. Vermillion's venomous closing argument claimed business models of deception, taking consumers money and doing nothing for it claiming PCS bullied, threatened and harassed consumers. These statements are totally unsupported by any of the exhibits or

testimony during the trial, as Judge Edelman stood idly by after shutting down the closing arguments of S. Sieber no less than 17 times.

164.    Ms. Ulle fabricated testimony when she stated to the jury in closing arguments that Plaintiffs "misrepresented their qualifications and expertise" in construction and remodels without a shred of evidence to support her statement or without any legal requirements alleged to have been misrepresented to consumers, to DCRA, or anyone else.

165.    There are no qualifications or expertise required to become a general contractor in D.C. except for the requirement to pass a criminal background check and obtain the required insurances which PCS, and its owner D. Sieber complied with.

166.    Judge Edelman allowed this unconstitutional conduct to continue in the face of new and prior objections.

**Judge Edelman and OAG Colluded to Create the Working Draft of Jury Instructions and Verdict Form Options Without Including the Precision Parties.**

167.    There was no evidence to remotely support the jury verdict based on unfounded and unconstitutional CPPA violations when no injury, damages, harm of loss to consumers occurred as a result of the Precision Parties.

168.    A major factor causing the injustice were the unlawful jury instructions and verdict form working drafts created by OAG and Judge Edelman independently, and at the last minute, without any involvement from Plaintiffs or giving them time to respond.

*Judge Edelman to OAG        May 21, 2024 9:06 AM*
"Good Morning, "Could the District please send us a Microsoft Word copy of Attachment 12 to the Joint Pretrial Statement (District of Columbia's Proposed Final Jury Instructions)?"

***OAG Reply to Judge Edelman    May 21, 2024 9:27 AM***
We were actually planning on submitting some redlines to those instructions to update them as trial has progressed. The District's redline edits are attached in a word version. Also attached are additional non-standard jury instructions the District intends to ask for."

169.    Judge Edelman did not invite the Plaintiffs to provide to him with "Defendants Proposed Final Jury Instructions" found in Exhibit 13 of the joint pre-trial statement, but only OAG's Final Proposed Jury Instructions found in Exhibit 12 and redline updates, which violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial by not allowing Plaintiffs to participate in the working draft of the jury instructions and verdict form options.

170.    The Court also gave Plaintiffs no time to review the jury instructions and verdict form in the face of fierce objections from S. Sieber, a *pro-se* litigant, regarding the last-minute intentional prejudice forced upon Plaintiffs by Judge Edelman on such a critical element of the trial as jury instructions and verdict form options.

171.    S. Sieber was forced to approve something against his will for something so critical as jury instructions and verdict form options, with one hour to approve them.

172.    The judicial malfeasance and highly prejudicial mindset of Judge Edelman rises to the level of incompetence.

173.    The following is a transcript from the proceeding highlighting Judge Edelman's prejudicial actions regarding jury instructions, and the absurdly prejudicial amount of time Judge Edelman gave a *pro-se* litigant to respond. The following exchange between Judge Edelman and S. Sieber are being pled as facts in this Complaint:

THE COURT: "Have you read the complete instructions?"

S. SIEBER: "I just got them."

THE COURT: "When did you just get them?"

S. SIEBER: "This morning."

THE COURT: "Right, that's when we sent them out."

S. SIEBER: "Right, but I" –

THE COURT: "So I gave you that long break so you can read them over."

S. SIEBER: "Well, the thing was -- I understand that, but I'm not intellectually capable of receiving something this detailed from the Court the day when I have to prepare for my witness testimony."

174.    S. Sieber is a *pro-se* litigant and Judge Edelman knows it, and Judge Edelman's actions are beyond prejudicial, beyond judicial misconduct, and grossly unconstitutional by any independent standard of review for a judicial officer sworn to fairness to conduct himself in this overtly prejudicial manner.

175.    The question of jury instructions had been ripe for finalization for almost a year and Judge Edelman intentionally and negligently procrastinated by failing to address the complicated question of jury instructions well before trial.

176.    The D.C. Superior Court had no standard CPPA jury instructions.

177.    As a matter of standard operating procedure, jury instructions are agreed upon by the parties and filed with the court before the final pretrial conference.

178.    The malfeasance of Judge Edelman violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial by springing colluded draft jury instructions and verdict form options created by Judge Edelman and OAG on a *pro-se* litigant at the last minute with no time to respond, and given no other choice.

179.    Judge Edelman should have, but did not, give a reasonable amount of time for the parties to discuss, review and agree on jury instructions that had to be created from scratch because no D.C. Superior Court CPPA jury instruction exist.

180.    Instead Judge Edelman jammed the colluded jury instructions created by he an

OAG down the throats of a *pro-se* litigant and Defendant's Counsel with only an hour to agree or

else.

**The Jury Instructions and Verdict Form Are Unconstitutional**

181.    The Jury did not find that consumers suffered any injury, damages, harm or loss

based on the actions of Plaintiffs notwithstanding the unconstitutional jury instructions and

verdict form options presented to them.

182.    OAG bringing their CPPA lawsuit without injury to consumers is therefore

unconstitutional based on selective D. C. Government enforcement undertaken not to protect

consumers, because they incurred to injury, damages, harm or loss at the hands of the Precision

Parties by rather to protect themselves from the criminal conduct Complaint of S. Sieber.

183.    The "**Category One**" jury instruction and resulting verdict form created by OAG

and Judge Edelman is unconstitutional on its face.

**Category One Instruction:** Representations in Violation of Section 28-3904(e) of the
Consumer Protection Act Section 28-3904(e) makes it illegal to "misrepresent as to
material fact which has tendency to mislead." In this case, the District contends that
Defendants violated Section 28-3904(e) when Defendants explicitly or implicitly
represented to a consumer or consumers that they would do any of the following:

- Provide architectural, engineering services, and other home improvement services.
- Obtain permits and variances necessary for construction or renovation.
- Complete all work within specified time frame.
- Provide specific construction or renovation services that the consumer requested.
- Perform home improvement work using licensed and skilled professionals.
- Use "high end" fixtures in the customers' homes and/or provide "high end" and
  "custom" renovations.

184.    It is unconstitutional to create a smorgasbord of legal actions and frame them as

unlawful CPPA misrepresentations in a jury instruction and verdict form using D.C. § 28-3904

(e) that is so vague, so confusing, and so unconstitutional on its face that the common man cannot begin to understand what the jury it attempting to decide.

185.    PCS provided architectural, engineering services, and other home improvement services to consumers because PCS was a licensed General Contractor in D.C. and all those actions were perfectly legal.

186.    PCS obtained all permits pursuant to its construction contracts as the trial testimony and exhibits proved which was a legal duty by contract.

187.    PCS provided construction and renovation services to consumers as a licensed D.C. Contractor that were requested by consumers with all required permits obtained, and all inspections performed in conformance with D.C. law as the trial testimony and exhibits proved.

188.    PCS used skilled and licensed workers under its D.C. Contractors license, with all work performed inspected and approved by DCRA in conformance with the D.C. building code, with no notices of infraction for violations of the D.C. construction codes on any consumer projects.

189.    PCS provided quality products and services to consumers because the trial testimony is devoid of any testimony to the contrary as testifying consumers never filed complaints with DCRA, or anybody else, regarding the performance of PCS or the work it performed on consumer projects.

190.    The jury did not find consumers suffered any injury, damages, harm or loss from the actions of Plaintiffs, but the jury somehow found that PCS had misrepresented something, but never defined to who, when, where or how, and that overbroad vagueness, inherent in D.C. § 28-3904 (e), violated the Plaintiffs Fifth, Seventh, and Fourteenth Amendment rights to a fair trial.

191.     Legal acts performed as a matter of contract cannot be a CPPA violation on a jury instruction and verdict form. Therefore  D.C. § 28-3904 (e) is an unconstitutional statutory provision on its face as evidenced by this real-life trial example of the ball of confusion the provision creates, especially when consumers have not been injured, damaged, harmed or incurred any losses as a result of the unconstitutional application of D.C. § 28-3904 (e)

192.     D.C. § 28-3904 (e) is also unconstitutional because it targets a certain segment of the citizenry, merchants, with draconian laws that are unconstitutional when common law fraud statutes exist to accomplish the stated goals of the CPPA to protect consumers.

193.     Section 28-3904 (e) was the unconstitutional foundation for an unconstitutional jury instruction and equally unconstitutional verdict form that listed only legal actions that could have violated the CPPA and that flies in the face of common sense.

194.     Plaintiffs believe in the integrity of the jury system, but are challenging the impossible task of a jury to make sense of unconstitutional jury instructions and an equally unconstitutional verdict form options applied to an equally unconstitutional CPPA provision, § 28-3904 (e).

195.     These facts give rise to the danger that § 28-3904 (e) creates for D.C. merchants subject to such an overbroad unconstitutional attack, with unchecked Government enforcement on a willy-nilly basis that suits OAG's political interests, even when no injury, damage or loss to consumers is present.

196.     The "**Category Two**" jury instruction and resulting verdict form options created by OAG and Judge Edelman is unconstitutional on its face.

**Category Two Instruction:** Omissions in Violation of Section 28-3904 (f) of the Consumer Protection Act makes it illegal to "fail to state material fact if such failure tends to mislead."

In this case, the District contends that Defendants violated Section 28-3904 (f) when Defendants failed to inform consumer or consumers that they:

- Were not licensed to provide architectural, engineering services, and other home improvement services
- Did not obtain permits and variances necessary for construction or renovation
- Would not complete all work within specified time frame.
- Did not provide specific construction or renovation services that the consumer requested.
- Would not perform home improvement work using licensed and skilled professionals
- Did not use "high end" fixtures in the customers' homes and/or provide "high end" and "custom" renovations
- Failed to disclose Stephen Sieber was not an interior designer.
- Failed to disclose Stephen Sieber's real name

197.    Plaintiffs incorporate ¶ 183 through ¶ 196 into claims of CPPA provision 28-3904

(f) being unconstitutional on its face.

198.    This jury instruction concocted by OAG and Judge Edelman is not only

unconstitutional on its face but violates the standard jury instruction the D.C. Courts have

adopted from the Maryland Courts on material "Omissions".

<u>Official Maryland "Omission" Jury Instruction adopted by D.C. Courts</u>
"We also look to Maryland law as instructive in our jurisdiction. Under Maryland's Consumer Protection Act, "[a]n omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action." Green v. H &amp; R Block, Inc., 355 Md. 488, 735 A.2d 1039, 1059 (1999) (citations omitted)

199.    The standard jury instruction Plaintiffs were entitled to under their Fifth, Seventh

and Fourteenth Amendment rights was the jury instruction traditionally used in the Maryland and

D.C. Courts, and not some concocted jury instruction put together by OAG and Judge Edelman

at the last minute that was customized to the whims of OAG.

200.     Nowhere in the testimony of consumers was it revealed that one, much less a

significant number of unsophisticated consumers ever relied on any "Omission" form Plaintiffs

when determining any course of action. Consumers instead relied on the Home Advisor and ANGI consumer ratings and the A+ PCS BBB rating that had been the same for nine years.

201.    D.C. § 28-3904 (f) is unconstitutional on its face because it is substantially overbroad and accords OAG unconstitutional enforcement discretion on words unspoken when there has been no injury, damages, harm or loss to consumers, with only those merchants singled out by OAG in their unguided discretion getting sued under CPPA § 28-3904 (f) which is unconstitutional on its face.

202.    Judge Edelman and OAG colluded to violate Plaintiffs Fifth, Seventh and Fourteenth Amendment rights as well as to violate the Separation of Powers Doctrine embedded in the US Constitution by ignoring the standard "Omission" jury instruction used by both the Maryland and D.C. Courts, and instead together on the fly, concocted their own legislation under the unconstitutional vail of D.C. § 28-3904 (f).

203.    The "**Category Three**" jury instruction and verdict form created by OAG and Judge Edelman is unconstitutional.

> **Category 3 Instruction**: Representations in Violation of Section 28-3904 (f-1) Section 28-3904(f-1) makes it an unfair or deceptive practice under the Consumer Protection Act to "use innuendo or ambiguity as to a material fact, which has a tendency to mislead." In this case, the District contends that Defendants committed unfair or deceptive acts or practices that violated Section 28-3904(f-1) when, among other representations, Defendants represented that they would provide consumers with "high end," "custom," and "concierge" renovations.

204.    Plaintiffs incorporate ¶ 183 through ¶ 203 into its claims regarding the unconstitutionality of D.C.§ 28-3904 (f-1).

205.    There was never any testimony at trial regarding any innuendo or ambiguity to consumers about any product or service provided by PCS, as the trial transcripts prove.

206.    Nowhere in any PCS contracts, entered into evidence, did Plaintiffs ever use the words high-end or concierge to define a particular product or service, those are the words of OAG in their unconstitutional jury instruction and verdict form option.

207.    It is beyond complex, or even possible, for the common man to understand what "innuendo or ambiguity that has a tendency to mislead" means as applied legal actions provided to consumers by a licensed contractor, therefore § 28-3904 (f-1) is overbroad and unconstitutional on its face.

208.    D. C. § 28-3904 (f-1) convolutes three nouns and an adjective into a confusing mess that the common man cannot   begin to make sense of when being asked to render a verdict based upon § 28-3904 (f-1).

209.    Judge Edelman gave the jury no guidance as to how to define high-end or concierge in the context of  28-3904 (f-1) at trial adding deeper to the confusion.

210.    Section 28-3904 (f-1) in unconstitutional on its face because there is simply no way to define what high end or concierge means or what innuendo and ambiguity means that has a tendency to mislead in the context of a particular set of facts, can you?

211.    Therefore,  Section 28-3904 (f-1) is unconstitutional on its face. Worse yet, the unconstitutional sprovision gives the D.C. Government selective discretion to bring lawsuits against honorable D.C. merchants in the form of a mob shakedown that violates the Fourteenth Amendment rights of Plaintiffs, especially when no injury, damages, harm or loss to consumers are present.

212.     Existing common law fraud statutes are in place that can constitutionally address the CPPA mission to protect District Consumers without wacky unconstitutional CPPA provisions allowing the D.C. Government to unfairly attack D.C. merchants.

213.    The "**Category Seven**" jury instruction and verdict form options created by OAG and Judge Edelman are unconstitutional.

> **Category Seven Instruction:** Violation of Section 28-3904(r) Section 28-3904 (r) makes it an unfair or deceptive practice under the CPPA to "make or enforce unconscionable terms or provisions of sales or leases."

214.    Plaintiffs incorporate ¶ 183 through ¶ 213 into its claims regarding the unconstitutionally of a jury instruction being legislated in colaboration by the executive and judicial branches of government.

215.    This jury instruction is invalid and unenforceable because it ignored the established jury instruction mandated in CPPA 28-3904 (r) that Judge Edelman and OAG decided to ignore for the "unconscionability of a contract term."

216.    The following text comes directly from the CPPA § 28-3904 (r) instruction that that is the jury instruction for the unconscionability of a contract term.

> "(1) knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer"

> "(2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased"

> "(3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees"

> "(4) that the person contracted for or received separate charges for insurance with respect to credit sales with the effect of making the sales, considered as a whole, unconscionable"

> "(5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors."

217.    The official Jury Instruction found in the text of § 28-3904 (r) above is a far

cry from the Jury Instruction given to the jury, making the OAG and Judge Edelman collaboration unconstitutional because judges are prohibited from legislating from the bench, especially with the executive branch of Government is a party in the case.

218.    Judge Edelman and OAG intentionally decided to ignore the jury instruction found in the plain text found § 28-3904 (r) in violation Plaintiffs Fifth , Seventh and Fourteenth Amendment rights and unlawfully replace it with their own.

**The Verdict Form Options Given to the Jury Created by Judge Edelman and OAG are Unconstitutional**

219.    Plaintiffs incorporate ¶ 183 through ¶ 218 into claims regarding  unconstitutional verdict form options.

220.     Verdict form options given to the jury consisted of compounding, stacked and unconstitutional options so vague, generalized, and confusing that it violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs to a fair trial.

221.    The unconstitutional nature of the colluded verdict form options, also created by Judge Edelman and OAG were based on CPPA provisions pled in in paragraphs ¶ 39,  ¶ 41, ¶ 43, ¶ 45 and ¶ 47 as unconstitutional.

222.    The jury did not find consumers suffered any injury, damages, harm or loss as a result of any of the actions of Plaintiffs in the verdict form options, casting yet deeper unconstitutional light upon those CPPA statutory provisions.

**Verdict Form Claim 1:** "Misrepresented their expertise and qualifications to perform Home Improvement Services"

223.    Plaintiffs incorporate ¶ 183 through ¶ 222 into the verdict form options supporting claims of unconstitutionality.

224.    The unconstitutional CPPA verdict form "Claim 1" abounds from D.C. Code §

28 3904 (e) that is an unconstitutional on its face.

225.    Jeffery Reiss, Deputy D.C. Chief Building Inspector testified at trial that the qualifications and expertise required to obtain a General Contractor's license in D.C. are "very minimal".

226.    There are no educational degrees, test requirements or anything else, except passing a criminal background check and obtaining the proper insurances needed to become a D.C. Contractor, all which PCS and D. Sieber conformed to.

227.    A licensed D. C. Contractor can offer any type of construction service to consumers it wants if the Contractor is licensed.

228.    OAG lied to the jury in closing arguments when stating Plaintiffs had misrepresented their qualifications and expertise to become a D.C. Contractor with OAG lawyers violating Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial that.

> Ms. Ulle Closing Argument: "First, PCS and the Siebers lured homeowners into signing contracts with them. And they did that by misrepresenting their qualifications and experience in construction and remodels."
>
> Mr. Vermillion Closing Argument:  . . . "and the consumers who told a clear story about how again and again the Defendants misrepresented, over and over again, their qualifications and expertise to do this work":

229.    OAG went on an intentional misrepresentation rampage to the jury with repeated bad faith claims, one after another, that molested the law while intentionally misleading the jury and the Court as to what the law is regarding the qualifications and expertise for a licensed Contractor to operate in D.C.

230.    Nowhere in the trial testimony did any consumer testify that Plaintiffs misrepresented, "over and over again", or at all, that Plaintiffs misrepresented their qualifications to do work in D.C.

**Verdict Form Claim 2 :** "Misrepresented they would obtain permits and Variances necessary for construction and renovation"

231.     Plaintiffs incorporate ¶ 183 through ¶ 230 into verdict form claims of unconstitutionality regarding D.C. Code § 28 3904 (e).

232.     The trial testimony of consumers proved that PCS obtained all the required permits and inspections required by law, highlighting the unconstitutional and confusing nature of perfectly legal actions being claimed as unlawful under the CPPA pursuant to D.C. Code § 28 3904 (e).

233.     The jury consisted of honorable citizens blinded by the continuing prejudice inflicted by Judge Edelman and OAG as well as the jury being confused from unconstitutional jury instructions and verdict form options that gave only legal options to choose from to reach a finding of liability under D.C. Code § 28 3904 (e).

234.     Therefore, Verdict Form Claim 2 is unconstitutional on its face.

**Verdict Form Claim 3 :** "Misrepresented and/or used innuendo or ambiguity when they said they would use high end fixtures in customers' homes and or provide high end and custom renovations"

235.     Plaintiffs incorporate ¶ 183 through ¶ 234 into verdict form claims of unconstitutionality.

236.     This unconstitutional verdict form claim abounds from D.C. Code § 28-3904 (f-1) that is an unconstitutional CPPA statutory provision on its face.

237.     This unconstitutional verdict form option in Claim 3 is a by-product of the equally unconstitutional jury instruction found in "Category 3" that abounds from CPPA statutory provision D.C. Code § 28-3904 (f-1) that hopelessly confuses the common man, and a jury with no idea of how to apply § 28-3904 (f-1) to any set of facts.

**Verdict Form Claim 4 :** "Misrepresented they would complete work within a specified time frame"

238.    Plaintiffs incorporate ¶ 183 through ¶ 237 into verdict form claims of

unconstitutionality.

239.    This unconstitutional claim abounds, again, from D.C. Code § 28 3904 (e)

that is an unconstitutional on its face.

240.    The starting and completion dates in PCS contracts did not begin running until

PCS had obtained permits for the project. The following provision is found in all PCS contracts

with the number of days variable to the scope of work, all of which were admitted into evidence

at trial.

**"Starting Date:** Within 10 days of obtaining the demo permit".

**"Completion Date:** Within 100 working days from the issuance of the building permit. Working days shall be defined Monday thru Friday minus any legal holidays or rain days if there is work being performed to the building exterior"

241.    The jury was blinded by prejudice based on the repeated unconstitutional acts of

Judge Edelman and OAG, or was simply confused because the jury had all the consumer

contracts in the jury room to see this contractual provision that was clearly present on all PCS

contracts.

**Verdict Form Claim 5** : "Misrepresented they would use licensed and skilled Professionals, including architects, plumbers, electricians, and designers and or failed to disclose they were not using licensed and skilled professionals"

242.    Plaintiffs incorporate ¶ 183 through ¶ 241 into verdict form claims of

unconstitutionality.

243.    This unconstitutional claim abounds, again, from  D.C. Code § 28 3904 (e) that is

an unconstitutional on its face.

244.    There is no provision in the D.C. Code that uses the words skilled workman.

245.    The skill of a workman is a by-product of the quality of his or her work, and is a subjective term that is unconstitutional in the context of a jury instruction or verdict form, as there is no evidence whatsoever admitted in the case that PCS did not use skilled workman, for the dispositive reason that consumers never complained to DCRA about PCS work approved by DCRA inspectors based on the permits obtained.

246.    The trail testimony is clear and undisputed that all plumbing and electrical permits were obtained by licensed trade professionals and all inspections were performed and passed by DCRA building code inspectors, as deputy Chief Building inspector Jeffery Reiss testified to at trial.

**Verdict Form Claim 6**: "Failed to Disclose Stephen Sieber's real name"

247.    Plaintiffs incorporate ¶ 183 through ¶ 246 into verdict form claims of unconstitutionality

248.    This unconstitutional claim abounds, again, from  D.C. Code § 28 3904 (f) that is an unconstitutional CPPA provision on its face.

249.    This Verdict Claim option 6 violates the standard jury instruction the D.C. Courts have adopted from the Maryland Courts on material "Omissions".

250.    Below is the standard jury instruction that the Maryland and D.C. Courts apply when a jury is considering an "omission" in the context of rendering a verdict in a CPPA case:

Official Maryland "Omission" Jury Instruction adopted by D.C. Courts
"We also look to Maryland law as instructive in our jurisdiction. Under Maryland's Consumer Protection Act, "[a]n omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action." Green v. H &amp; R Block, Inc., 355 Md. 488, 735 A.2d 1039, 1059 (1999) (citations omitted).

251.    The verdict form presented to the jury is unconstitutional because Plaintiffs

were entitled under their Fifth, Seventh and Fourteenth Amendment rights to the same jury instruction traditionally used in the Maryland and D.C. Courts as a matter of due process and not some concocted jury instruction put together by OAG and Judge Edelman that was customized to the whims of OAG at the last minute with no time for the Precision Parties to respond.

252.    Nowhere in the testimony of consumers was it revealed that one, much less a significant number of unsophisticated consumers ever relied on S. Sieber or any omission about him for any reason when determining a course of action.

253.    Stevie Marco is the stage name of S. Sieber, and is a recognized fixture in the music industry who has toured with some of the most famous names in the music and entertainment business.

254.    When Googling Stevie Marco one finds dozens of videos on YouTube and album releases dating back over two decades.

255.    S. Sieber has never been an owner in his son's company, never designed anything for any consumer, never signed a PCS contract, and had no authority from PCS owner D. Sieber to make any representations on behalf of the PCS company.

256.    Section 28-3904 (f) is unconstitutional on its face because it is substantially overbroad and accords OAG unconstitutional enforcement discretion on words unspoken when there has been no injury, damages, harm or loss to consumers, with only those merchants singled out by OAG in their unguided discretion sued under the CPPA under § 28-3904 (f), of which selective enforcement is unconstitutional.

257.    Judge Edelman and OAG colluded in violation of the Fifth, Seventh and Fourteenth Amendments of Plaintiffs, and in violation of the "Separation of Powers" doctrine when ignoring the standard "Omission" jury instruction used by both the Maryland and D.C.

Courts, and instead concocting an unconstitutional jury instruction of their own legislation under the unconstitutional vail of statutory provision § 28-3904 (f).

258.    Nowhere in all the testimony of consumers did one, much less a significant number of unsophisticated consumers, rely on S. Sieber or his musician stage name "Stevie Marco" when determining a course of action when entering contracts with PCS.

**Verdict Form Claim 7: "**Failed to disclose Stephen Sieber was not a licensed designer"

259.    Plaintiffs incorporate ¶ 184 through ¶ 258 into verdict form claims of unconstitutionality.

260.    Nowhere in all the testimony of consumers did one, much less a significant number of unsophisticated consumers testify that S. Sieber or "Stevie Marco" ever designed anything for any consumer or submitted any drawings to DCRA or anyone else on behalf of any consumer or PCS.

261.    The verdict claim language conquered up by Judge Edelman and OAG during their collusive efforts is an oxymoron, and like saying "I failed to disclose I have never beaten my wife." The jury instruction and verdict form are therefore backward, circular, redundant, confusing, overbroad and unconstitutional.

262.    There is absolutely no evidence for the jury to conclude that S. Sieber aka "Stevie Marco" ever did any design work for consumers, held himself out as a professional interior designer, or failed to represent he was not one, or, had any legal duty to do so.

**Verdict Form Claim 8: "**Misrepresented Stephen Sieber's authority to act as a home improvement salesman and negotiate the final terms of contracts."

263.    Plaintiffs incorporate ¶ 183 through ¶ 262 into verdict form claims of unconstitutionality.

264.    It is impossible for the jury to have found that S. Sieber negotiated any final terms

of any PCS contracts because there is no evidence to support these claims. There was not one contract presented at trial that S. Sieber signed for PCS, or with any consumer for any reason.

265.    It was rather D. Sieber who signed PCS contracts, 100% of the time, because he was the sole owner of PCS and person who had the home improvement salesman's license for PCS.  The testimony is overwhelming that S. Sieber had no authority to negotiate contract terms or sign contracts for PCS as documented by the testimony of D. Sieber, the sole owner of PCS at trial that was never challenged by OAG. The following is a transcript from the trial that Plaintiffs are pleading as fact in this Complaint:

> S. SIEBER: "Did I ever have any authority to make any representations about Precision Contracting without your explicit permission?"
>
> Derrick Sieber. "No."

**Verdict Form Claim 9:**  "Violated 16 DCMR 812 by failing to obtain permits, performing work outside the scope authorized by permits or performing work without using licensed and skilled professionals"

266.    Plaintiffs incorporate ¶ 183 through ¶ 265 into verdict form claims of unconstitutionality.

267.    This unconstitutional claim abounds, again, from  D.C. Code § 28 3904 (f) that is an unconstitutional on its face.

268.    "Claim 9" is further unconstitutional because it is a re-run of Claim 2 and Claim 5 and reveals the stacking of CPPA violations unlawfully that further prejudiced the jury by presenting the Precision Parties as perpetual lawbreakers when no injury, damages, harm or loss to consumers ever occurred.

269.    The intentional stacking of identical claims under separate headings and assigning

the same violation to two separate parties is unconstitutional double, triple and quadruple

jeopardy that violated the Fifth, Seventh, Eighth and Fourteenth Amendment rights of Plaintiffs

to a fair trial and cruel and unusual punishment in terms of excessive fines.

**Verdict Form Claim 10:**   "Violated 16 DCMR 800.1 by authorizing Stephen Sieber to
accept payment on a home improvement contract"

270.    Plaintiffs incorporate ¶ 183 through ¶ 269 into verdict form claims of

unconstitutionality.

271.    S. Sieber did not accept any funds personally for any PCS contract, nor did he

have the authority to authorize payments pursuant to any PCS contract as testified to by D.

Sieber at trial, of which Plaintiffs are pleading as fact in this Complaint.

> S. SIEBER: "Did I ever have any authority to make any
> representations about Precision Contracting without your explicit
> permission?"

> Derrick Sieber. "No."

272.    There can be no violation of the CPPA for simply picking up a check made out to

PCS at the direction of the owner of the company that is a completely legal act, and in no way

can be interpreted as a CPPA statutory violation, especially when no injury, damages, harm or

loss to consumers has occurred.

273.    This type of selective Government enforcement on a merchant is petty and a

completely unreasonable application as to the intent of the City Counsel when no injury,

damages, harm or loss to consumers occurred.

**Verdict Form Claim 11:**   "Included an unconscionable term in a contract"

274.    Plaintiffs incorporate ¶ 183 through ¶ 273 into verdict form claims of

unconstitutionality.

275.    The jury's findings on this claim are invalid and unenforceable for the simple

reason that Jude Edelman ignored the law and decided to legislate from the bench with OAG to create new law when instructing the jury on how to access the unconscionability of a contract term as described most specifically in the jury instruction for this verdict form claim pled in ¶ 213 through ¶ 218.

276.    The lawful jury instruction and verdict form option comes directly from D.C. Code § 28-3904 (r) that Judge Edelman ignored when he refused to present the CPPA Standard Jury Instruction called for in § 28-3904 (r) regarding an unconscionable contract provision to the jury and instead colluded with OAG to concoct their own unconstitutional Claim 11 Verdict Form option.

**Judge Edelman Allowed OAG to Tamper with Jury Deliberations Using Agents of the US. Marshalls Office and Colluded Ex-parte.**

277.    At the conclusion of court proceedings on May 22, 2024, S. Sieber followed OAG lawyers Kevin Vermillion, Lindsay Marks and Margret Ulle out of the courthouse and took a series of photos of them for a press release about the litigation and their involvement in OAG wrongdoing.

278.    At the conclusion of court proceedings on May 24, 2024, S. Sieber followed OAG lead trial lawyer Kevin Vermillion and D.C. Consumer Protection Director, Adam Teitelbaum, outside the courthouse and took more photos.

279.    Over that weekend, S. Sieber used Song fi Metaverse "AI" technology to create caricatures of OAG lawyers Kevin Vermillion, Lindsay Marks, Margret Ule and Adam Teitelbaum and sent those caricatures to OAG for their review before publishing.

280.    OAG got very upset that S. Sieber had exercised his right to take their photos in the public domain, outside the courthouse, and that S. Sieber had promised to use their caricatures as "public figures" in a Precision Parties press release about OAG wrongdoing.

281.    After receiving the photos and caricatures by email, OAG filed an

Emergency Motion on the morning of May 28, 2024, with the Court titled: "THE DISTRICT OF

COLUMBIA'S EMERGENCY MOTION FOR AN ORDER PREVENTING JUROR

CONTACT EXCEPT IN LIMITED CIRCUMSTANCES" ("Motion to Protect Jurors")

282.    In OAG's Motion to Protect Jurors, OAG attached as exhibits the photos, AI

caricatures, and the email chain OAG received from S. Sieber, thereby making all photos,

caricatures and email communications public.

283.    On May 28, 2024, at 11:48am while the jury was deliberating, S. Sieber got an

email notification on his phone that OAG's "Motion to Protect Jurors" had been filed, with a

copy sent directly to the chambers of Judge Edelman.

284.    OAG's Motion to Protect Jurors had no legal basis or probable cause because the

record of the case shows the Precision Parties had no contact whatsoever with jurors to compel

OAG to file such a "Motion to Protect Jurors".

285.    OAG was furious because S. Sieber had taken photos of OAG lawyers

for a press release, and they were offended by the AI generated caricatures and were so mad that

they made the decision to engage in unlawful conduct in attempts to win the case at all costs.

286.    The OAG Motion to Protect Jurors, sent directly to Judge Edelman, caused him to

ignore due process and violate the constitutional rights of Plaintiffs by giving OAG the green

light for U.S. Marshals to invade the jury deliberation area and escort jurors from the building for

their protection during jury deliberations, all this at the direction of OAG while a party in the

case, and without notice to the Precision Parties.

287.    After receiving the notification of OAG's filing, S. Sieber immediately returned

to courtroom 130 to see if Judge Edelman was going convene an instant hearing on the OAG Emergency Motion to Protect Jurors.

288.    As S. Sieber walked into the courtroom, he saw and heard Mr. Kevin Spencer from the U.S. Marshals Office informing Mr. Lee, Judge Edelman's courtroom clerk, that the U.S. Marshals would be escorting the jury from the courthouse for their protection pursuant to orders from OAG.

289.    Mr. Spencer asked Mr. Lee if Judge Edelman was in his chambers and Mr. Lee said yes, and Deputy U.S. Marshal Spencer exited the courtroom to go see Judge Edelman.

290.    S. Sieber then approached Mr. Lee after witnessing this and asked him why the jury needed to be escorted from the courthouse.

291.    Mr. Lee told S. Sieber that OAG oversees security at the courthouse and had ordered the U. S. Marshals to escort the jury from the building.

292.    S. Sieber then said to Mr. Lee, " I'm sure Judge Edelman knows what's going on in his courtroom regarding something so serious as to have the U.S. Marshals escort the jury from the courthouse", Mr. Lee nodded "yes".

293.    Flabbergasted by what he had seen and heard, S. Sieber informed Mr. Lyle, counsel for Derrick Sieber and PCS ("Defendant's Counsel"), on what had transpired.

294.    Mr. Lyle told S. Sieber that OAG was a party in the case, and had no right to to order agents of the U.S. Marshalls Office to the jury deliberation area to interact with jurors at their whims.

295.    That night, on May 28, 2024, Defendants filed oppositions to OAG's Motion to Protect Jurors and demanded a mistrial based on OAG's jury tampering and Judge Edelman's role in it.

296.     The next day, May 29,2024, Court convened in the morning and both S. Sieber and Defendant's Counsel moved Judge Edelman, again, for a mistrial pursuant to motions filed the night before.

297.     Judge Edelman denied the renewed mistrial motions from the bench.

298.     Judge Edelman violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs to a fair trial by colluding with OAG, Ex-parte, to allow the U.S. Marshals into the jury deliberation area in contact with jurors when OAG was a party to the case, and without notifying the Precision Parties, convening a due process hearing, or undertaking any meaningful judicial investigation.

299.     Before denying the Precision Parties motion for a mistrial, Judge Edelman asked jurors if agents from the U. S. Marshals Office had any contact with them, this without putting jurors under oath.

300.     All jurors told Judge Edelman they had contacts with agents from the Marshals Office on a limited basis but Jurors 8 and 9 said they had more extensive contact.

301.     Judge Edelman did not bring Deputy U.S. Marshal Kevin Spencer into the Courtroom, put him under oath, and ask him any questions about his discussions with OAG and what actions the Marshals had been ordered to take, and did take involving jurors, as well as clarifying conversations Deputy Marshal Spencer had with Judge Edelman in his chambers.

302.     Plaintiffs claim OAG and Judge Edelman are hiding the truth as to what occurred and attempting to quash allegations of collusion between himself and OAG, with the Precision Parties being kept totally in the dark as their Fifth, Seventh, and Fourteenth Amendment rights to a fair trial are being grossly violated by a sitting D.C. Superior Court judge and the D. C. Attorney General of the District of Columbia.

303.     Defense Counsel Edward Lyle challenged Judge Edelman's nonchalant

investigation on such a serious matter as jury tampering by the Court and OAG, of which

statement of Mr. Lyle is now pled as a fact in this Complaint.

> MR. LYLE: "I understand inquiring of the jurors might be what the
> Court can do at this point. But to me that's not satisfactory. If
> you inquire of the jury did you talk to somebody in some way that
> might be conceived to be improper, I think most jurors are going
> to say, no, I didn't."

304.     The next day when Court convened Judge Edelman engaged in a debate with the

Precision Parties on the facts surrounding the allegations of collusion by the Court and OAG

that Plaintiffs are pleading as facts in this Complaint:

> <u>The Court:</u> "Just to put a couple of other things on the record.
> My only understanding before I walked into the courtroom was that
> the marshals would be here at the request of the District."
>
> <u>S. SEIBER:</u> "I was here. I was right here. I saw the whole thing
> go down. The US Marshall walked through that door, Mr. Lee was
> sitting right there. He said OAG has had us come up to escort the
> jury out of the building. It's on the tape, if you want to play
> it. I was stunned when I heard it. I was sitting right back there
> at first. And then this dude comes out, says -- I think it was
> Spencer who" –
>
> <u>THE COURT:</u> "Mr. Spencer."
>
> <u>S. SEIBER:</u> "He comes out, he goes OAG had me come up, got to
> escort the jury. Let me know, you know, when you need us to come
> up. He disappeared, jury walks out, three marshals show up. What
> is a jury to think, Your Honor, especially after the District
> files a motion insinuating that I'm going after and harassing
> jurors. There is nothing in the record to show such a thing."
>
> <u>MR. LYLE:</u> "Well, why are the marshals there?"
>
> <u>THE COURT:</u> "The marshals were -- again, were here at the request
> of the Office of the Attorney General or the Attorney General."
>
> <u>S. SEIBER:</u> "We don't know what was said, Your Honor."
>
> <u>THE COURT:</u> "True."

305.    S. Sieber's protested to Judge Edelman about OAG agents being in contact with the jury during deliberations and demanded a mistrial.

306.    Judge Edelman knew, as evidenced by his own words, that OAG had ordered U.S. Marshals to come to the jury deliberation area while being a party in the case.

307.    Judge Edelman  intentionally did not inform the Precision Parties until S. Sieber questioned Judge Edelman about it in the afternoon of May 28, 2024, otherwise the scam never would have been uncovered if not for S.  Sieber walking into the courtroom at the exact moment Mr. Spencer was approaching Mr. Lee to let him know the U.S. Marshals would be escorting jurors from the building.

308.    The jury returned a verdict finding the Precision Parties liable for close to seventy CPPA violations based on unconstitutional CPPA provisions 28-3904 (e), 28-3904 (f), and  28-3904 (f-1) and equally unconstitutional jury instructions and verdict forms so compounding, general and duplicative they are unconstitutional on their face. Plaintiffs are claiming the jury was tampered with by the D.C. Attorney General in collusion with Judge Edelman.

## POST TRIAL FACTS

**The Precision Parties Filed a Motion on August 2, 2024, titled: "Motion for the Issuance of Deposition Subpoenas, A Deferred Evidentiary Hearing, and Suspension of the Current Proceeding" that was Denied by Judge Edelman**

309.    On August 2, 2024, the Precision Parties filed a motion titled: "MOTION FOR THE ISSUANCE OF DEPOSITION SUBPOENAS, A DEFERRED EVIDENTIARY HEARING,AND SUSPENSION OF THE CURRENT PROCEEDING, based on the facts described in this Complaint.

310.    The Precision Parties had established a prima facie case for Ex-parte collusion

and were entitled by their Fifth, Seventh and Fourteenth Amendment rights to an evidentiary

hearing after the depositions of Deputy U.S. Marshal Kevin Spencer and other involved parties

had been taken.

311.    On August 14, 2024, OAG opposed the Precision Parties Motion

312.    On August 20, 2024, the Precision Parties submitted their Reply to the OAG

Opposition.

313.    On October 3, 2024, Judge Edelman issued an Order denying the Precision

Parties Motion that, in part, has led to the filing of this 42 U.S Code § 1983 Complaint.

314.    The judicial Canon of Ethics on the appearance of impropriety states that a judge

should "avoid any conduct that could lead reasonable people to believe that their honesty,

impartiality, or fitness to serve as a judge is impaired"

315.    Judge Edelman has violated that Canon of Ethics as well as the First, Fifth,

Seventh and  Fourteenth Amendment rights of Plaintiffs to a fair trial by allowing OAG, a party

to the case, to tamper with jury deliberations Ex-parte.

**The First Amendment Rights of S. Sieber were Violated by Judge Edelman by placing Prior Restraint on the Free Speech Rights of S. Sieber Without a Due Process Hearing or for Just Cause.**

316.    Judge Edelman, without any due process hearing on the merits, placed prior

restraint on the free speech rights of S. Sieber as a means of intimidation that had nothing

whatsoever to do with the merits of the case, but rather to keep tabs on what was being said

between OAG and S. Sieber about Ex-parte allegations between Judge Edelman and OAG.

317.    The verbal order of Judge Edelman was an intentional First Amendment violation

by a trial judge against S. Sieber, and just another unlawful and prejudicial act by Judge Edelman

against S. Sieber, a *Pro-se* litigant.

318.    There is due process involved when a Judge strips a *Pro-se* litigant, or any

American citizen, of the right to speak to someone. The following statement was made by Judge

Edelman to S. Sieber that is included as a fact in this Complaint:

> The Court  . . "I require any communications between the
> parties be inwriting. There is to be no oral communications
> between the parties, and my chambers CC'd on any e-mail that's
> sent. You want to do this again, you include me in that. Do you
> understand that, sir?"

319.    The judicial Canon of Ethics requires a judge should be patient, dignified,

respectful, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge

deals in an official capacity. The above stated command for Judge Edelman violates that Judicial

Canon of Ethics especially when S. Sieber had always acted within the law in a respectful matter

in front of the Court.

### Chief Judge Anita M. Josey Herring Refused to Provide the Full Audio and Video Tapes from the Web-ex System for the Dates of May 28 and May 29, 2024, and Participated in the Ex-parte Collusion Between OAG and the Court

320.    The Precision Parties immediately set out to get a copy of the web-ex video and

audio that captured events in the normal course of the court's business that would further

document and prove the jury tampering claims in this Complaint.

321.    The task began by the Precision Parties making a formal request to then Chief

Judge Anita M. Josey-Herring ("Judge Josey-Herring") in conformance with Court procedures to

obtain the web-ex video and audio tapes.

322.    The first request was made on July 26, 2024, at 4:46pm with Judge Josey-

Herring stonewalling the turning over of the tapes for over 6 weeks that contained over 50 emails

appearing show Judge Josey-Herring involved in a cover-up.

323.     Finally on September 6, 2024, Judge Josey-Herring turned over just 20 minutes

of audio and no video tapes of which response was horribly deficient to review what had actually taken place.

324.    The tapes provided appear to have been intentionally altered with remnants of blurring and volume reduction present.  Even the small amount of content turned over by Chief Judge Josey-Herring had to be digitally amplified, but verified many claims in this Complaint with substantial sections edited out or deleted all together.

325.    Plaintiffs pled in this Complaint that the D.C. Superior Court is intentionally withholding evidence and therefore covering up intentional wrongdoing by Superior Court Judge Edelman and Attorney General Brian Schwald that violated and continue to violate the First, Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs.

**Mr. Hedgepeth, Chief of Courthouse Securtiy, has Refused to Turn Over Audio and Video Security Tapes for Courtroom 130 and the Chambers and Jury Deliberation Areas for May 28 and May 29, 2024, After Being Served a Subpoena to do so.**

326.    On September 29, 2024 at 8:24pm Defendants Counsel wrote the following to Mr. Hedgepeth, Chief Security Officer for the courthouse:

> "I am writing this to supplement my earlier request for a response from you concerning the subpoena that was issued to you by certified mail on August 17 and personally sent to you on September 6th after our telephone conversation on that day. Our subpoena demanded audio and video tapes that you control of Courtroom 130 of the Moultrie Courthouse and the areas of Judge Edelman's chambers, the jury deliberation room, and the location where U.S. Marshals congregated in this matter on the days of May 28 and 29, 2024".

> "My clients have given your office three weeks since our conversation of September 6th to produce those tapes, and so far we have not received even a status report from you or any of your associates."

> "This non-response follows the same pattern of evasion that my clients and their co-defendant Stephen Sieber have experienced in trying through Chief Judge Josey-Herring to obtain the complete Webex audio and video tapes of Courtroom130 and adjacent areas on those days."

"All we have received in that effort were two <u>audio</u> excerpts on May 28th and miscellaneous <u>audio</u> excerpts on May 29th rather than complete the complete audio file for those days.  As for <u>video</u> tapes, we have received none from either you or Chief Judge Josey-Herring.  Those video tapes are very important in making clear what happened in that courtroom on those days

"If we do not receive word from you by close of business this Monday, September 30, 2024 that the audio and video tapes under your control will be delivered by this coming Wednesday, October 2, 2024, and if we do not in fact receive those tapes by that day, we intend to seek enforcement of our subpoena from the trial court.  if we do not obtain relief in that way, we will pursue other avenues available to my clients. If you or others think that this matter will just fade away with the passage of time, please know that it will not."

327.     After the repeated stonewalling, Mr. Hedgepeth misrepresented the truth to Mr. Lyle in his September 30, 2024, 1:05 PM final reply to Mr. Lyle when he stated:

"Please direct any inquiries to Mr. Harris. He can update you on the Courts efforts to comply with any request for Courtroom audio and video.  As for the May 28th and 29th video that you requested, it is not available. Our video retention period is only 30 days. Any video not archived before that date is no longer available. Your request came in August and hence June 29th would have been the last date for us to retrieve it."

328.     S. Sieber has been in contact with in-house General Counsel Adin Harris for months independent of the communications that Mr. Lyle was having with  Mr. Hedgepeth.

329.     Mr. Harris has represented to S. Sieber  that the security surveillance tapes subpoenaed by Defendant's Counsel Edward Lyle are available and stored in a long term achieve. Therefore, Mr. Hedgepeth is misrepresenting the truth by failing to provide the Court's security surveillance required by lawful subpoena.

330.     Plaintiffs are claiming in this 42 U.S Code § 1983 Complaint that there is a cover-up ongoing at the highest levels of the executive branch and judicial branches of government under color of law that is captured in the trial transcripts and caught on tape and that is why the Chief Judge and the Chief Security Officer refuse to turn over the evidence that will prove collusion between the D.C. Attorney General, and two of its judges.

331.    The public has a right to know if they can trust the D.C. Superior Court and the The D.C. Attorney General to conform to the Separation of Powers Doctrine embedded in the U.S. Constitution or are they colluding to violate the constitutional rights of D.C. Citizens at times of their choosing and political convenience. The trial transcripts and the audio and video tapes from both the web-ex recordings as well courthouse security tapes being unlawfully withheld  show the worst to be true.

### FIRST CLAIM

**Unconstitutional CPPA Law**
**Violation of First Amendment Free Speech**
**Violation of the Fourteenth Amendment Due Process**
**Violation of Fourteenth Amendment Equal Protection Under the Law**

*(Against The District Government and Government Officials Individually)*

332.    Plaintiff incorporates ¶ 1 through ¶ 331 by reference as if fully rewritten in this First Claim.

333.    Defendants at all times relevant to this action were acting under color of D.C. state law.

334.    D.C. Code § 28 3904 "It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged".  This CPPA provision is unconstitutional on its face under the First Amendment.

335.    Plaintiffs claim the language in D.C. Code § 28 3904 above is substantially overbroad and provides the D.C. Government with selective and unconstitutional enforcement discretion to bring lawsuits against D.C. merchants for legal First Amendment speech when no injury, damages, harm or loss to consumers has occurred, making the provision unconstitutional under the First and Fourteenth Amendments.

## CLAIM TWO

**Unconstitutional CPPA Law**
**Violation of First Amendment Free Speech**
**Violation of the Fourteenth Amendment Due Process**
**Violation of Fourteenth Amendment Equal Protection Under the Law**

*(Against The District Government and Government Officials Individually)*

336.     Plaintiff incorporates ¶ 1 through ¶ 335 by reference as if fully rewritten in Claim Two.

337.     Defendants at all times relevant to this action were acting under color of D.C. state law.

338.     D.C. Code § 28 3904 (e) "misrepresent as to a material fact which has a tendency to mislead." This CPPA provision is unconstitutional on its face under the First Amendment to the U.S. Constitution.

339.     Plaintiffs claim § 28 3904 (e) is substantially overbroad and provides the D.C. Government with selective and unconstitutional enforcement discretion to bring lawsuits against D.C. merchants when no injury, damages, harm or loss to consumers has occurred for legal First Amendment speech.  Fourteenth Amendment due process and equal protection under the law are also violated by § 28 3904 (e).

## CLAIM THREE

**Unconstitutional CPPA Law**
**Violation of First Amendment Free Speech**
**Violation of the Fourteenth Amendment Due Process**
**Violation of Fourteenth Amendment Equal Protection Under the Law**

*(Against The District Government and Government Officials Individually)*

340.     Plaintiff incorporates ¶ 1 through ¶ 339 by reference as if fully rewritten in Claim Three.

341.    Defendants at all times relevant to this action were acting under color of D.C. state law.

342.    D.C. Code § 28 3904 (f) "fail to state a material fact if such failure tends mislead".  This CPPA provision is unconstitutional on its face under the First Amendment to the U.S. Constitution.

343.    Plaintiffs claim § 28 3904 (f) is substantially overbroad and provides the D.C. Government with selective and unconstitutional enforcement discretion to bring lawsuits against D.C. merchants for words unspoken that cause no injury, damage, harm or loss to consumers and is unconstitutional under the First and Fourteenth Amendments.

## CLAIM FOUR

**Unconstitutional CPPA Law**
**Violation of First Amendment Free Speech**
**Violation of the Fourteenth Amendment Due Process**
**Violation of Fourteenth Amendment Equal Protection Under the Law**

*(Against The District Government and Government Officials Individually)*

344.    Plaintiff incorporates ¶ 1 through ¶ 343 by reference as if fully rewritten in Claim Four.

345.    Defendants, at all times relevant to this action, were acting under color of D.C. state law.

346.    D.C. Code § 28 3904 (f-1) "use innuendo or ambiguity as to a material fact, which has a tendency to mislead". This CPPA provision is unconstitutional on its face.

347.    Plaintiffs claim D.C. Code § 28 3904 (f-1) is substantially overbroad and provides the D.C. government with selective and unconstitutional enforcement discretion to bring lawsuits against D.C. merchants for legal First Amendment speech when no injury,

damages, harm or loss to consumers and is unconstitutional under the First Amendment and

Fourteenth Amendments.

## CLAIM FIVE

**Unconstitutional CPPA Law**
**Violation of First Amendment Free Speech**
**Violation of the Fourteenth Amendment Due Process**
**Violation of Fourteenth Amendment Equal Protection Under the Law**

*(Against The D.C. Government and Government Officials Individually)*

348.    Plaintiff incorporates ¶ 1 through ¶ 347 by reference as if fully rewritten in

Claim Five.

349.    Defendants at all times relevant to this action were acting under color of D.C.

state law.

350.    D.C. Code § 28 3904 (m) "harass or threaten a consumer with any act other

than legal process, either by telephone, cards, letters, or any form of electronic or social media."

CPPA § 28 3904 (m) is unconstitutional on its face.

351.    Plaintiffs claim § 28 3904 (m) is substantially overbroad and provides the D.C.

Government with selective and unconstitutional enforcement discretion to bring lawsuits against

D.C. merchants for legal First Amendment speech and therefore is unconstitutional on its face

under the First Amendment.

## CLAIM SIX

**Violation of First Amendment**
**Issuing a Knowingly False Press Release with Malice**

*(Against the D.C. Government, Government Officials Individually*
*and Kenneth Vogel Individually)*

352.    Plaintiff incorporates ¶ 1 through ¶ 351 by reference as if fully rewritten in

Claim Six.

353.     Defendants at all times relevant to this action were acting under color of D.C. state law.

354.     The D.C. Government, through OAG on July 31, 2024, issued a knowingly false press release with their CPPA Complaint attached to it ("Racine Press Release") about Plaintiffs, with malice, that violated the First Amendment rights of Plaintiffs to freedom from defamation when suppressing the true reputation and public image of Plaintiffs to hide their own unlawful conduct and not to protect the interests of consumers under the CPPA.

355.     Defendant Kenneth Vogel, with malice, conspired with the D.C. Government and Government Officials under color of law to issue the knowingly false Racine Press Release about Plaintiffs that violated the First Amendment constitutional rights of Plaintiffs to freedom from defamation to suppress the true reputation and public image of Plaintiffs through knowingly false statements of fact to hide their own unlawful conduct and not to protect the interests of consumers who incurred no injury, damages harm or loss because of Plaintiffs.

## CLAIM SEVEN

### Violation of First Amendment
### Conspiring to Publish Knowingly False News Articles with Malice

### *(The District Government, Government Officials Individually, American University, WAMU and Natalie Delgadillo Individually)*

356.     Plaintiff incorporates ¶ 1 through ¶ 355 by reference as if fully rewritten in Claim Seven.

357.     Defendants at all times relevant to this action were acting under color of D.C. state law.

358.     Defendants the District Government, Government Officials, American University, WAMU and Natalie Delgadillo conspired under color of law to publish the

knowingly false Delgadillo Article, with malice, about Plaintiffs that violated the First

Amendment Constitutional rights of Plaintiffs to freedom from defamation to suppress the true

reputation and public image of Plaintiffs and to hide its own unlawful conduct and not to protect

consumers because consumers incurred to injury, damages, harm or loss as a result of Plaintiffs.

## CLAIM EIGHT

### Violation of First Amendment Commercial Free Speech

### *(The District Government, Government Officials Individually,*
### *Kenneth Vogel Individually and ANGIE)*

359.    Plaintiff incorporates ¶ 1 through ¶ 358 by reference as if fully rewritten in

Claim Eight.

360.    Defendants at all times relevant to this action were acting under color of D.C.

state law.

361.    Defendant's Kenneth Vogel and ANGIE conspired with the D.C. Government

and Government Officials under color of law to illegally remove the PCS Profile Pages from

the ANGI and Home Advisor websites and the authentic PCS consumer ratings and reviews

posted by District consumers in violation of D. Sieber's constitutional right to commercial free

speech to promote the true PCS reviews of his company to the public.

362.    Special focus is given to facts pled in ¶ 49 through ¶ 69

## CLAIM NINE

### Home Invasion
### Violation of Fourth Amendment

### *(Against The D.C. Government, and Government Officials Individually)*

363.    Plaintiff incorporates ¶ 1 through ¶ 362 by reference as if fully rewritten in

Claim Nine.

364.    Defendants at all times relevant to this action were acting under color of D.C. state law.

365.    Special focus is given to facts pled ¶ 70 through ¶ 75 regarding Eighth Amendment violations of named Defendants.

## CLAIM TEN

### Violation of First Amendment Free Speech and Prior Restraint

### *(Against The D.C. Government, Government Officials and Associate Judge Jason Park)*

366.    Plaintiff incorporates ¶ 1 through ¶ 365 by reference as if fully rewritten in Claim Ten.

367.    Defendants at all times relevant to this action were acting under color of D.C. state law.

368.    In a February 2023 summary judgement Order, Judge Jason Park, who presided over the litigation earlier, held that the Precision Parties had threatened customers in a manner that violated D.C. Code § 28 3904 (m) by threatening to charge D.C. consumer Emmy Levens for work she did not pay for.

369.    Judge Park's Order violated the constitutional rights of Plaintiffs by infringing on Plaintiffs' First Amendment right to legal free speech, while also placing unlawful prior restraint on free speech by Plaintiffs in the future.

## CLAIM ELEVEN

### Violation of Eighth Amendment by Imposition of Unconstitutional Fines

### *(Against The D.C. Government, Government Officials, American University, WAMU, Natalie Delgadillo Individually and Associate Judge Juliet McKenna)*

370.    Plaintiff incorporates ¶ 1 through ¶ 369 by reference as if fully rewritten in

Claim Eleven.

371.    Defendants at all times relevant to this action were acting under color of D.C. state law.

372.     In her May 2, 2023, Sanctions Order, Judge McKenna violated the Eighth Amendment by issuing excessive fines in the amount of $20,804.96 to S. Sieber that was requested by AU / Delgadillo counsel Mr. Charles Tobin for having to file pleadings to quash the witness subpoena S. Sieber had lawfully served upon Ms. Delgadillo.

373.    No protective order was in place when Judge McKenna issued her sanctions against S. Sieber with no legal basis to order S. Sieber to pay money, as a punitive fine, in the amount of $20,804.96, for something he had a constitutionally protected right to do.

### CLAIM TWELVE

**Violation of Constitutional Right to a Fair Trial**
**Violation of Fifth Amendment Due Process**
**Violation of Seventh Amendment Due Process**
**Violation of Fourteenth Amendment Due Process**
**Violation of Fourteenth Amendment Equal Protection Under the Law**

*(Against The D.C. Government, Government Officials Individually, Associate Judge Todd Edelman and Associate Judge Juliet McKenna)*

374.    Plaintiff incorporates ¶ 1 through ¶ 373 by reference as if fully rewritten in Claim Twelve.

375.     Defendants at all times relevant to this action were acting under color of D.C. state law.

376.    In its pre-trial exhibit list, the Precision Parties listed the Racine Press Release, the Delgadillo Article, the Shirey Declaration and the Delgadillo declaration as defense exhibits to be presented at trial in support of their defense to show the jury those publications gave consumers supporting OAG's case reasons to fabricate their testimony.

377.    Both Judges McKenna and Edelman in pretrial hearings struck from the trial the Racine Press Release, the Delgadillo Article, the Delgadillo declaration and the Shirey declaration as irrelevant, which was an unlawful judicial act that violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial.

378.    Both Judges McKenna and Edelman in pretrial hearings violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights by quashing the witness subpoenas previously served upon Mr. Vogel, Mr. Racine, Mr. Shirey and Ms. Delgadillo, as well as other OAG personal, all of whom had direct communications with consumer witnesses and tampered with their trial testimony.

379.    Both Judges McKenna and Edelman violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial by quashing any testimony from D. Sieber to impeach the knowingly false statements that appeared in the Racine Press Release and Delgadillo Article that were read by testifying consumers.

380.    Judge Edelman violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights by allowing into evidence highly prejudicial and unredacted hearsay news articles "for the truth of the matter asserted" from 17 years earlier that had absolutely nothing to do with PCS or his son D. Sieber's business.

381.    Judge Edelman egregiously violated of the Fifth, Seventh, and Fourteenth Amendment rights of Plaintiffs by allowing previously struck exhibits into the trial and not allowing the fundamental right of cross-examination of a witness rising to the level of intentional judicial misconduct, incompetence and unconstitutional  malfeasance

382.    Judge Edelman admitting prejudicial NOI evidence "for the truth of the matter

asserted" and without a proper jury instruction regarding legal liability violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs to a fair trial.

383.    OAG counsel Kevin Vermillion cross examined *pro-se* litigant S. Sieber on subjects that had nothing at all to do with the direct testimony of S. Sieber that Judge Edelman allowed to continue after continuing objections from both S. Sieber and PCS Defense Counsel Edward Lyle that intentionally prejudiced the jury and violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs.

384.    Judge Edelman's overtly prejudicial rulings allowed forced questioning of S. Sieber about highly prejudicial and totally irreverent hearsay exhibits, none of which having anything to do with any CPPA violations of testifying witnesses, or the adjudication of CPPA claims against the Precision Parties, or the merits of the litigation which violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs.

385.    The closing arguments of Mr. Vermillion and Ms. Ulle to the jury consisted of reprehensible personal attacks that intentionally misrepresented the facts, evidence, and testimony, and then supplemented those falsehoods with repeated character assassination by generally attempting to convince the jury to find for OAG based on bad character rather than arguing the facts and evidence presented at trial of which acts violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs.

386.    Mr. Vermillion's venomous and unconstitutional closing argument claiming business models of deception, taking consumers money and doing nothing for it, claiming PCS bullied, threatened and harassed consumers is totally unsupported by any of the exhibits or testimony during the trial as Judge Edelman stood idly by after shutting down the closing

arguments of S. Sieber no less than 17 times, of which judicial malfeasance and misconduct grossly violated the Fifth, Seventh, and Fourteenth Amendment rights of Plaintiffs.

387.    Judge Edelman and OAG colluded to create the working draft of the jury instructions without the participation of Plaintiffs.

388.    Judge Edelman did not invite the Plaintiffs to provide to him with "Defendants Proposed Final Jury Instructions" found in Exhibit 13 of the joint pre-trial statement, but only OAG's Final Proposed Jury Instructions found in Exhibit 12 with redline updates, which violated Plaintiffs Fifth, Seventh and Fourteenth Amendment rights to a fair trial.

389.    The Court gave Plaintiffs no time to review the jury instructions and verdict form in the face of fierce objections from S. Sieber, a *Pro-se* litigant, regarding the last-minute intentional prejudice forced upon Plaintiffs by Judge Edelman on such a critical element of the trial as jury instructions and the verdict form options that violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs.

390.    S. Sieber, a *pro-se* litigant, was forced to approve the jury instructions and verdict form options against his will for something so critical to the outcome of the case as jury instructions and verdict form options, with one hour to approve them that violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs.

391.    The judicial malfeasance and highly prejudicial mindset of Judge Edelman rises to the level of incompetence that violated the Fifth, Seventh, and Fourteenth Amendment rights of Plaintiffs.

392.    OAG and Judge Edelman colluded to create unconstitutional verdict form working drafts without the participation of Plaintiffs that violated the Fifth, Seventh, and Fourteenth Amendment rights of Plaintiffs.

393.    Verdict form options from working drafts created by OAG and Judge Edelman given to the jury consisted of compounding, stacked and generalized claim form options so vague and confusing that it violated the Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs to a fair trial.

## CLAIM THIRTEEN

**Violation of Separation of Powers**
**Violation of Fifth Amendment Due Process**
**Violation of Seventh Amendment Due Process**
**Violation of Fourteenth Amendment Due Process**
**Violation of Fourteenth Amendment Equal Protection Under the Law**

*(Against The D.C. Government, Government Officials Individually, The D.C. Superior Court, Associate Judge Todd Edelman, Associate Judge Anita Josey-Herring and Thomas Hedgepeth Individually)*

394.    Plaintiff incorporates ¶ 1 through ¶ 393 by reference as if fully rewritten in Claim Thirteen with special focus on Claim Thirteen found in ¶ 277 through ¶ 331.

395.    Defendants at all times relevant to this action were acting under color of D.C. state law.

396.    Judge Edelman colluded with the Attorney General Brian Schwald and other Government Officials "Ex-parte" to allow agents from the U.S. Marshals Office to invade the jury deliberation area to tamper with jury deliberations with no notice to Plaintiffs.

397.    The OAG Motion to Protect Jurors, sent directly to Judge Edelman, caused him to ignore due process and violate the constitutional rights of Plaintiffs by giving OAG the green light, "Ex-parte" for U.S. Marshals to invade the jury deliberation area and escort jurors from the building for protection from Plaintiffs during jury deliberations, all this at the direction of OAG while a party in the case, and without notice to Plaintiffs.

398.    Plaintiffs filed a motion for a mistrial once the unlawful Ex-parte collusion was exposed and Judge Edelman denied the motion.

399.    On August 2, 2024, the Precision Parties filed a motion titled: "MOTION FOR THE ISSUANCE OF DEPOSITION SUBPOENAS, A DEFERRED EVIDENTIARY HEARING,AND SUSPENSION OF THE CURRENT PROCEEDING, based on the facts described in this Complaint.

400.    The Precision Parties had established a prima facie case for Ex-parte collusion and were entitled by their Fifth, Seventh and Fourteenth Amendment rights to an evidentiary hearing after the depositions of Deputy U.S. Marshal Kevin Spencer and other involved parties had been taken.

401.    On October 3, 2024, Judge Edelman issued an Order denying the Precision Parties Motion that led to the filing of this 42 U.S Code § 1983 Complaint.

402.    The Precision Parties immediately set out to get a copy of the web-ex video and audio that captured events in the normal course of  the court's business that would further document and prove the Ex-parte jury tampering claims pled in this Complaint.

403.    Chief Judge Anita Josey-Herring refused to provide the full audio and video tapes from the Web-ex system for the dates of May 28 and May 29, 2024, and participated in Ex-parte collusion between OAG and the Court to hide unlawful conduct ongoing between OAG, and Judge Edelman.

404.    The first request was made on July 26, 2024, at 4:46pm with Judge Josey-Herring stonewalling the turning over of the tapes for over 6 weeks that contained over 50 emails implying Judge Josey-Herring involved in a cover-up of Ex-parte collusion.

405.    Finally on September 6, 2024, Judge Josey-Herring turned over just 20 minutes

of audio and no video tapes of which response was horribly deficient to confirm what had actually taken place.

406.    The Web-ex  tapes provided appear to have been intentionally altered with remnants of  blurring and volume reduction present.  Even the small amount of content turned over by Chief  Judge Josey-Herring had to be digitally amplified, but verified many claims in this Complaint but with substantial sections edited out or deleted all together with no video at all provided.

407.    On August 16, 2024, Defendant's Counsel Edward Lyle issued a subpoena to Mr. Thomas Hedgepeth, Chief Security Officer for the D. C. courthouse, to turn over courtroom and chambers surveillance tapes for the dates of  May 28, and May 29, 2024 to prove the unlawful Ex-parte interaction with agents of OAG from the U.S. Marshals Office tampering with jury deliberations and the Ex-parte collusion between OAG and Judge Edelman through Deputy U.S. Marshal Kevin Spencer

408.    On September 29, 2024 at 8:24pm Defendants Counsel wrote to Mr. Hedgepeth, Chief Security Officer for the courthouse after being stonewalled and ignored for weeks after being served a subpoena to comply.

409.    Mr. Hedgepeth never complied with the subpoena and misrepresented the truth about the availability of Court surveillance audio and video tapes.

410.    Plaintiffs pled in this Complaint that the D.C. Superior Court, Judge Todd Edelman, Judge Anita Josey-Herring, Attorney General Brian Schwalb, the D.C. Government, DC Government Officials, and Chief Security Officer for the D.C. courthouse Thomas Hedgepeth are all conspiring to intentionally withhold evidence and therefore covering up intentional wrongdoing and Ex-parte collusion that violated and continue to violate the First,

Fifth, Seventh and Fourteenth Amendment rights of Plaintiffs and the Seperation of powers doctrine embedded in the U.S. Constitution.

## PRAYER FOR RELIEF

### Compensatory Damages

411.    Award compensatory damages as pled in the Claims section of this Complaint against all named Defendants jointly and severally, except for the Judicial Officers of the D.C. Superior Court who acted in their judicial capacity and are therefore immune from any compensatory damage award as it relates to this 42 U.S Code § 1983 Complaint.

### Punitive Damages

412.    Award punitive damages the jury concludes will punish Defendants for egregious conduct as pled in the Claims section of this Complaint that constitutes violations of a Plaintiff's constitutional rights, and to deter others from engaging in similar harmful behavior, except for Judicial Officers of the D.C. Superior Court who acting in their judicial capacity and therefore, immune from any punitive damage awards as it relates to this 42 U.S Code § 1983 Complaint.

413.    The Complaint alleges all Defendants acted with malice.

### Injunctive Relief

414.    Plaintiff seeks injunctive relief to be ordered by the Court that the Court finds appropriate to protect future constitutional violations by the District of Columbia and the D.C. Superior Court.

### Legal Fees

415.    Plaintiffs seek legal fees from all Defendants, including from the D.C. Superior Court judicial Defendants for the time and money spent litigating the matter currently at issue

in the D. C. Superior Court as well as all legal fees accrued as a result of this  42 U.S

Code § 1983 Complaint.

## JURY DEMAND

416.  Plaintiffs demand a trial on all issues triable of right by a jury in this matter.


Respectfully submitted,

*/s/ Stephen C. Sieber, Pro-se*

Stephen C. Sieber, author
1805 45th Street NW
Washington D.C 20007
*Email, marcostevie@gmail.com*
Phone 240- 432-3265


*/s/ Edward W. Lyle*

Edward W. Lyle, D.C. Bar 025700
1250 Connecticut Avenue N.W., Suite 700
Washington D.C. 20036
Tel: (202) 333-4280
Fax: (202) 333-4282
Email: *ewlyle@west1805.com*
*Attorney for Precision Contracting Solutions, LP*
*and Derrick Sieber, individually*


November 18, 2024