# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEPHEN SIEBER, *et, al* | * | |
| | * | |
| | * | Case No. 1:24-cv-03247 |
| v. | * | Hon. Ana C. Reyes |
| | * | 42 U.S C. § 1983 |
| | * | |
| THE DISTRICT OF COLUMBIA *et, al* | * | |

**PLAINTIFFS' OPPOSITION TO THE MOTIONS TO DISMISS OF: DISTRICT OF COLUMBIA–KARL RACINE–BRIAN SCHWALB–KEVIN VERMILLION LINDSAY MARKS–MARGARET ULLE–ADAM TEITELBAUM JENNIFER RIMM–TIMOTHY SHIREY–JENNIFER JONES KENNETH VOGEL–THOMAS HEDGEPETH KEVIN SPENCER–ANGI–ANGIE HICKS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES……………………………………………………………...*ii–v*

INTRODUCTION……………………………………………………………………... 1–3

STATEMENT OF FACTS…………………………………………………………… 4–28

CONSPIRACY UNDER COLOR OF D.C.LAW………………………………………. 28

LEGAL STANDARD……………………………………………………………… 29–30

ARGUMENT………………………………………………………………………...30–83

(1) The District of Columbia Government is Liable…………………………… 30–32

(2) The District Defendants Have No Immunity……………………………….32–35

(3) OAG Investigator Timothy Shirey Has No Immunity………………………36–37

(4) U.S. Deputy Marshal Kevin Spencer Has Absolute Immunity………………37–39

(5) Chief Security Officer Thomas Hedgepeth Has No Immunity……………….39–41

(6) The Rooker-Feldman Doctrine Does Not Apply……………………………..41–42

Count I. First Amendment Retaliation ……………………………………………42–46

Count II. Fifth Amendment Stigma Plus…………………………………………..46–59

Count III. First Amendment Commercial Speech………………………………...50–59

Count IV. Fifth Amendment Right to a Defense…………………………………...59–62

Count V. Fifth Amendment Right to a Fair Trial…………………………………..62–68

Count VI. Seventh Amendment Right to a Jury Trial ………………………………68–72

Count VII. Eighth Amendment Excessive Fines……………….................................72–74

Count VIII. Fourth Amendment Property Seizure……………………………………74–75

Count IX. CPPA Statutes That Violate the First Amendment ………………………..75–83

CONCLUSION……………………………………………………………………………..83

## TABLE OF AUTHORITIES

### CASES

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993)……………………………………......39
*Arizona v. Youngblood*, 488 U.S. 51 (1988)……………………………………………… 40, 67
*Armstrong v. Daily,* 786 F.3d 529 (7th Cir. 2015)………………………………………………40
*Ashcroft v. al-Kidd,* 563 U.S. 731 (2011)………………………………………………………34
*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)……………………………3, 28, 29, 31, 53, 56, 57, 68
*Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355 (1962)…………………69
*Atherton v. District of Columbia Office of the Mayor,* 567 F.3d 672 (D.C. Cir. 2009)……………30
*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003)…………………………………31
*Bay Area Laundry & Dry-Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*,
522 U.S. 192, 201 (1997)…………………………………………………………………45
*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)……………..3, 28, 29, 31, 32, 43, 56, 57, 68
*Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023)……………………………………………39
*Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)…………………………………………………56
*Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972)……………………………..73
*Borda v. Norfolk S. Ry. Co.*, 218 F. Supp. 2d 143 (D.D.C. 2002)……………………………..44
*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993)…………………………………...33, 35, 36, 37
*Butz v. Economou*, 438 U.S. 478 (1978)…………………………………………………………35
*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009)………………………………………67
*Cel-Tech Comm. Inc. v. L.A. Cell Tele Co.*, 20 Cal. 4th 163, 973 P.2d 527
Cal. Rptr. 2d 548 (1999)……………………………………………………………………78
*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980)………………79
*Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024)…………………………………………..44
*Christopher v. Harbury*, 536 U.S. 403 (2002)……………………………………………………40
*City of Houston v. Hill*, 482 U.S. 451 (1987)………………………………………………81, 82
*Consolidated Edison Co. of New York v. Bodman*, 449 F.3d 1254 (D.C. Cir. 2006)……………53
*Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000)………………………………31
*Dennis v. Sparks*, 449 U.S. 24 (1980)………………………………………………28, 34, 56, 62
*District of Columbia v. Carter*, 409 U.S. 418 (1973)……………………………………………37
*District of Columbia v. Precision Cont. Sol. L.P.,* 2019-CA-5047-B……………………...1, 30, 41
*Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. (2005)……………………41, 42, 67
*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)………………………………………76
*FTC v. Commonwealth Mkt. Group, Inc.*, 72 F. Supp. 2d 530 (W.D. Pa. 1999)…………………35
*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014)……………………………………………...35
*Firestone v. Firestone* 76 F.3d 1205 (D.C. Cir. 1996)……………………………………………30
*Foretich v. Glamour,* 753 F. Supp. 955 (D.D.C. 1990)…………………………………………..47
*Forrester v. White*, 484 U.S. 219 (1988)…………………………………………………………..39
*Franks v. Delaware*, 438 U.S. 154 (1978)………………………………………………………..72
*Grayned v. City of Rockford*, 408 U.S. 104 (1972)…………………………………………..76, 78
*Grayson v. AT&T Corp.*, 15 A.3d 219 (D.C. 2011)………………………………………………74
*Grosdidier v. Broadcasting Board of Governors*, 709 F.3d 19, 28 (D.C. Cir. 2013)………………67
*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)………………...42, 46, 59, 62, 68, 72, 74, 75
*Harlow v. Fitzgerald,* 457 U.S. 800 (1982)…………………………………………………30, 37, 40

*Hartman v. Moore*, 547 U.S. 250 (2006)……35, 43, 45, 46
*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984)…... 40, 46
*Houston v. Hill*, 482 U.S. 451 (1987)……81
*ICC v. Louisville & Nashville R. Co.*, 227 U.S. (1913)……61
*Imbler v. Pachtman*, 424 U.S. 409 (1976)……33
*Johnson v. City of Shelby*, 574 U.S. 10, (2014)……1
*Jones v. Delaney,* 610 F.Supp.2d 46 (D.D.C. 2009)……58
*Kartseva v. Department of State*, 37 F.3d 1524, 1527–28 (D.C. Cir. 1994)……49, 50
*Kolender v. Lawson*, 461 U.S. 352 (1983)……78
*Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271 (D.C. Cir. 1994)……29
*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004)……37
*Link v. Wabash R. Co.*, 370 U.S. 626 (1962)……66
*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)……60
*Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018)……35
*Meijer, Inc. v. Biovail Corp.,* 533 F.3d 857 (D.C. Cir. 2008)……30
*McDonough v. Smith*, 588 U.S. 109, (2019)……45, 49
*McLaughlin v. Bradlee,* 803 F.2d 1197 (D.C. Cir. 1986)……51, 52
*Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978)……30, 31
*Monroe v. Pape*, 365 U.S. 167 (1961)……42, 46, 59, 62, 68, 72, 74, 75
*Mooney v. Holohan*, 294 U.S. 103 (1935)……70
*Mullin v. Washington Free Weekly, Inc.,* 785 A.2d 296 (D.C. 2001)……47
*Nader v. McAuliffe,* 593 F. Supp. 2d 95, 99 (D.D.C. 2009)……51
*Napue v. Illinois*, 360 U.S. 264, 269 (1959)……70
*North Carolina v. Pearce*, 395 U.S. 711 (1969)……70
*Oparaugo v. Watts,* 884 A.2d 63, 73 (D.C. 2005)……47
*Orange v. District of Columbia,* 59 F.3d 1267 (D.C. Cir. 1995)……45, 49
*Owen v. City of Independence*, 445 U.S. 622 (1980)……31
*Paul v. Davis*, 424 U.S. 693, 710–12 (1976)……45, 49
*Payton v. New York*, 445 U.S. 573 (1980)……36
*Pearson v. Callahan*, 555 U.S. 223 (2009)……34
*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)……31
*Precision Contr. Sols., LP v. ANGI Homeservices*, *Inc* 415 F. Supp. 3d 113 (2019)……51, 54, 57
*Remmer v. United States*, 347 U.S. 227 (1954)……19, 47, 64, 72
*Renchard v. Prince William Marine Sales, Inc.*, 87 F. Supp. 3d 271, 285 (D.D.C. 2015)……27
*Saucier v. Katz*, 533 U.S. 194 (2001)……34
*Sieber v. Vogel* 2020 CA 001596 B……53, 54, 57
*Sindram v. Suda* 986 F.2d 1459 (D.C. Cir. 1993)……17
*Smith v. Goguen*, 415 U.S. 566 (1974)……78
*Soldal v. Cook County*, 506 U.S. 56 (1992)……72
*State v. Murdaugh*, Op. No. 28329 (S.C. May 13, 2026)……35
*Stephenson v. Cox*, 223 F. Supp. 2d 119 (D.D.C. 2002)……32
*Strumsky v. Wash. Post Co.*, 922 F. Supp. 2d 96 (D.D.C. 2013)……52
*Talavera v. Shah*, 638 F.3d 303 (D.C. Cir. 2011)……67
*Thornhill v. Alabama*, 310 U.S. 88 (1940)……81
*Toland v. Sieber, et al.,* Case No. 2016 CA 006458 B)……6, 58
*United States v. Agurs*, 427 U.S. 97 (1976)……37

*United States v. Harriss*, 347 U.S. 612 (1954)……………………………………………………77
*United States v. Morgan,* 313 U.S. 409 (1941)…………………………………………………...17
*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)………..76, 77
*Villaroman v. United States*, 184 F.2d 261 (D.C. Cir. 1950)……………………………………..61
*Wannall v. Honeywell International, Inc.,* 775 F.3d 425
(D.C. Cir. 2014)…………………………………………...3, 32, 34, 36, 53, 55, 58, 68
*Ward v. Rock Against Racism,* 491 U.S. (1989)…………………………………………………76
*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004)…………………………………...31
*Wearry v. Foster*, 33 F.4th 260 (5th Cir. 2022)……………………………………………………..35
*Williams v. United States*, 396 F.3d 412 D.C. Cir. 2005)…………………………………………38
*Yamaha Corp. of America v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992)………………..53

**STATUTES**

18 U.S.C. § 241 Conspiracy Against Rights……………………………………………………...19
28 U.S.C. § 1367(c)(3)……………………………………………………………………...53
42 U.S C. § 1983……………………………………….19, 31, 37, 39, 40, 41, 42, 49, 58, 67, 74
Cal. Civ. Code §§ 1761, 1770……………………………………………………………………77
California's Unfair Competition Law framework…………………………………………………..79
D.C. Code § 1-301.81(a)(1)…………………………………………………………………………30
D.C. Code § 28-3901……………………………………………………………………25, 77, 78, 79
D.C. Code § 28-3904………………………………………………………………………………..79
D.C. Code § 28-3904(e)…………………………………………………………….25, 26, 76, 77, 78
D.C. Code § 28-3904(f)……………………………………………….25, 26, 44, 76, 77, 78, 79, 80
D.C. Code § 28-3904(f-1)……………………………………………………………….25, 26, 76, 78
D.C. Code § 28-3904(m)…………………………………………………...27, 28, 76, 78, 81, 82
D.C. Code § 28-3909………………………………………………………………………………..30
D.C. Code § 28-3909(a)…………………………………………………………………………….71

**RULES**

Rule 2.11(A)(2)(c) of the Model Code of Judicial Conduct……………………………………18
Rule 2.9 The D.C. Code of Judicial Conduct……………………………………………………..14
Rule 3.3 The American Bar Association Model Rules of Professional Conduct, ………………..58
Rule 12(b)(6)………………………………………………………...29, 30, 32, 48, 53, 58, 68
Rule 21 D.C. Court of Appeals Writ of *Mandamus* Petition……………………………………19
Federal Rule of Civil Procedure 37(e)(2)…………………………………………………………66
Federal Rule of Civil Procedure 41(b)……………………………………………………………53
Rule 65 of the D.C. Superior Court Rules of Civil Procedure……………………..2, 22, 23, 24, 73
Fed. R. Evid. 611(b)…………………………………………………………………………….61
Rule, 819 F.3d 444, 450 (D.C. Cir. 2016)………………………………………………………...80

## INTRODUCTION

As a threshold matter, Plaintiffs mistakenly cite the Fourteenth Amendment under Count Headings II, IV, V, VIII and IX in Plaintiffs' Second Amended Complaint ("SAC"). Plaintiffs respectfully request the Court and Defendants apply the Fifth Amendment under Count Headings II, IV and V, apply the Fourth Amendment to Count Heading VIII and remove the Fourteenth Amendment from Count Heading IX, *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014).

At a hearing on February 26, 2026, the Court encouraged the parties to settle this case: *"It is ridiculous, beyond ridiculous you all are in my courtroom today. Figure it out. This is the last time I'm giving you this lecture. The next time, if we're still all here in front of me, then we're all off to the races. All right?"* (Hr'g Tr. 23 : 1–5, Feb. 26, 2026) Pursuant to the Court's directive, Plaintiffs emailed counsel for Defendants on February 26, May 7 and May 13, 2026, requesting a settlement conference to resolve the case with no response at all, no emails, no phone calls or even the courtesy of a reply to settlement conference offers. Therefore, Plaintiffs now oppose the motions to dismiss of Defendants in this consolidated Opposition. (¶ symbols within the Opposition refer to the paragraphs in the SAC)

At its core, the SAC pleads First Amendment retaliation and pretextual bad faith enforcement by the Office of the Attorney General for the District of Columbia, ("OAG") using the D.C. Consumer Protection Procedures Act, ("CPPA") as a tortious weapon in *District of Columbia v. Precision Contracting Solutions L.P. et al,* 2019-CA-5047–B, ("D.C. litigation"). OAG's constitutional violations were in concert with Superior Court judges and private actors in a targeted bad faith conspiracy under color of D.C. law that was continuous from July 31, 2019, until December 18, 2024, when a final order and judgment was entered in the D.C. litigation by Superior Court Judge Todd E. Edelman.

As part of Defendants' years long retaliation, OAG and its co-conspirators made ongoing stigmatizing statements to third parties apart from their press release and lawsuit, this after coordinating the removal of Plaintiffs' business profile with over one–hundred–seven verified five-star consumer reviews from the ANGI and HomeAdvisor websites. These constitutional violations were just the beginning. Plaintiffs were systematically denied fundamental due process in the D.C. litigation; including the right to present a central defense, to have key witnesses testify at trial, to have their theory of the case heard by the jury and to have OAG's knowingly false press release adjudicated on its merits as law of the case. Plaintiffs were also denied the right to a name clearing hearing, a fair trial, and the right to be free from judicial and prosecutorial misconduct that included *ex parte* jury tampering, destruction of evidence and the fabrication of consumer declarations for a knowingly unlawful purpose.

As the conspiracy progressed, all the catastrophic consumer injury claims found in OAG's press release and lawsuit were dismissed from trial for the simple reason they never existed. OAG, to this day, has never disputed that the statements in their press release and lawsuit were knowingly false when published, of which failure to deny continues in their motion to dismiss in this Court. After the dismissal of all consumer injury claims, OAG preceded to trial on technical violations of the CPPA that involved no consumer injury.

Defendants' conspiratorial actions culminated in a sweeping final judgment against Plaintiffs on December 18, 2024, that included $2,967,364.24 in consumer restitution, civil penalties, legal fees and a permanent employment ban without a mandatory Superior Court Rule 65 hearing before banishing Plaintiffs from their chosen profession. All this despite no injury-in-fact to consumers and PCS's sterling A+ Better Business Bureau consumer satisfaction rating for ten consecutive years and during all relevant times of the litigation.

The millions of dollars in financial penalties and permanent employment ban were not imposed by the jury, who found only minor technical violations of the CPPA after being tampered with during its deliberations. The bad faith restitution, fines and legal fees were rather imposed by conflicted Superior Court Judge Todd E. Edelman, who was caught with OAG in an *ex parte* jury tampering scheme that was admitted in the transcript record by Judge Edelman himself. As Plaintiffs' Opposition reveals, Judge Edelman intentionally misrepresented the findings of the jury when dreaming up his own fictitious consumer injury as a means of retaliation for Plaintiffs' uncovering the jury tampering plot. This 42 U.S.C. § 1983 Complaint seeks to remedy years of bad-faith retaliation, a rigged trial and years of ongoing stigma levied upon Plaintiffs, in concert with other constitutional violations that ran roughshod through the D.C. Superior Court trial disgracing the United States Constitution.

Tellingly, Defendants motions to dismiss do not dispute the plausibility of the nine counts in the SAC, including the detailed conspiracy claims other than sparse legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Instead, Defendants' motions to dismiss rest on affirmative defenses. Under established federal pleading standards, Defendants' unified failure to address the plausibility of well-pled constitutional violations and conspiracy claims constitute a waiver for the Rule 12(b)(6) phase of the case, *see Wannall v. Honeywell International, Inc.,* 775 F.3d 425, 428 (D.C. Cir. 2014). Plaintiffs' Opposition exposes a steady stream of retaliation, conspiracy and continuing constitutional violations over a five-year period with the chain of causation never broken.

Because Defendants' constitutional violations and tortious conspiracy was relentless, calculated and now unopposed as to plausibility, all Defendants' motions to dismiss must be denied and they must now answer for their years of willful animus and pre-textual bad faith.

## STATEMENT OF FACTS

Precision Contracting Solutions L.P., ("PCS") was a licensed general contractor in the District of Columbia for thirteen consecutive years beginning in 2007 until 2020, and Derrick Sieber, (D. Sieber") was a licensed home improvement salesman for PCS during that same period. ¶ 32. PCS maintained an A+ rating at the Better Business Bureau ("BBB") for ten consecutive years beginning in 2010, with only one consumer complaint at the BBB and Department of Consumer and Regulatory Affairs ("DCRA") during PCS's thirteen-year business history. ¶33. Stephen Sieber, ("S. Sieber) had no ownership or management authority within PCS and is the father of D. Sieber and a professional musician and recording artist known by his stage name "Stevie Marco" promoted on his records and live performances. ¶ 34.

On July 31, 2019, the Office of the D.C. Attorney General ("OAG") issued a press release with their lawsuit attached to it against PCS, its owner D. Sieber and S. Sieber, ("Precision Parties") ¶ 56, that was signed by then D.C. Attorney General Attorney Karl A. Racine ("A.G. Racine") as the chief law enforcement officer and policy maker for the District of Columbia. ¶ 344. The press release and lawsuit contained eight false, defamatory and stigmatizing statements of fact about the Precision Parties, ¶¶ 53–78, claiming D.C. consumers had been catastrophically injured by them. ¶¶ 62–76.[1] OAG has never disputed, even in its

---

[1] **OAG False Statement One:** "[PCS] leaves jobsites unsecured resulting in consumer homes being trespassed and burglarized" ¶ 62. **OAG False Statement Two:** "Defendants violations of the Construction Code has also resulted in damage to neighboring properties. In one example during a basement renovation of a Consumers' property, Defendants damaged the neighboring property by failing to perform underpinning which resulted in water damage to the neighbor's basement and foundation" ¶ 64. **OAG False Statement Three:** "In another example, Defendant's construction work caused the foundation of the neighboring property to shift, causing major cracks in the walls. Residents of the neighboring properties were evacuated" ¶ 66. **OAG False Statement Four:** "DCRA inspected the property and issued a Stop Work Order that resulted in a Notice of Infraction being issued by DCRA. DCRA determined that renovation work had been performed (i) without the required permits, (ii) that failed to maintain proper

motion to dismiss here, that the false and defamatory statements published by OAG were knowingly false. ¶¶ 55, 61. Judge Juliet McKenna on May 8, 2023, based on a motion filed by the Precision Parties in the D.C. litigation, issued an order dismissing all damage claims to consumers without objection from OAG. ¶ 219. At trial, the jury found no injury-in-fact, damage or financial harm to consumers. ¶¶ 220, 316.

A.G. Racine instituted a policy within OAG and the D.C. Government not to remove any false and defamatory public statements once published on the OAG website and to remain silent regarding any requested name clearing hearings in the Superior Court. ¶ 344. On November 2 and November 4, 2021, S. Sieber sent a demand notice to OAG to remove the false and defamatory content from OAG's website that was causing career ending damage, ¶ 111, which OAG ignored, and which remains on the internet today. ¶ 112. https://oag.dc.gov/release/ag-racine-sues-precision-contracting-solutions.

A new D.C. Attorney General was elected on November 8, 2022, Mr. Brian Schwalb, ("A.G. Schwalb") who carried on the policy making and enforcement decisions of A.G. Racine regarding the D.C. litigation, including administrative and investigative actions targeted at the

construction safeguards, (iii) failed to protect the adjoining property, and (iv) failed to comply with proper site treatment under the Construction Code" ¶ 68. **OAG False Statement Five:** "In 2017, PCS entered into a contract with a homeowner for a full renovation of their property. Two years later, and after the full sums requested by PCS had been paid, the consumer was left with an unfinished property and PCS continued to demand sums far in excess of the original contract to complete the project" ¶ 70. **OAG False Statement Six:** "Defendant S. Sieber previously did business as Sieber Contracting Solutions where he was barred by the Montgomery Office of Consumer Affairs for operating as a contractor for false advertising, inferior workmanship, operating businesses under corporate charters that had been revoked by the State of Maryland and falsely stating that he employed registered and certified engineers in his firm" ¶ 72. **OAG False Statement Seven:** "PCS often performed work outside of a permit's scope when they obtained permits at all, employed unlicensed subcontractors, and performed work that was illegal, unapproved, or lacked required inspections" ¶ 74. **OAG False Statement Eight**: "Our office has received more than a dozen complaints about the company's shoddy construction work, which left District homes in varying states of disrepair," ¶ 76.

Precision Parties. ¶¶ 345–47. The OAG Defendants are listed in ¶¶ 12–20 of the SAC and operated as a cohesive unit within OAG. Mr. Vermillion, Ms. Marks and Ms. Ulle were the trial lawyers, while Ms. Jones, Mr. Teitelbaum and Ms. Rimm were case supervisors responsible for the actions of the trial lawyers. Timothy Shirey was an OAG investigator working at the direction of case supervisors. ¶ 37. A.G. Racine or A.G. Schwalb directed and approved all actions taken in the D.C. litigation by OAG lawyers as official policy makers for the District of Columbia. ¶¶ 344–49. All Defendants including the OAG Defendants are being sued in both their individual and official capacities. ¶¶ 11–30.

**First Amendment Retaliation**

Defendant Vogel, back in 2016, filed a Verified Complaint in D.C. Superior Court masquerading as his client Lamar Toland *"Pro-se,"* claiming in his ghost-written Complaint that both D. Sieber and S. Sieber were shills planting fake consumer reviews on the HomeAdvisor website. (*Toland v. Sieber, et al.,* Case No. 2016 CA 006458 B)

> **Paragraph 26 in the Toland Verified Complaint**: "Defendants Sieber and Marco [S. Sieber] are believed to have planted fake and misleading online reviews of their company on homeadvisor.com through the use of "shills" in order to induce consumers to enter into home renovation contracts. The creation of false online reviews is an intentional act, calculated to deceive the public as to PCS's skills, integrity, and business reputation" ¶ 80.

Mr. Vogel's Verified Complaint, pretending to be Mr. Toland *Pro-se,* was dismissed by Superior Court Judge John Mott in 2017 when Mr. Vogel admitted in open court that he had no evidence to support claims that D. Sieber and S. Sieber were planting fake reviews. ¶ 85. Undeterred, Mr. Vogel, in 2018, took his dismissed Verified Complaint to OAG, claiming again the Precision Parties were planting fake consumer reviews on the HomeAdvisor website, this in an effort to leverage Mr. Toland's ongoing commercial real estate arbitration dispute with PCS.

¶¶ 79, 86. In addition to presenting his dismissed lawsuit to OAG, Mr. Vogel also claimed he would be representing D.C. consumers who had suffered catastrophic injury to their properties and finances at the hands of the Precision Parties. ¶¶ 62, 64, 66, 68, 70, 72, 74, 76, 87. Based on Mr. Vogel's false claims of planting fake reviews and destroying consumer properties to the point of evacuation, OAG launched a CPPA investigation into the Precision Parties in October of 2018. ¶ 88. On October 16, 2018, OAG Investigator Timothy Shirey was assigned to serve a document subpoena where S. Sieber resides. ¶ 42. Mr. Shirey entered the private residence without a warrant, forcing entry through the front door causing property damage and a loud noise during his break-in. ¶ 43. Another resident of the property, Mr. Michael Haws, was in the kitchen at the time and heard the door slam open and went to investigate and found Mr. Shirey standing in the foyer of the residence. ¶ 44. S. Sieber and D. Sieber were upstairs and heard the same loud noise and came downstairs to investigate, finding Mr. Shirey in the foyer with Mr. Haws. S. Sieber asked Mr. Shirey how he got into the house ¶ 45. Mr. Shirey did not answer the question and stated he was from OAG and serving a documents subpoena pursuant to an investigation OAG had opened into the Precision Parties. ¶ 46. Mr. Shirey pointed his finger at S. Sieber and stated, "your time has come" and instructed the documents subpoena be delivered to Mr. Lyle, PCS counsel, and then Mr. Shirey left. ¶ 47. Mr. Lyle and S. Sieber contacted OAG and spoke to Assistant A.G. Richard Rodriguez to report the Shirey break-in and demanded Mr. Shirey be removed from any PCS investigation for his criminal conduct. OAG refused. ¶ 48.

Following OAG's refusal, S. Sieber filed criminal Complaints with the District of Columbia Metropolitan Police Department ("DCMPD") against investigator Shirey and A.G. Karl Racine for covering up Mr. Shirey's criminal conduct. ¶ 49. S. Sieber later went down to the DCMPD and was informed the department would not be investigating because the Complaint

was against A.G. Racine and one of his employees. ¶50. After these criminal Complaints were made, OAG filed its lawsuit and press release containing knowingly false statements. ¶¶ 51–79.

**Fifth Amendment Stigma-Plus**

The "**Stigma**" consists of OAG making continuing false and stigmatizing statements for years that damaged Plaintiffs' reputation, good name, honor and integrity in the public domain using their press release and lawsuit as a reference. ¶¶ 53, 63–78, 112. The stigmatizing slander continued verbally to third parties, including existing PCS customers, throughout the life of the D.C. litigation. Mr. Shirey contacted PCS customers as an investigator, ¶ 351, and Mr. Vogel as a private attorney repeated the knowingly false statements found in the OAG press release. ¶¶ 80, 89, 91, 363–65. They did this by using PCS contracts turned over by subpoena and PCS yard signs to entice PCS customers, in exchange for restitution recovery and contrived consumer testimony at trial. ¶351. OAG has never denied that its public statements were in fact false, ¶¶ 55, 61, nor have Mr. Shirey and Mr. Vogel made any such denials in their motions to dismiss.

OAG's Complaint was a "shotgun pleading" making it impossible for the Precision Parties to know which consumer injury claims applied to who, with OAG refusing to identify so-called injured consumers by name in its lawsuit. ¶ 57. On August 19, 2019, the Precision Parties filed a motion in the Superior Court for a more definitive statement, which was denied, leaving the Precision Parties in the dark as to "who had alleged what" regarding injury to consumers. ¶ 58. In its answer to the OAG Complaint, the Precision Parties denied all claims and filed counterclaims to clear their good name as well as an unclean hands affirmative defense based on pretextual bad faith and the knowingly false statements in OAG's press release and lawsuit. ¶ 59. OAG published its false statements because Mr. Vogel had approached OAG in 2018 making the same false claims to leverage his client's ongoing commercial real estate arbitration with PCS.

¶¶ 79–88. At the time of Mr. Vogel's contact with OAG, PCS had 54 "five-star" consumer ratings and reviews on the HomeAdvisor website, 51 five-star ratings and reviews on ANGI, and dozens more five-star reviews on DCRA's consumer ratings portal and on Google. ¶ 83. These combined 140 reviews posted by D.C. consumers had an average star rating of 4.8 out of a possible 5 stars, including an A+ rating at the Better Business Bureau ("BBB") for ten consecutive years posted on PCS's business profile on HomeAdvisor and ANGI, reflecting the sterling consumer satisfaction history of PCS in the D.C. community over a thirteen-year period licensing period. ¶ 84.

Mr. Vogel began offering satisfied PCS customers legal representation, including Mr. Sam Preston, located several blocks from Mr. Vogel's office, pitching restitution recovery under CPPA remedies based on Mr. Vogel's claims of fraudulent PCS postings on HomeAdvisor and PCS's shoddy workmanship. ¶ 89. Mr. Vogel also began approaching PCS customers who had job signs in their yards to generate income for his law firm at the expense of the PCS reputation in the community. ¶ 90. Mr. Vogel also contacted existing PCS customers who ultimately testified at trial, including Vicky More and Emmy Levens, with Mr. Vogel wrongfully alarming them that PCS was defrauding D.C. consumers and destroying homes and the homes of their neighbors. ¶ 91. Mr. Vogel avoided discovery in the D.C. litigation using claims of the Attorney Client Privilege, but as it turned out no consumer ever retained Mr. Vogel for legal services. Mr. Vogel, however, remained an avid co-conspirator throughout the entire D.C. litigation. ¶ 92.

In 2017 ANGI purchased HomeAdvisor and assumed operational control of the company under the ANGI umbrella with its founder Angie Hicks responsible for relationships with OAG in her role as "Chief Consumer Officer" ¶ 93. PCS paid ANGI and HomeAdvisor over $300,000 for leads of consumers who were interested in renovation services from 2012 until 2019,

consistent with the ANGI revenue model and contractual agreements between the parties in a win–win business relationship. ¶ 94. The PCS ratings and reviews posted on both ANGI and HomeAdvisor were true and verified by ANGI through a well-designed system using direct email communications that connected consumers who posted reviews with ANGI corporate verification teams. ¶ 95. Both Mr. Vogel and OAG contacted ANGI requesting an investigation into all PCS consumer ratings and reviews to verify the reviews were truthful and not misleading. ¶ 96. Also, OAG did its own independent investigation using consumer contracts turned over during discovery to contact PCS consumers to verify they had posted legitimate ratings and reviews about PCS on the HomeAdvisor and ANGI websites. ¶ 98. The Precision Parties became aware of these investigations through first-hand communications with PCS customers who notified D. Sieber to inform him that OAG, Home Advisor and ANGI were investigating ratings and reviews posted by D.C. consumers about PCS. ¶¶ 97–9.

After intense investigations by both OAG and ANGI, all PCS ratings and reviews posted on ANGI, HomeAdvisor and on the DCRA consumer ratings portal were found to be true and authentic consumer postings and were in no way misleading. ¶ 100. This information was learned through first-hand communications between D. Sieber and PCS HomeAdvisor representative “Shay” and “Ryan Kendal” who oversaw the HomeAdvisor national program, and from feedback from PCS customers who were being contacted during these investigations. ¶ 101.

On August 5, 2019, HomeAdvisor representative Shay emailed D. Sieber to call HomeAdvisor to discuss why the PCS business profile and its 107 consumer ratings and reviews posted on HomeAdvisor and ANGI had been removed. ¶ 102. On August 6, 2019, both D. Sieber and S. Sieber participated in a conference call with Shay who informed them that ANGI

upper management had permanently removed the PCS business profile and consumer reviews at OAG's public interest request. ¶ 103.

The Meeting of the Minds: Once OAG, ANGI and Mr. Vogel realized the PCS ratings and reviews were authentic consumer postings and not misleading, an agreement was made to remove the PCS business profile and the 107 five-star D.C. consumer reviews from the ANGI and HomeAdvisor websites anyway. This was to occur shortly after the OAG lawsuit was filed and the press release published online. ¶ 104. The conspiracy to remove PCS's public profile and legitimate D.C. consumer reviews was essential to the co-conspirators plan because those glowing consumer reviews flew in the face of the massive consumer injury claims that OAG and Mr. Vogel were promoting over the internet and in person. ¶¶ 87–91,105–08, 351.

The unlawful conspiracy involved a one–two punch, (1) OAG would publish knowing false claims of massive consumer injury that did not exist in their press release and lawsuit about the Precision Parties and, (2) A few days later PCS's business profile and reviews would be removed by ANGI at the direction of OAG's public interest request, ¶ 103, authorized by Angie Hicks. ¶ 107. This one–two punch gave the false impression that PCS had posted fake reviews, supported by OAG's false claims of catastrophic consumers injury published on the internet as the only public information available about PCS and the Precision Parties. ¶ 108. This meeting of the minds and coordinated bad faith attack by OAG also involved private actor co-conspirators ANGI, Angie Hicks and Mr. Vogel that was designed to defame and stigmatize Plaintiffs under color of D.C. law. ¶ 109.

The **"Plus"** On December 18, 2024, Superior Court Judge Todd E. Edelman ordered a permanent employment ban against the Precision Parties in furtherance of Defendants' conspiracy that completed Plaintiffs' actionable stigma–plus claim. ¶¶ 258–59, 339–40.

**First Amendment Commercial Speech**

On August 5, 2019, in furtherance of the conspiracy to violate Plaintiffs' First Amendment commercial speech rights, OAG, ANGI, Angie Hicks and Mr. Vogel, in a deliberate and collaborative censorship of truth, agreed to, and did, remove the PCS business profile and the 107 five-star ratings and reviews posted by D.C. consumers from both the ANGI and HomeAdvisor websites because they were in direct conflict with the false statements in OAG's July 31, 2019, lawsuit and press release published on the internet from OAG's website. ¶ 122.

Truthful, non-misleading consumer reviews are classified as protected commercial speech because they describe commercial transactions and influence consumer behavior. ¶ 123. When OAG, in collusion with ANGI, Angie Hicks and Mr. Vogel, agreed to remove truthful and non-misleading reviews, its conspiracy to violate commercial First Amendment speech interfered with the commercial marketplace relied upon by consumers and the Precision Parties. ¶ 124. Although OAG did not have the ability to remove the consumer ratings and reviews from commercial websites, OAG exerted its political influence to convince ANGI to remove truthful, non-misleading consumer reviews to prop-up OAG's knowingly false statements in its press release and lawsuit promoted over the internet and hosted on the OAG website. ¶ 125.

The consumer reviews on HomeAdvisor and ANGI were posted about PCS, a reputable and licensed business that provided construction services to D.C. consumers. ¶ 127. Co-conspirators OAG, ANGI, Angie Hicks and Mr. Vogel had no valid reason to restrict Plaintiffs' First Amendment commercial speech rights because the restriction was not geared to the public interest, but rather to allow OAG's false and defamatory lawsuit and press release to stand alone as the only information about the Precision Parties on the internet. ¶ 128.

Protecting a knowingly false government press release and bad faith lawsuit from truthful public rebuttal based on authentic consumer reviews is not a legitimate District of Columbia or federal interest under the First Amendment. ¶ 129. The removal did not advance consumer protection but rather defeated it, and in doing so violated the right of consumers to receive authentic marketplace information. ¶ 130. OAG's press release with its lawsuit attached was used as an anchor for ongoing person-to-person slander to third parties, including PCS customers and to further stigmatize the Precision Parties up to and after a final order in the D.C. litigation was issued by Judge Todd Edelman on December 18, 2024. ¶¶ 254–59.

**Fifth Amendment Right to a Defense**

Superior Court Judges McKenna and Edelman struck OAG's press release, lawsuit and associated witnesses from the Precision Parties defense and theory of their case regarding the press releases falsity, bad faith, lack of supporting evidence and motives needed to show the jury OAG had acted in pretextual bad faith. ¶ 133–44. Judges McKenna and Edelman also refused to hold a name-clearing hearing on the merits of the stigma after being repeatedly requested to do so, including during in-limine conferences held on March 30, 2023, April 5, 2023, and on May 6, 2024, to clear the Precision Parties names prior to trial. ¶ 135.

OAG's online press release influenced witnesses and jurors, as testified by OAG consumer witness Richard Sobiecki, who stated under oath that he believed the statements he read that were published by OAG which led him to conclude PCS was a "shady operation" ¶ 137. Plaintiffs, however, were precluded by court order from exposing the falsity of the press release and Complaint in front of the jury through cross-examination of Mr. Sobiecki about the truthfulness and motives behind its publication. ¶¶ 133. The exclusion of the press release and witnesses central to the defense-in-chief of the Precision Parties, combined with the repeated

denial by Judges McKenna and Edelman to adjudicate the truth of the press release on its merits in a name-clearing hearing, prevented the Precision Parties from exposing OAG's pre-textual bad faith lwasuit in front of the jury at trial. ¶¶ 143–44.

__**Fifth Amendment Right to a Fair Trial**__

On the morning of May 28, 2024, OAG filed an "Emergency Motion" in the D.C. litigation while the jury was deliberating titled on the docket as: "*Motion for order preventing any party to this matter from harassing jurors after a verdict has been returned, both inside and outside the courthouse*" ¶ 147. ("Emergency Motion to Protect Jurors")

After receiving notice of OAG's Emergency Motion to Protect Jurors via his cell phone, S. Sieber returned to Judge Edelman's courtroom 130, unnoticed, while the jury was deliberating and took a seat within earshot of the courtroom clerk located next to where Judge Edelman presides. ¶ 148. S. Sieber witnessed Deputy U.S. Marshal Kevin Spencer ("Marshal Spencer") informing Judge Edelman's clerk, Mr. Dawayone Lee ("Mr. Lee") that Deputy U.S. Marshals would be escorting jurors from their deliberations pursuant to orders from OAG, a party in the case, without notice to the Precision Parties, a hearing or a court order. ¶150. Marshal Spencer asked Mr. Lee if Judge Edelman was in his chambers and Mr. Lee said *"yes"* ¶ 151. Marshal Spencer stated: *"I'm just going to give him a heads up"* and exited the courtroom to speak to Judge Edelman, creating additional *ex parte* contact between OAG, Marshal Spencer and Judge Edelman, while leaving the Precision Parties in the *ex-parte* dark. ¶ 152.

The D.C. Code of Judicial Conduct Rule 2.9 prohibits *ex parte* contact between a presiding Judge and OAG, a party in the case, using Deputy Marshals. ¶ 153. Once Marshal Spencer exited the courtroom into the chambers area, S. Sieber approached courtroom clerk Mr. Lee as to what he had witnessed. Mr. Lee explained that OAG had ordered the Deputy Marshals

to escort the jury from their deliberations. ¶ 154. That evening, on May 28, 2024, Plaintiffs filed an Opposition to OAG's Emergency Motion to Protect Jurors, stating there was no reason for OAG to file such a motion because Plaintiffs had never made any contact with the jury and the jury had never complained to anyone about the Precision Parties. ¶ 155. Plaintiffs demanded an instant mistrial in open court and in motions filed later that night on May 28, 2024. The next day, on May 29, 2024, while the jury was still deliberating, the Precision Parties raised the *ex parte* contact and jury tampering incidents with Judge Edelman again, as documented in the trial transcripts. In ¶¶ 158–59 below from the official court transcripts, Judge Edelman informed the Precision Parties from the bench that it was OAG or the Attorney General himself who had commanded the Deputy Marshals to escort the jury:

> MR LYLE: *"Well, why are the Marshals there."* ¶ 158.
>
> JUDGE EDELMAN: *"The marshals were -- again, were here at the request of the Office of the Attorney General or the Attorney General"* ¶ 159.

S. Sieber informed Judge Edelman that he witnessed Deputy Marshals interacting with the jury when courtroom clerk Mr. Lee exited the courtroom into the jury deliberation area.

> JUDGE EDELMAN: *"when you say interacted, what do you mean?* ¶ 161.
>
> S. SEIBER: *"Spoke with them"* ¶ 162.
>
> JUDGE EDELMAN: *"I don't think that that is correct. We can -- again, we're not going to resolve this now. If you want to raise an issue, we can do it post-trial, if necessary. Why -- let me ask you this: How did you even --they're behind a door"* ¶ 163.

In ¶ 164 below S. Sieber made sure that Judge Edelman was noticed on the record that security cameras would have captured Deputy Marshals speaking to the jury.

> S. SEIBER: *What happened is the door opened, there was three marshals right there, and the jury together and there was some, you know, like, looks and -- you got cameras back there, you can see it"* ¶ 164.

In ¶ 166 below, Judge Edelman admits on the record he was directly involved in the *ex-parte* decision to allow Deputy Marshals to escort the jury from their deliberations.

> JUDGE EDELMAN: *"I agree with you that the party asking the marshals to escort the jury and the marshals doing that is problematic. I agree with you 100 percent on that. Essentially, if I weren't involved in that decision, that would be -- I agree with you on that,"* ¶ 166.
>
> S. SIEBER: *"But what about them talking to each other."* ¶ 168.
>
> JUDGE EDELMAN: *"Them talking, I guess, beyond more than chatting, if it was just like a hello as they came into -- it couldn't have been anything substantiative if they were walking with -- they came in 30 seconds after they left the room"* ¶ 169.
>
> S. SEIBER: *"We don't know what was said, Your Honor"* ¶ 170.
>
> JUDGE EDELMAN: *"True"* ¶ 171.
>
> MR. LYLE: *"From my understanding it was there was some interaction as the jurors came out. The logical question would be what's going on. If the marshal, some marshal said OAG asked us to come in, then there's a problem, because there's an inference that OAG is doing this to protect them against us."* ¶ 173.
>
> JUDGE EDELMAN: *"What are you requesting"* ¶ 174.
>
> S. SIEBER: *"A mistrial"* ¶ 175.

**The Webex Tapes.**

Plaintiffs' SAC named former Superior Court Chief Judge Anita Josey-Herring and current Chief Judge Milton C. Lee Jr. as Defendants in the SAC. One of the administrative functions of the Chief Judge is to handle requests from litigants to obtain access to Webex recordings that document video and audio activity in the Courtroom. ¶177. The audio and video

conversations between courtroom clerk Mr. Lee and Marshal Spencer were captured on Webex as well as the conversation between S. Sieber and courtroom clerk Mr. Lee. ¶¶ 150–52.

Finally, on September 12, 2024, three and a half months after requested, Chief Judge Josey-Herring turned over just 20-minutes of fragments of audio recordings from the 16 hours requested with no video tapes turned over at all. ¶ 188. The Webex audio tapes turned over appear to have been altered after intense professional analysis with blurring, cuts and drastic volume reduction present. ¶ 189. Even the limited audio turned over by Chief Judge Josey-Herring had to be digitally amplified but did verify unlawful acts. ¶ 190. In the middle of the request for the Webex recordings a new Chief Judge, Milton C. Lee Jr., took office on October 1, 2024, taking over the administration of the Webex recordings and he too withheld evidence of the *ex-parte* jury tampering scheme involving OAG and Judge Edelman. ¶¶ 198–205.

However, on May 21, 2026, Plaintiffs had no choice but to voluntarily dismiss Judges Todd E. Edelman, Anita Josey Herring and Milton C. Lee from Plaintiffs' SAC based on absolute judicial immunity after studying *Sindram v. Suda* 986 F.2d 1459, 1460 (D.C. Cir. 1993). Plaintiffs maintain the dismissed judges participated in a conspiracy to obstruct justice and intend to depose these judges as material witnesses pursuant to the rigid requirements of the D.C. Circuit as set forth in *United States v. Morgan,* 313 U.S. 409, 422 (1941).

**The CCTV Security Tapes**

When the jury tampering incidents first occurred on May 28, 2024, S. Sieber put Judge Edelman on notice that the CCTV security cameras would have captured the audio and video conversations between Deputy Marshals and jurors that took place in the jury deliberation and chambers area. ¶ 191 *see* ¶ 164. On August 17, 2024, D. Sieber's counsel Edward Lyle, ("Mr. Lyle") served a subpoena upon Chief Security Officer ("CSO") for the Superior Court, Mr.

Thomas Hedgepeth, to turn over the audio and video CCTV tapes, *separate from the Web-ex tapes,* from the jury deliberation and chambers hallway area where S. Sieber had witnessed Deputy Marshals in conversation with jurors. ¶ 194. After CSO Hedgepeth received the subpoena to turn over the CCTV security tapes for the days of May 28 and May 29, 2024, he was unresponsive for weeks. ¶ 195. On September 29, 2024, some six weeks after the subpoena for the CCTV tapes was served upon Defendant Hedgepeth, Mr. Lyle wrote the following demand letter to Mr. Hedgepeth after being stonewalled:

> "I am writing this to supplement my earlier request for a response from you concerning the subpoena that was issued to you by certified mail on August 17 and personally sent to you on September 6th after our telephone conversation on that day. Our subpoena demanded audio and video tapes that you control of Courtroom 130 of the Moultrie Courthouse and the areas of Judge Edelman's chambers, the jury deliberation room, and the location where U.S. Marshals congregated in this matter on the days of May 28 and 29, 2024. If we do not receive word from you by close of business this Monday, September 30, 2024, that the audio and video tapes under your control will be delivered by this coming Wednesday, October 2, 2024, and if we do not in fact receive those tapes by that day, we intend to seek enforcement of our subpoena from the trial court. If we do not obtain relief in that way, we will pursue other avenues available to my clients. If you or others think that this matter will just fade away with the passage of time, please know that it will not" ¶ 196.

Mr. Hedgepeth finally responded to Mr. Lyle on September 30, 2024, stating the CCTV security footage requested had been deleted. ¶ 197.

<u>Judge Edelman's Refusal to Recuse From the D.C. Litigation</u>

Rule 2.11(A)(2)(c) of the Model Code of Judicial Conduct states: "A judge shall disqualify him or herself in any proceeding in which the judge's impartiality might reasonably be questioned and if the Judge has more than a de minimis interest that could be substantially affected by the proceeding" ¶ 206. A.G. Schwalb and Judge Edelman had much more than a de

minimis interest in making sure Judge Edelman did not recuse, even though mandatory recusal was required for violating criminal statute 18 U.S.C. § 241, Conspiracy Against Rights. ¶¶ 207–08. Recusal would have required an evidentiary hearing in front of a new judge, including the examination and cross-examination of witnesses. ¶209. The required evidentiary hearing would have exposed the *ex parte* jury tampering conspiracy of A.G. Schwalb, OAG and Judge Edelman to violate Plaintiffs' civil rights. ¶¶ 147–75,

On August 2, 2024, the Precision Parties filed a motion for an evidentiary hearing regarding the *ex parte* communications and jury tampering incidents to prevent Judge Edelman from issuing a retaliatory final order in the D.C. litigation. ¶ 210. *See Remmer v. United States*, 347 U.S. 227, 229–30 (1954). On October 3, 2024, Judge Edelman denied Plaintiffs' motion for a *Remmer* hearing, ¶ 211, even after his admissions on the record to *ex parte* communications and jury tampering. ¶¶ 147–75. Following Judge Edelman's denial of the requested *Remmer* hearing, the Precision Parties on November 18, 2024, filed their current 42 U.S.C. § 1983 civil rights Complaint in this Court over a month before a final order was issued in the Superior Court litigation. ¶ 212. On November 19, 2024, Judge Edelman denied Plaintiffs' motion for mistrial that had been ripe for ruling for weeks. ¶ 213. On the evening of November 19, 2024, the Precision Parties filed an emergency motion to vacate Judge Edelman's order denying a mistrial and moved Judge Edelman to recuse himself from the case before issuing a final order. ¶ 214. On November 22, 2024, Judge Edelman denied the Precision Parties' recusal motion. ¶ 215. On December 3, 2024, the Precision Parties filed a Rule 21 *Writ of Mandamus Petition* with the D.C. Court of Appeals seeking an order for Judge Edelman to recuse himself from the Superior Court Litigation ¶ 216. The D.C. Court of Appeals Court denied the Precision Parties' *Mandamus* Petition per curiam without inquiry. ¶ 217. Plaintiffs

have pled in complete detail, backed up by official court transcripts, that A.G. Schwalb, Judge Todd E. Edelman, Judge Anita Josey-Herring, Judge Milton C. Lee Jr., the OAG Defendants, Defendant Kevin Spencer and Defendant Thomas Hedgepeth conspired to, and did, enter into an *ex-parte* jury tampering and evidence destruction scheme. ¶¶147–75, 206–17, 345–49, 352–62.

**Seventh Amendment Right to a Jury Trial**

The parties agreed to a bifurcated trial, with the jury to find liability and for the trial court to adjudicate remedies based on the jury's liability findings. Prior to the case being transferred to Judge Edelman, Judge McKenna back in 2023 suggested a remedies conference and briefing schedule be held well in advance of trial to ensure the Precision Parties received notice as to the Court's remedies adjudication guidelines prior to trial.[2] ¶¶ 221–23. Despite Judge McKenna's suggestion, it was ignored by Judge Edelman with no remedies conference ever held and remedies briefing deferred until September 6, 2024, more than three months after the conclusion of the trial. ¶ 224. Plaintiffs never would have agreed to a bifurcated trial if they knew in advance the OAG Defendants could pursue, and that Judge Edelman could order millions of dollars in consumer restitution, civil fines and legal fees as well as a permanent employment injunction with no injury-in-fact to D.C. consumers being present. ¶ 226.

Plaintiffs were sandbagged by the fact that boilerplate declarations of non-injured consumers who were completely satisfied with their PCS projects and did not testify at trial would become a binding authority for a no injury-in-fact consumer restitution scheme based on

[2] "I'm going to suggest that we set a briefing schedule once we set a trial date so that this issue can be resolved sufficiently in advance of trial so that everybody is on the same page going forward about the factors that the Court will ultimately consider in the event of a judgment against Precision or either of the Siebers about how remedies will then be calculated." (April 5, 2023, in-limine hearing) ¶ 221

contrived technical CPPA violations. If Plaintiffs had known there would be no remedies briefing until post-trial and that OAG's fabricated declarations would be used by Judge Edelman to issue millions of dollars in bogus consumer restitution, fines and legal fees in a bait and switch sham, Plaintiffs would have insisted on the jury adjudicating remedies at trial. ¶ 227.

Judge Edelman usurped the jury's sole authority to find liability by substituting his own made-up consumer injury not found in the jury verdict, violating Plaintiffs' right to a jury trial under the Seventh Amendment in retaliation for Judge Edelman's criminal conduct being exposed by the Precision Parties during the trial. ¶¶ 228, 238.

Judge Edelman's False Statements About the Jury's Verdict

In his final order docked on December 18, 2024, Judge Edelman made the following knowingly false statements that grossly misrepresented the jury's verdict:

> *"As the jury found, Defendants have acted in bad faith, performing shoddy work over a period of many years, relying on intentional misrepresentations as part of their standard business practices, and threatening consumers who complain."* ¶229. (Final Order at 33:5-7 (Dec 18, 2024)
>
> *"They have inflicted substantial injury to the public over an extended period of time amounting to millions of dollars in improperly obtained payments just from a few dozen consumers who submitted sworn declarations to the Court.*" ¶ 234. (Final Order at 33:7-10 (Dec 18, 2024)

The truth is the jury did not find Plaintiffs acted in "bad faith" ¶ 230. The jury did not find Plaintiffs "performed shoddy work over a period of many years" ¶ 231. The jury did not find any injury-in-fact to consumers or the public. The jury did not find any poor workmanship was ever performed by PCS. ¶ 232. Finally, the jury did not find that Plaintiffs relied on intentional misrepresentations as part of their standard business practices and threatening consumers who complain. ¶ 233. Despite the realities of the jury's verdict, Judge Edelman

made-up his own knowingly false consumer injury in a final order, just like OAG did in its press release, thereby violating Plaintiffs' right to a fair and impartial jury trial. ¶ 236. Judge Edelman's final order amounted to vindictive retaliation against Plaintiffs for calling him out on OAG's *ex parte* jury tampering scheme that he willfully participated in. ¶¶ 147–75.

The undisputed evidence at trial was that PCS maintained a ten-year A+ BBB rating without a single DCRA notice of infraction ever adjudicated against the company in its thirteen-year business history, with only one complaint that was instantly resolved. ¶¶ 32–33, 237. When Judge Edelman added his fraudulent liability findings in his remedies order that the jury did not find in its verdict, he violated Plaintiffs' Seventh Amendment right to a jury trial. On December 18, 2024, following Judge Edelman's refusal to recuse, he issued his final order against Plaintiffs in the amount of $2,967,364.24 with a lifetime employment ban in the District of Columbia and with no injury-in-fact to D.C. consumers being present and an A+ BBB certified consumer complaint history without a mandatory Rule 65 evidentiary hearing. ¶¶ 254–59.

**OAG's Consumer Restitution Scheme**

Prior to the entry of Judge Edelman's final order, OAG initiated a restitution canvassing campaign targeting PCS customers who were completely satisfied with their projects and who did not testify at trial. OAG achieved this by using contracts provided by Plaintiffs during discovery. ¶ 260. OAG's bad faith canvassing mission invited past PCS customers, including those with contracts dating back over a decade, and with no proof of payment, to sign a boilerplate declaration saying only they did business with PCS to get a full refund of all payments made to PCS pursuant to their binding construction contracts. ¶ 261.

Judge Edelman ultimately awarded consumers $1,488,755.52 in consumer restitution based exclusively on OAG's fabricated boilerplate declarations. ¶ 262. Thirty-nine out of the

past 600+ past PCS customers signed these free money declarations to become unjustly enriched in a financial windfall at the coercion of OAG, who also received $576,00 in civil penalties, ¶ 256 and $902,608.72 in legal fees, ¶ 257, amounting to $1,478,608.72 for the D.C. Government. These consumer declarations were fabricated notwithstanding: (1) The absence of injury-in-fact to consumers. ¶ 140, 219. (2) PCS's status as a licensed D.C. contractor with a ten-year A+ BBB rating and sterling consumer satisfaction history. ¶ 33. (3) All work performed by PCS was inspected and approved by DCRA. ¶ 264, 301, 305, and (4) Past PCS customers realized significant equity gains from the five-star construction services provided by PCS. ¶ 264.

OAG did the groundwork by getting happy PCS customers with no injury-in-fact to sign OAG's boilerplate declarations as their part of Defendants' conspiracy to destroy the Precision Parties. ¶ 265. Judge Edelman did the rest by using those fabricated and enticed OAG drafted declarations to award $1,488,755.52 in consumer restitution with no injury-in-fact and $1,478,608.72 in civil fines and legal fees paid to OAG, ¶ 266, amounting to a grand total of $2,967,364.24. ¶ 254. Judge Edelman then piled on by ordering a permanent injunction banning Plaintiffs from ever operating again in D.C. without the required Super. Ct. Civ. R. 65 evidentiary hearing and ignoring PCS's sterling consumer satisfaction history and 10-year A+ BBB rating with no threat of future harm to consumers remotely present. ¶ 258.

**Eighth Amendment Excessive Fines**

The District Defendants conspired with Judge Edelman to issue unlawful excessive fines to unjustly enrich the District of Columbia and consumers, violating the Eighth Amendment Excessive Fines Clause, ¶ 253. The denial of a fair trial under Count V, combined with the denial of a Seventh Amendment jury trial pled in Count VI, resulted in the violation of the Eight Amendment Excessive Fines pled as Count VII and the Fourth Amendment taking of property

pled in Count VIII, making all these unconstitutional violations inextricably linked. Plaintiffs have pled facts in the SAC, ¶¶147–75, 219–51, 254–67, in support of Defendants Eighth Amendment Excessive Fines violations.

**Fourth Amendment Property Seizure**

Judge Edelman awarded restitution to consumers in the full amount paid to PCS for their completed, inspected and approved construction projects provided by a licensed D.C. General Contractor based on OAG's boilerplate declarations. ¶ 264, 266. These past PCS customers incurred no injury-in-fact, nor did they testify at trial, nor did they ever complain about PCS's construction services, with some PCS projects dating back over a decade old with no verification of payment. ¶¶ 260–265, 269. Article III standing requires consumers have suffered a concrete injury-in-fact to receive restitution. ¶¶ 219, 232–36, 249, 270. Furthermore, before ordering a lifetime employment ban against Plaintiffs, Judge Edelman failed to convene the mandatory Rule 65 injunctions hearing on the merits of the lifetime employment ban that was demanded by the OAG and disputed by Plaintiffs before Judge Edelman ruled on the permanent employment ban. ¶ 258. Plaintiffs have pled facts in their SAC in ¶¶ 147–75, 219–51, 254–67 in support of Defendants' Fourth Amendment property seizure violations.

**First Amendment Violations Caused by CPPA Statutes**

On May 21, 2024, at 9:06 a.m. with the trial approaching its conclusion, Judge Edelman sent an email to OAG counsel stating: "Could the District please send us a Microsoft Word copy of Attachment 12 to the Joint Pretrial Statement, (District of Columbia's Proposed Final Jury Instructions)" ¶ 275. No such request was made to the Precision Parties, whose proposed jury instructions were found in Attachment 13 to the pre-trial statement filed a year earlier. ¶ 276.

The jury instructions for the trial were created and edited by OAG and Judge Edelman *ex parte,* without the Precision Parties input. ¶ 277. On May 22, 2024, at 9:14 a.m., the court sent out its draft jury instructions adopting the proposed edits of OAG and Judge Edelman. ¶ 278. That same morning, May 22, 2024, the court ordered the review and approval of the proposed jury instructions. ¶ 279. S. Sieber, a *Pro-se* litigant, entered an objection to the court's last-minute jury instructions review on the transcript record as to its prejudicial nature:

> JUDGE EDELMAN: *"Have you read the complete instructions?* ¶ 281.
>
> S. SIEBER: *"I just got them"* ¶ 282.
>
> JUDGE EDELMAN: *"When did you just get them?"* ¶ 283.
>
> S. SIEBER: *"This morning"* ¶ 284.
>
> JUDGE EDELMAN: *"Right, that's when we sent them out"* ¶ 285.
>
> S. SIEBER: *"Well, the thing was -- I understand that, but I'm not intellectually capable of receiving something this detailed from the Court the day when I have to prepare for my witness testimony"* ¶ 286.

Judge Edelman ignored S. Sieber's objection and proceeded with the jury instruction review. ¶ 287. CPPA statutes D.C. Code § 28-3904(e), D.C. Code § 28-3904(f) and D.C. Code § 28-3904(f-1) were applied to the Jury Instructions ordered by Judge Edelman. ¶ 274.

<u>No Definitions Exist in the CPPA to Assure First Amendment Protections:</u>

D.C. Code § 28–3901 (Definitions and Purpose) or any other provisions of the CPPA define any of the individual words, terms or phrases in the CPPA or the phrases "material fact" or "tendency to mislead" or "misrepresent as to a material fact which has a tendency to mislead" or "fail to state a material fact if such failure tends to mislead" or "use innuendo or ambiguity as to a material fact." ¶ 317. This failure to define D.C. Code § 28-3904(e), D.C. Code § 28-

3904(f) and D.C. Code § 28-3904(f-1) or any of the terms in those statutes alerts to being unconstitutional as applied to a jury instruction as "excessively vague" with no definitions contained in an expansive multi-statute Act or in the D.C. litigation jury instructions themselves. ¶¶302–03. The overly vague and undefined CPPA and jury instructions gives the District Government unchecked powers to employ arbitrary and targeted enforcement for self-interested financial reasons having nothing whatsoever to do with the protection D.C. consumers. ¶ 294.

**CPPA § 28-3904(e) and (f) as Applied to Jury Instructions:**

<u>Category One Jury Instruction:</u> This jury instruction citing D.C. Code § 28 3904(e) misstates "material fact." The instruction defines "material fact" based on what an "unsophisticated consumer," rather than a "reasonable consumer," would consider important. The jury instruction conflates the "unsophisticated" and "reasonable consumer" standard without clarification, thereby creating a standard far too vague and confusing regarding fair notice of prohibited conduct for the jury to consider. The Category One instruction contained 6 bullet points for the jury to choose from, all of which are legal actions during the execution of a binding construction contract. ¶¶ 288–90.

<u>Category Two Jury Instructions:</u> The Category Two jury instructions cite D.C. Code § 28-3904(f) that contains eight "legal acts" framed as CPPA violations. Each of the eight sub-instructions employ a confusing double-negative beginning with "did not" or "failed to" ¶ 291. In the "Finding of Liability" section of Category Two, OAG and Judge Edelman altered the legislated text of D.C. Code § 28-3904(f) *ultra vires,* and together changed the statute itself to a highly prejudicial standard from its legislated text that originally stated: "fail to state a material fact if such failure tends to mislead" *that was intentionally changed to* "failed to state a material fact which <u>**has any tendency to mislead.**</u>" ¶¶ 291–92.

Verdict Form Text: "Misrepresented their expertise and qualifications to perform home improvement services." PCS was a licensed D.C. general contractor, and D. Sieber was a licensed salesman for PCS who had all the required insurances from 2007 until 2020, legally qualifying him to do business in D.C. and enter contracts with consumers. ¶302. Nowhere in the jury instructions are the terms "expertise" or "qualification(s)" found, much less defined as to what is an unlawful act for the jury to consider making the instruction unconstitutionally vague.

The Jury's Verdict: On May 29, 2024, the jury submitted its verdict form finding only technical CPPA violations that Plaintiffs contended were redundant and unsupported by facts and law, were void for vagueness and therefore unconstitutional as applied. ¶ 315. The jury's verdict did not find any injury-in-fact to D.C. consumers resulting from any of the CPPA technical violations found by the jury. ¶ 316. The Jury did not adjudicate remedies. ¶¶ 221–27.

**CPPA § 28-3904(m) as Applied to the First Amendment**

On March 4, 2022, Judge Jason Park in the D.C. litigation granted summary judgment to OAG on its D. C. Code § 28-3904(m) claims only. ¶322. Judge Park cited *Renchard v. Prince William Marine Sales, Inc.*, 87 F. Supp. 3d 271, 285 (D.D.C. 2015) which invoked a broad, non-statutory "reasonable person" test rather than specific definitions respecting First Amendment protections. ¶ 323. Also, D.C. Code § 28-3904(m) states that it is a CPPA violation to: "harass or threaten a consumer with any act other than legal process, either by telephone, cards, letters, or any form of electronic or social media." ¶ 324. Judge Park granted summary judgment stating: (1) *"Precision customer Emmy Levens testified in a summary judgment declaration that the Precision Parties sent her and her husband, Derek Richer, an email in which D. Sieber threatened to charge for work that PCS had done that was above and beyond' the contract"* ¶ 328. (2) Judge Park also granted summary judgment based on D. Sieber violating D.C. Code §

28-3904(m) by threatening to have his attorney file a complaint with an FBI agent's employer in response to the agent's misconduct under color of law for threatening a third party DCRA inspector assigned to his project wherein PCS was the contractor. ¶ 325. (3) Judge Park granted summary judgment to the District in response to the Precision Parties' threatening to send a complaint to Facebook for Mr. Richer using his access as a high-level Facebook executive to hack into D. Sieber's Facebook account. ¶ 330. (Summary Judgment Order, Judge Park March 4, 2022, 32:19–35:20)

**CONSPIRACY UNDER COLOR OF D.C. LAW**

The first statement of fact in the SAC states: UNDER COLOR OF LAW: The following statement of facts are listed for each Count, describing the actions of each Defendant within each Count. Defendants in all Counts acted under color of law with private actors conspiring with the Municipality and Municipal Employees to violate Plaintiffs' civil rights. ¶ 31.

Private parties who conspire with government officials are acting "under color of law" for purposes of civil rights liability, and claims targeting them are not subject to dismissal, *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980). The following refers to verbatim to the SAC and provides the Court with a detailed explanation of the who–what–when–where and how each co-conspirator reached their meeting of the minds when implementing their civil rights conspiracy. This disclosure nudges Plaintiffs' conspiracy claims from "conceivable" to "plausible" ¶ 341, *Twombly* at 570 (2007) *see Iqbal,* at 678–79 (2009). A "Conspiracy Index" has been filed with Plaintiffs' Opposition with court permission as an attachment that contains verbatim paragraphs from the SAC for the convenience of the Court and for Defendants to easily review in a more efficient manner without searching through the 70-page SAC.

The Defendants who participated in their unlawful conspiracy as pled in the SAC are as follows: (1) The District of Columbia Municipality. ¶¶ 342–43. (2) Former A.G. Karl Racine. ¶¶ 53–117, 344. (3) Current A.G Brian Schwalb. ¶¶ 147–75, 253–67, 345–47. (4) OAG lawyers Jenniffer Jones–Jennifer Rimm–Adam Teitelbaum–Kevin Vermillion–Lindsay Marks–Margaret Ulle. ¶¶ 53–175, 253–67, 348–349. (5) OAG investigator Timothy Shirey. ¶¶ 39–51, 350–51. (6) Deputy U.S. Marshall Kevin Spencer. ¶¶ 147–75, 352. (7) Chief Security Officer for the D.C. Courts Thomas Hedgepeth. ¶¶ 191–97, 352. (8) Superior Court Judge Todd Edelman. ¶¶ 147–175, 356–58. (9) Superior Chief Court Judge Anita Josey-Herring. ¶¶176–90, 356–58. (10) Superior Court Chief Judge Milton C. Lee. ¶¶ 198–205, 362. (11) Private Attorney Kenneth Vogel. ¶¶ 79–131, 363–65. (12) Corporate Defendant ANGI. ¶¶ 79–131, 367–68. (13) Angie Hicks individually. ¶¶ 79–131, 369.

**LEGAL STANDARD**

To survive a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face", *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly* 550 U.S. 570 (2007). A claim is facially plausible when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* In evaluating the motion, the Court must accept all the complainants' factual allegations as true and construe them liberally in the plaintiff's favor, but need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint, nor must the court accept legal conclusions" *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994). In deciding a Rule 12 (b)(6) motion, the court must only consider the facts alleged in the complaint, documents attached as exhibits and matters of which the court

may take judicial notice, including the public records of prior court proceedings, *Meijer, Inc. v. Biovail Corp.,* 533 F.3d 857, 867 (D.C. Cir. 2008).

Dismissal under Rule 12(b)(6) based on an affirmative defense is inappropriate unless the facts establishing the defense are clear from the face of the complaint. *Firestone v. Firestone* 76 F.3d 1205, 1209 (D.C. Cir. 1996). If the Complaint itself does not conclusively establish that the claims are time-barred or precluded, the dismissal is premature, and the motion must be denied. *Id.* While the statute of limitation, *res judicata* and collateral estoppel can be raised in a motion to dismiss, it is an affirmative defense, and if the face of a complaint avoids triggering it, the court cannot dismiss unless the defendant presents an airtight public court record that proves otherwise, *Atherton v. District of Columbia Office of the Mayor,* 567 F.3d 672, 681 (D.C. Cir. 2009). To overcome qualified immunity, a plaintiff must show: (1) the official violated a statutory or constitutional right and (2) that the right was "clearly established" at the time of the challenged conduct, *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

## ARGUMENT

### (1) The District of Columbia Government is Liable

When using the term "District Defendants," Plaintiffs are referring to the District of Columbia ("District") and OAG employees. Pursuant to D.C. Code § 1-301.81(a)(1) and D.C. Code § 28-3909, the D.C. City Council has vested the independently elected Attorney General with final authority to direct the District's legal affairs and initiate litigation, establishing the D.C. Attorney General as a final policymaker, *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Therefore, the decision to bring its retaliatory lawsuit in the Superior Court in *District of Columbia v Precision Contracting Solutions L.P.,* and the resulting constitutional violations are municipal acts initiated by an official policy maker. *See Pembaur v.*

*City of Cincinnati*, 475 U.S. 469, 483–84 (1986). The Supreme Court has ruled that municipalities do not possess qualified immunity or a good-faith defense under 42 U.S.C. § 1983. *See Owen v. City of Independence*, 445 U.S. 622, 650 (1980). The D.C. Circuit has applied this precedent to the District, holding it is treated as a municipality and enjoys no immunity from *Monell* claims once a policy, custom, or final policymaker action is established, *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004); *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003); *Daskalea v. District of Columbia*, 227 F.3d 433, 446 (D.C. Cir. 2000). The District however relies on blanket conclusory statements like this:

> "But nowhere do Plaintiffs articulate any policy of violating the constitution, a policy maker taking an unconstitutional action, a custom or practice, or deliberate indifference. See generally 2d Am. Compl. Because Plaintiffs have not "indicated the contours of any type of municipal policy and because "[it] is not [the Court's] role . . . [to] try to surmise which theory of municipal liability has the strongest support in the complaint," Blue v. District of Columbia, 811 F.3d 14, 19–20 (D.C. Cir. 2015), the Court should dismiss all claims against the District." ( Dist. Mot. 32 : 20–26)

When a municipal defendant files a motion to dismiss § 1983 claims using blanket conclusory statements like the one above, completely ignoring specific immunity defenses for each count and failing to detail *why* the SAC statement of facts are inadequate, ¶¶ 39–51, 53–117, 118–131, 133–145, 147–217, 253–277, 269–272, 274–336, 342–349, the District has committed a fatal procedural error. Under federal law, blanket conclusory assertions like *"Because Plaintiffs have not "indicated the contours of any type of municipal policy"* cannot defeat specific, well-pleaded facts. Therefore, the District woefully fails to carry its legal burden. The Supreme Court has unequivocally established that courts are required to completely strip away and ignore unadorned legal conclusions, formulaic recitations of elements, and naked assertions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Ironically, it is the *District's own motion* that is a textbook example of "naked assertions devoid of further factual enhancement." *Twombly*, 550 U.S. at 557. Because the District fails to provide any link at all between the facts pled in the SAC and entitled immunity, its arguments fail. The District cannot simply say *"[b]ut nowhere do Plaintiffs articulate any policy of violating the constitution."* They must instead execute a count-by-count analysis. Because it fail to do this, their motion must be denied. It is a bedrock principle of federal civil procedure that a Rule 12(b)(6) motion must challenge the plausibility of the facts pled in each of the nine counts in precise arguments as to why the District government is not liable for each specific count. In the D.C. Circuit, when a defendant fails to contest a count or factual theory in a motion to dismiss, that argument is deemed waived for the purposes of the motion, *see Wannall*, 775 F.3d at 161; *Stephenson v. Cox*, 223 F. Supp. 2d 119, 121 (D.D.C. 2002).

**(2) The Individual District Defendants Have No Immunity**

The fatal flaw in the individual District Defendants' motion is that they to fail carry their own legal burden. Absolute immunity is a functional defense that requires the moving party to demonstrate *how* the specific conduct alleged qualifies as protected courtroom advocacy. By offering nothing more than a generic conclusory assertion of immunity and remaining otherwise completely silent, Defendants have failed to provide a single shred of legal analysis to support their absolute immunity defense. The sum of the individual District Defendants argument of absolute immunity rests on conclusory paragraphs like this:

> "Plaintiffs also allege that their rights were violated when the District enforced the CPPA against them as applied to the jury instructions given to the jury in the District's CPPA litigation and the final verdict form used in the same, as well as because the CPPA is allegedly facially overbroad. See generally id. ¶¶ 273–336. Overarchingly, Plaintiffs also allege that all 11 Plaintiffs do not make clear how this alleged constitutional violation (the exclusion of their trial exhibits by the Superior Court) is attributable to the

> Individual District Defendants, but merely incorporate their roles in the judicial process as advocates for the District. See id. ¶ 132. 36 Case 1:24-cv-03247-ACR Document 87-1Filed 05/28/26 Page 45 of 46 Defendants acted as a group in a conspiracy to deprive them of these alleged constitutional rights. See generally id. ¶¶ 339–51." ( Dist. Mot. 36 : 20–37 : 2)

The District's assertion of qualified immunity suffers from the same failure to plausibly address the facts of each Count in the SAC, juxtaposed as to why those facts are not sufficient to defeat qualified immunity. Under the Supreme Court's "functional approach," a public official's immunity is determined not by their job title, but by the specific function they were performing at the time of the alleged violation, *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) *see Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). OAG conduct repeatedly fell within the realm of unprotected investigative or administrative functions because: (1) OAG issued a retaliatory, bad faith press release, and enforcement action lacking probable cause to penalize the Precision Parties for exercising their First Amendment right to file criminal Complaints. ¶¶ 39–131. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 277–78 (1993). (2) OAG acted in an investigative and administrative capacity under color of D.C. law when engaging in joint action civil rights conspiracy with private actors ANGI, Angie Hicks, and Kenneth Vogel, to deliberately suppress authentic D.C. consumer ratings to bolster OAG's false online narrative. ¶¶ 104–109. (3) OAG engaged in stigma plus as well as ongoing person–to–person slander promoting the false and defamatory claims in the OAG press release throughout the entire D.C. litigation. ¶¶ 89–91 351, 363–365, *see Buckley*, 509 U.S. at 273. (4) OAG executed an *ex parte* jury tampering scheme through the U.S. Marshals Service. ¶¶ 47–175 and failed to address why they are immune. (5) OAG issued unauthorized orders to U.S. Deputy Marshals to escort a deliberating jury outside the lawful scope of their official authority and failed to address why they are immune. (6) OAG ignored fabricated out–of–court consumer declarations for an unlawful purpose. ¶¶ 258–67.

No Quasi-Judicial Immunity Exists: The Supreme Court clarified that a judge's personal immunity does not change the character of the underlying unlawful conspiracy or shield those who corruptly partner with the judge. *id.* Consequently, even if Judge Edelman's involvement in the conspiracy is insulated by personal immunity, that immunity provides no quasi protection to the individual District Defendants who orchestrated and executed the jury-tampering scheme with Judge Edelman, *Dennis*, 449 U.S. at 28–29. Therefore, the District Defendants claims of qualified immunity fall flat. To overcome qualified immunity, a plaintiff must demonstrate: (1) the facts alleged show the Defendants' conduct violated a constitutional right; and (2) the right was "clearly established" at the time of the misconduct, *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The District Defendants' motion to dismiss relies entirely on naked assertions devoid of further factual enhancement and conclusory legal characterizations regarding qualified immunity. Because the Defendants have failed to provide any substantive legal analysis or apply controlling case law to the specific facts and counts alleged in the SAC, they have failed to meet their burden. Consequently, under controlling D.C. Circuit precedent, they have waived their qualified immunity arguments for the purposes of this Motion. *See Wannall v. Honeywell, Inc.,* 775 F.3d 168 (D.C. Cir. 2014).

In *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) the Court stated: *"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."* Every reasonable public official involved in the avalanche of unconstitutional acts perpetrated by OAG lawyers knew those acts were unlawful because: (1) public officials cannot use the power of the District to launch fraudulent civil enforcement actions to retaliate against a citizen for exercising their First Amendment

rights, *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Lozman v. City of Riviera Beach*, 585 U.S. 87, 98 (2018). (2) Public defamatory statements made by District officials satisfy the public "stigma" requirement of Plaintiffs' stigma–plus claim. As the Supreme Court has recognized these acts do not fall within an official's core of immune duties. *See Buckley* at 277 (1993). (3) private, *ex parte* jury tampering makes qualified immunity unavailable as affirmed in *State v. Murdaugh*, Op. No. 28329, at 7–9 (S.C. May 13, 2026). (4) creating out–of–court fabricated declarations in the absence of injury–in–fact, with Superior Court Judge Edelman making up consumer injury the jury did not find, defies qualified immunity. ¶¶ 228–51.

The U.S. Supreme Court has long established that agency attorneys performing functions analogous to prosecutors are governed by the same functional limitations on immunity *see Butz v. Economou*, 438 U.S. 478, 515–17 (1978) *see Buckley* at 273–74. In *FTC v. Commonwealth Marketing Group, Inc.*, 72 F. Supp. 2d 530, 536 (W.D. Pa. 1999) a federal court affirmed that consumer protection enforcement attorneys are not automatically entitled to immunity merely by virtue of initiating civil proceedings; rather, their liability must be evaluated based on the specific, investigative role they chose to perform. When government attorneys cross the constitutional line to manipulate a record or coerce witnesses with promises of windfall restitution, ¶ 351, federal law denies them any immunity defense. This principle was reinforced by the Seventh Circuit in *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014), which held that a government attorney acting in an investigative capacity cannot insulate himself from the civil consequences of investigative fabrication by later introducing that evidence at trial. Similarly, the Fifth Circuit in *Wearry v. Foster*, 33 F.4th 260, 273 (5th Cir. 2022) confirmed that the active fabrication of false narratives, ¶¶ 260–267, is a complete corruption of the investigative function that leaves a government official entirely exposed to liability.

**(3) OAG Investigator Timothy Shirey Has No Immunity**

Under the Supreme Court's functional approach, investigative and administrative acts performed by law enforcement personnel or prosecutor-employed investigators do not qualify for absolute prosecutorial immunity *Buckley at* 273 (1993). Instead, Mr. Shirey's actions are governed strictly by qualified immunity, which is destroyed by his bad-faith intentional constitutional violations pled in the SAC. ¶¶ 39–51, 339, 350–51.

Qualified immunity is completely unavailable to Mr. Shirey for his unlawful home invasion that caused property damage while serving a documents subpoena. ¶¶ 39–51. The Supreme Court has repeatedly held that a government investigator's conduct when executing a search, serving a warrant, or performing standard field police work falls squarely within the category of investigative activity, which is not entitled to absolute immunity, *Buckley*, 509 U.S. at 274. Moreover, under Supreme Court precedent, the physical invasion into a private residence without a valid judicial warrant or an emergency exception is a *per se* violation of the Fourth Amendment, *Payton v. New York*, 445 U.S. 573, 589–90 (1980). No reasonable government investigator could possibly believe that serving an administrative document subpoena gives them a license to break into a citizen's private dwelling causing property damage. Because Defendant Shirey failed to contest the factual plausibility in Count I or his involvement in the conspiracy, it stands as an undisputed fact for the purpose of this motion that investigator Shirey executed a lawless, retaliatory break in, *Wannall* at 161 (2014). This bad-faith violation of a clearly established Fourth Amendment right completely strips Mr. Shirey of any qualified immunity.

Also Mr. Shirey cannot claim immunity for his campaign to slander Plaintiffs to third parties by making in person statements promoting the false and defamatory press release template. Nor can Defendant Shirey claim any form of immunity for soliciting false testimony in

exchange for windfall restitution through the signing fabricated boilerplate declarations. ¶ 351. Qualified immunity does not protect government investigators when they disseminate defamatory claims via the spoken word and launch administrative smear campaigns, *Buckley*, 509 U.S. at 277–78. The First Circuit has made it clear that a government investigator who fabricates evidence, suppresses the truth, or attempts to suborn perjury violates clearly established constitutional rights and can be held personally liable for damages under § 1983, *see Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004), confirming that fabricating evidence never receives qualified immunity; *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Finally, investigator Shirey cannot hide behind his status as a subordinate executing a broader agency mandate. Under the doctrine of qualified immunity, a government official's civil liability turns strictly on the objective legal reasonableness of their own individual conduct, rather than the general lawfulness of an overall agency directive. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), holding that government officials are shielded from liability only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

**(4) U.S. Deputy Marshal Kevin Spencer Has Absolute Immunity**

Plaintiffs voluntarily dismiss Deputy U.S. Marshal Kevin Spencer from this action. This dismissal applies strictly to Marshal Spencer as a direct named defendant. It does not dismiss or affect the claims against any other defendants in this case. Plaintiffs brought this action pursuant to 42 U.S.C. § 1983 and under controlling Supreme Court precedent, dismissal of a federal official from a Section 1983 claim is mandatory. In *District of Columbia v. Carter*, 409 U.S. 418, 424–25 (1973), the Supreme Court ruled that § 1983 deals solely with state-level violations, declaring that the "actions of the Federal Government and its officers are at least facially exempt

from its proscriptions." Because Marshal Spencer is an officer of the Federal Government, he cannot be sued under § 1983. Pleading that Marshal Spencer participated in a "state-sponsored conspiracy" with local D.C. officials does not bypass this exemption. The U.S. Court of Appeals for the D.C. Circuit has ruled that federal officers acting under federal authority are not transformed into state actors by virtue of a conspiracy. As established in *Williams v. United States*, 396 F.3d 412, 414–15 (D.C. Cir. 2005), a federal official's actions do not fall under § 1983 even when tightly intertwined with a local government conspiracy. Marshal Spencer used his federal badge, federal credentials, and federal position to enter the courtroom; therefore, his dismissal under Section 1983 is proper as a matter of law.

While *District of Columbia v. Carter* mandates that a federal agent be dismissed from the § 1983 claim, the conspiracy facts legally lock in the liability of OAG lawyers who pulled the strings. All factual assertions regarding Marshal Spencer, including the timelines, communications, and the receipt of "unauthorized orders" remain embedded in the SAC. He is preserved in the facts as an active co-conspirator. Under the uniform federal law of civil conspiracy, the physical, overt acts of one co-conspirator are legally imputed to all other members of the joint conspiracy. The OAG lawyers cannot hide behind the defense that they did not personally escort the jury. By utilizing a federal officer to execute their unlawful self-interested directives, the Marshal's physical intrusion into the jury domain is legally treated as an action taken by the District Defendants themselves. Government attorneys are only entitled to absolute prosecutorial immunity when performing traditional "judicial advocacy" tasks. Under D.C. Circuit standards, issuing unauthorized administrative and security directives to an external federal agency (the U.S. Marshals Service) to escort a deliberating jury while being a party in the case is an administrative function, not advocacy.

By executing this out-of-court administrative conspiracy, the OAG Defendants stripped themselves of absolute immunity, exposing themselves to personal liability and punitive damages under § 1983.

**(5) Chief Security Officer Thomas Hedgepeth Has No Immunity**

The intentional destruction of vital CCTV video footage which had been explicitly compelled by a legally operative subpoena that captured criminal *ex parte* jury tampering violates clearly established constitutional rights. Neither absolute judicial immunity nor qualified immunity protects an administrative law enforcement official who acts in bad faith to intentionally destroy evidence under subpoena, even if acting at the behest of a judicial officer. Defendant's implied reliance on absolute quasi-judicial immunity is wholly ungrounded. To determine whether an official is entitled to absolute immunity, the Supreme Court mandates a "functional approach," examining the nature of the function performed not the identity of the actor who performed it, *Forrester v. White*, 484 U.S. 219, 229 (1988). Absolute immunity strictly immunizes acts that are inherently judicial or adjudicative in nature, *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435–36 (1993) (refusing absolute immunity for a court reporter whose administrative failure delayed a trial transcript).

The management, retention, and handling of a courthouse's security hardware and CCTV footage are purely executive, administrative, and operational tasks that carry no adjudicative function. The D.C. Circuit has routinely affirmed that administrative and law enforcement functions performed within a court or legislative setting do not inherit absolute protections, *see Blassingame v. Trump*, 87 F.4th 1, 5 (D.C. Cir. 2023) distinguishing protected official judicial/presidential capacity from unprotected, non-immune personal or administrative actions. Because the destruction of security footage is an operational act completely decoupled from the

judicial decision-making process, absolute immunity is unavailable to Defendant Hedgepeth who cannot shield his unlawful acts by claiming he was acting under a chain of command directive issued by Judge Edelman. The D.C. Circuit has explicitly and categorically rejected a blanket "just following orders" defense, *Hobson v. Wilson*, 737 F.2d 1, 67 (D.C. Cir. 1984), *overruled in part on other grounds*. Compliance with internal directives or institutional policy cannot excuse a flagrant, active disobedience of the law in the form of a lawfully issued subpoena. *id*.

To overcome qualified immunity under § 1983, a plaintiff must allege facts showing that the official violated a statutory or constitutional right that was "clearly established" at the time of the misconduct, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Decisions of this Court have embeded the right of access to courts in the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). The right of access to the courts is completely subverted when government actors intentionally cover up institutional wrongdoing by destroying critical dispositive evidence. When a government official acts in bad faith to frustrate a litigant's civil action by destroying materials essential to that litigation, it violates a clearly established constitutional right, *id.* at 413-14. Defendant Hedgepeth was under a non-discretionary, mandatory legal duty to preserve the CCTV footage the exact moment he was served with a valid subpoena. No reasonable law enforcement or security official could have believed that destroying subpoenaed video footage capturing the crime of *ex parte* jury tampering was lawful. Because the unconstitutionality of a government official destroying evidence in bad faith is clearly established under the Fourteenth Amendment the unlawfulness of such actions is beyond debate, and qualified immunity must be denied, *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). See *Armstrong v. Daily,* 786 F.3d 529,

538 (7th Cir. 2015) (denying qualified immunity because the bad-faith destruction of evidence is a patent violation of a plaintiff's constitutional rights).

**(6) The Rooker–Feldman Doctrine Does Not Apply**

Defendants' assertion that this Court lacks subject-matter jurisdiction under Rooker-Feldman misrepresents federal law. The U. S. Supreme Court curbed the expansion of the doctrine, holding that it applies only to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced, *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 284 (2005).

Plaintiffs filed their 42 U.S C. §1983 civil rights action on November 18, 2024, a month before the Superior Court issued its final order on December 18, 2024. Under *Exxon Mobil,* because federal jurisdiction properly attached while the Superior Court proceeding was still ongoing, the subsequent entry of a Superior Court final order cannot retroactively divest this Court of its jurisdiction. The District Defendants attempt to hoodwink this Court when stating: "Plaintiffs' operative complaint comes well after the entry of a final order in Superior Court entering judgment against them for violating the CPPA. "See 2d Am. Compl. (filed April 27, 2026); Dec. 18, 2024, Order, *District of Columbia v. Precision Contracting Sols., LP,* No. 2019-CA-005047-B (D.C. Super. Ct. filed Dec. 18, 2024)" There is no need to play games with the Court hoping to slip one by as the District Defendants know well that the date of the filing of Plaintiffs' 42 U.S C. § 1983 lawsuit, November 18, 2024, establishes the date federal jurisdiction attaches. Mr. Vogel makes the same futile argument that must be instantly rejected.

Defendant Hedgepeth also attempts to invoke Rooker–Feldman on frivolous grounds. The source of Plaintiffs' independent constitutional injuries is not the D.C. Superior Court judgment itself, but rather the illegal, extrajudicial *ex parte* jury tampering scheme orchestrated by OAG and Judge Todd Edelman involving Defendant Hedgepeth. His unlawful conduct

constitutes an independent constitutional tort under 42 U.S.C. § 1983 that deprived Plaintiffs of their Fifth Amendment right to a fair trial before a neutral, uncorrupted tribunal. Plaintiffs are therefore not inviting this Court to act as an appellate body to review or modify the Superior Court's legal rulings. Instead, Plaintiffs seek damages for the discrete, unlawful conduct perpetrated by the Defendants during the D.C. litigation. Because the injury flows directly from the Defendants' extrajudicial misconduct rather than the state court decree, the Rooker-Feldman doctrine is wholly inapplicable. *Exxon Mobil*, 544 U.S. at 293.

## COUNT I
### First Amendment Retaliation

First Amendment Retaliation is brought against the District Defendants and Kenneth Vogel as a co-conspirator. *See Monroe v. Pape*, 365 U.S. 167, 187 (1961); *Halberstam v. Welch*, 705 F.2d 472, 482 (D.C. Cir. 1983). On October 16, 2018, based on Mr. Vogel's false claims of the Precision Parties planting fake reviews on HomeAdvisor and destroying consumer properties, OAG launched a CPPA investigation causing Mr. Shirey's criminal break-in. OAG spent eight months thereafter investigating the Precision Parties trying to establish probable cause that D. Sieber and S. Sieber were planting fake ratings and reviews and destroying consumer properties, including those of consumers Mr. Vogel claimed he would be representing. ¶ 79, 80, 86–8.

After exhaustive investigations, Defendants were faced with the reality that all PCS ratings and reviews posted on HomeAdvisor, ANGI and the DCRA ratings portal were true and authentic with no damage to consumer properties as Mr. Vogel had falsely claimed. ¶¶ 63, 65, 67, 69, 71, 73, 75, 77, 83–84, 95–100. Instead of closing its investigation, OAG decided to publish its press release and lawsuit containing knowingly false claims of catastrophic consumer injury in retaliation for S. Sieber filing criminal complaints against investigator Shirey and A.G. Racine. ¶¶ 39–51, 53, 58–78. The District argues, *"Plaintiffs do not allege that the District*

*Defendants even knew the criminal complaints had been filed."* (Def. MTD 3 : 12–3). The District's implication that Plaintiffs did not notice them of the criminal complaints is contradicted by the face of the SAC. Plaintiffs explicitly put the District on notice that criminal conduct had occurred through contact with Assistant A.G. Richard Rodriguez demanding Mr. Shirey be removed from any PCS investigation. Rule 9(b) permits knowledge to be alleged generally, provided the surrounding facts render that knowledge plausible under *Twombly*. When notice to OAG of criminal conduct is paired with the eight–month OAG investigation and the false press release with lawsuit atached published directly thereafter, as well as OAG never denying the falsity of the stigmatizing statements while refusing to remove the press release hosted on the OAG website, and after demand notices had been sent to remove the stigmatizing content, the District's knowledge of the criminal complaint filed by S. Sieber is overwhelmingly plausible, with Rule 9(b) fully satisfied.[3] ¶ ¶ 48, 49, 56, 61, 96, 98, 100, 111,112

Plaintiffs have further satisfied the causation element of its First Amendment Retaliation claim by pleading the underlying D.C litigation lacked objective probable cause, ¶¶ 60–78, 219, 232–33, 249, *Hartman v. Moore,* 547 U.S. 250 , 256 (2006). The OAG lawsuit is incorporated in the SAC with a link t it hosted on the OAG website. ¶ 112. Indeed, the "Prayer for Relief" in the District's CPPA Complaint is rooted in consumer injury that did not exist:

> *"Award such relief as the Court finds necessary to redress* ***"injury to consumers"*** *resulting from Defendants' violations of the CPPA including ordering restitution from Defendants based on their unlawful conduct and/or requiring Defendants to pay damages to consumers.* ***(emphasis added),*** (¶53 Defendants CPPA Complaint)

---

[3] While Plaintiffs maintain that the existing pleadings and chronology of the SAC are more than sufficient under *Twombly*, to the extent the Court finds further technical clarification is needed regarding Plaintiffs noticing Defendants of the criminal complaint against them, Plaintiffs respectfully request leave to amend by interlineation solely to clarify that fact, avoiding a motion for leave to file a third amended complaint in the interests of judicial economy.

While a valid jury verdict can serve as *prima facie* probable cause, the presumption vanishes if the judgment is obtained through fraud, *Borda v. Norfolk S. Ry. Co.*, 218 F. Supp. 2d 143, 148 (D.D.C. 2002), noting prior judgments do not establish probable cause if procured by fraud or improper means. The jury tampering engineered by OAG and Judge Edelman pled in ¶¶ 147–75 is the pinnacle example of fraud and improper means.

Also, Defendants created jury instructions *ex parte,* ¶¶ 275–87 and covertly altered the statutory text of D.C. § 28-3904(f) *ultra vires* to a highly prejudicial standard that stood at the foundation of the jury's verdict, exposing clear fraud upon the Court. ¶ 292. The District cannot brandish a tainted unconstitutional verdict as a shield against its own fraud upon the court. Therefore, the underlying verdict becomes void as a matter of law and incapable of establishing objective probable cause. Also, fraud lay at the center of OAG's knowingly false press release and CPPA lawsuit that promoted massive consumer injury that did not exist.

The Supreme Court has held that courts must evaluate the viability of civil rights claims on a charge-by-charge basis and the existence of probable cause for one charge does not categorically defeat a Fourth Amendment malicious-prosecution claim relating to another baseless charge, *Chiaverini v. City of Napoleon*, 602 U.S. 556, 588 (2024). As Justice Elena Kagan detailed in her opinion for the majority, "allowing a single minor supported charge to insulate government officials from liability for fabricating separate, far more severe charges would open the door to systemic overreach because the presence of a minor technical infraction does not give the government a blank check to invent false claims to destroy a target," *Chiaverini* at 562–63.

OAG cannot use tainted technical violations in a jury verdict that was tampered with to insulate itself from its broader First Amendment Retaliation violations when their knowingly false consumer injury claims collapsed when the Precision Parties refused to settle the case.

The second argument raised by the District is that Plaintiffs' First Amendment Retaliation claim is time-barred. The Supreme Court recognizes First Amendment retaliation claims rooted in continuing bad faith are distinct from isolated actions, *see Hartman* at 256 (2006). Because Plaintiffs' claims involved years of retaliatory acts, they did not possess a complete and present cause of action while the D.C. litigation remained active. The Supreme Court formalized this accrual rule in *McDonough v. Smith*, 588 U.S. 109, 114–15 (2019), holding that when a citizen faces a fabricated retaliatory legal process engineered by government actors, the statute of limitations does not begin to run until the underlying enforcement proceedings definitively conclude, which in Plaintiffs' case was December 18, 2024, ¶ 254.

Also, the bad-faith lawsuit and jury tampering were the mechanisms used by Defendants to manufacture the "plus" element of Plaintiff's stigma–plus claim. The statute of limitations cannot begin to run, until a plaintiff possesses a "complete and present cause of action." *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997). A stigma–plus cause of action requires the coexistence of two independent elements: (1) the government's public utterance of false, stigmatizing statements, and (2) a resulting tangible alteration of legal status or deprivation of a right, *Orange v. District of Columbia,* 59 F.3d 1267, 1274 (D.C. Cir. 1995). Because a stigma–plus claim is not actionable until both components manifest, the limitations clock does not begin when only one element exists. It is a bedrock principle of federal law that government defamation, standing alone, does not cross the threshold from a common–law tort to a constitutional violation. *Paul v. Davis*, 424 U.S. 693, 701 (1976).

The District Defendants have failed to oppose Plaintiffs' conspiracy claims. In First Amendment retaliation claims, causation is understood to be 'but-for causation" and a plaintiff can rely on evidence of motive and injury to provide a sufficient circumstantial demonstration of that causal link. *Hartman v. Moore*, 547 U.S. 250, 260 (2006). At the pleading stage, a conspiracy claim satisfies this requirement by establishing a unified meeting of the minds rather than establishing it as outright fact to penalize Plaintiff's protected speech, demonstrating the D.C. litigation would not have been pursued "but for" the joint retaliatory animus. *See Hobson v. Wilson*, 737 F.2d 1, 51-54 (D.C. Cir. 1984), holding that a First Amendment conspiracy is plausibly alleged when defendants form an agreement to systematically disrupt or penalize protected expression, thereby acting in concert to bring about the constitutional injury. For all the forgoing reasons, the motion to dismiss Count I of the District Defendants must be denied.

**COUNTS II and III**

**Fifth Amendment Stigma–Plus**
**First Amendment Commercial Speech Violations**

Fifth Amendment Stigma Plus and First Amendment Commercial Speech Violations, Counts II and III, are brought against the District Defendants and co-conspirators ANGI, Angie Hicks and Kenneth Vogel for the reasonably foreseeable constitutional violations in furtherance of the conspiracy. *See Monroe*, 365 U.S. at 187; *Halberstam*, 705 F.2d at 482. Stigma–Plus and First Amendment Commercial Speech violations are inextricably intertwined. The District Defendants argue, and Plaintiffs agree, the SAC pleads the initial "Stigma" occurred on July 31, 2019, when OAG published a knowingly false press release with their lawsuit attached to it, and the "Plus" occurred on December 18, 2024, when Judge Edelman issued a permanent employment ban against the Precision Parties in the D.C. litigation, (Def. MTD 29 : 3–11). The District states: *"Plaintiffs were given due process protections because the injunctive relief issued*

*only after they were found liable by a jury, meaning Plaintiffs received their opportunity to be heard."* (Dist. Mot. 29 : 14–16).

The District paints a rosy jury trial in the D.C. litigation with all the required due process protections and the right to be heard. However, the District totally ignores and therefore concedes claims in the SAC that pled the D.C. litigation was rigged, including admitted *ex parte* jury tampering and failure to hold the required *Remmer* hearing, ¶¶ 147–75. The Precision Parties were also denied the right to have the press release riddled with intentional false and defamatory statements adjudicated on its merits as law of the case with a name clearing hearing. ¶¶ 133–36. The Precision Parties were denied the right to present evidence, witnesses and their theory of the case at trial, ¶¶ 144, and the right to confront consumers who signed fabricated declarations awarded restitution with no injury-in-fact. ¶¶ 254–67. Finally, the Precision Parties were denied their right to have the removal of the 107 consumer ratings and reviews on the Home Advisor and ANGI websites adjudicated on the merits. ¶ 80

**Defendants Republished the Sigma During the Entire D.C. Litigation**

Defendants rely on the single publication rule, which under D.C. law applies to mass media aggregate communications, *Mullin v. Washington Free Weekly, Inc.,* 785 A.2d 296, 298 n.2 (D.C. 2001). The single publication rule however rule does not shield active, targeted, and individual repetitions of defamatory statements directed to a new audience on separate occasions, *Foretich v. Glamour,* 753 F. Supp. 955, 960 (D.D.C. 1990). Because the SAC alleges that co-conspirators Shirey and Vogel engaged in separate communications with individual PCS customers and embellished the original online text of the press release and lawsuit throughout the entire litigation, each conversation constitutes an independent, actionable publication under *Oparaugo v. Watts,* 884 A.2d 63, 73 (D.C. 2005), which also extended the statute of limitations.

Indeed Mr. Shirey of OAG and Mr. Vogel, made similar embellished knowingly false statements contained in the OAG press release and lawsuit to new third parties throughout the D.C. litigation that are specifically pled in the SAC as follows:

> *"Mr. Shirey, as a co-conspirator, began contacting PCS customers as an official OAG investigator and repeating the same knowingly false statements found in the Racine Press Release to non-complaining PCS customers. He did this by using the PCS contracts turned over by subpoena in attempts to coerce them into making false statements about PCS in exchange for restitution recovery and contrived consumer testimony at trial".* ¶ 351
>
> *"Defendant Mr. Vogel's role in the unlawful conspiracy was that of a private lawyer acting under color of law in concert with OAG by using his political connections with OAG to spread knowingly false claims about the Precision Parties for illegal and self-interested reasons,"* ¶ 363.
>
> *"Mr. Vogel next took to the streets and to OAG with his dismissed, knowingly false claims of massive consumer injury to dozens of consumers Mr. Vogel claimed to represent, of which clients Mr. Vogel did not represent,"* ¶ 364.
>
> *"Mr. Vogel also made false claims to OAG and PCS customers of catastrophic consumer injury caused by PCS that did not exist,"* ¶ 365.
>
> *"Mr. Vogel's law office also contacted several existing PCS customers who ultimately testified at trial, including Vicky More and Emmy Levens, with Mr. Vogel wrongfully alarming them that PCS was defrauding D.C. consumers and damaging the homes of PCS customers and their neighbors through shoddy workmanship"* ¶ 91

Because each slanderous statement constitutes a new statute of limitations clock clock, the "stigma" was actively re-inflicted up to and until the "plus" finally occurred on December 18, 2024. Accordingly, the temporal gap between the stigma and the plus is nonexistent. Furthermore, because Defendants failed to challenge any temporal nexus or causation gap in their motions to dismiss, any substantive challenge to the causal proximity of the stigma–plus claim has been waived and forfeited for the duration of this Rule 12(b)(6) phase.

**Defendants Statute of Limitations Argument Fails.**

A procedural due process claim predicated on a stigma–plus deprivation of a protected liberty interest accrues only when the requisite elements of the constitutional injury are fully realized. Under the established "stigma–plus" framework, a plaintiff cannot demonstrate a cognizable liberty interest based on government defamation alone; instead, the injury is actionable only upon the public disclosure of the damaging statements coupled with an official alteration of employment status, such as termination. See *Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995).

The statute of limitations governing such a § 1983 claim begins to run when the plaintiff has a "complete and present cause of action", *McDonough v. Smith,* 588, U.S.109 114–115 (2019). Because a cause of action does not accrue until the plaintiff can first file suit and obtain relief, the limitations clock does not begin until both the public stigma and the status deprivation have occurred to solidify the actionable constitutional tort. See *Paul v. Davis* at 771.

Finally, the District Defendants' attempt to rescue their stigma–plus defense by citing *Kartseva,* 37 F.3d at 1527. (Def. Mot. 30 : 12). Defendants' argument that the press release did not proximately cause the employment ban misconstrues the legal standard governing stigma–plus claims under *Kartseva v. Department of State*, 37 F.3d 1524, 1527–28 (D.C. Cir. 1994). To plead a viable stigma–plus claim, a plaintiff is not required to demonstrate the public defamation independently triggered the tangible loss of status. Rather, *Paul v. Davis,* 424 U.S. 693, 710 (1976) and its progeny requires only that the government-imposed stigma be inflicted "in the course of" or "in conjunction with" the alteration or termination of a legally recognized status. Because the stigmatizing press release, its ongoing republications and the permanent

employment ban were concurrent within the D.C. litigation, they form a singular, integrated transaction. Therefore, the operational and temporal proximity of these actions establishes the requisite constitutional nexus as a matter of law under the *Kartseva* framework, fully satisfying the statute of limitations and the stigma–plus doctrine. *Id.* at 1527.

**The Integrated First Amendment Commercial Speech Violations**

To ensure the false OAG press release and lawsuit stood completely unopposed, Defendants coordinated a digital "information blackout," stripping away Plaintiffs' business profile and consumer ratings and reviews on the HomeAdvisor and Angie websites on August 5, 2019, just days after the OAG press release hit the internet on July 31, 2019. ¶¶ 104–09.

Once OAG, ANGI and Mr. Vogel realized all the PCS consumer reviews were truthful and not misleading, an agreement was made to remove the PCS business profile and the 107 D.C. consumer ratings and reviews from the ANGI and HomeAdvisor websites anyway. This was planned to occur days after the OAG lawsuit and press release were published. ¶¶ 83, 104. The conspiracy to remove PCS's public profile and legitimate consumer ratings and reviews was essential to the co-conspirators because those ratings and reviews flew in the face of the false catastrophic injury claims being published by OAG on the internet hosted on the OAG website. ¶ 105. The unlawful conspiracy involved a one–two punch that gave the public the false impression that PCS had posted fake reviews, supported by OAG's false claims of catastrophic damage to consumers published on the internet as the only third–party public information available about PCS and the Precision Parties on the internet. ¶ 108.

This meeting of the minds and resulting coordinated actions by OAG and private actors ANGI, Angie Hicks and Mr. Vogel were specifically designed to defame and stigmatize the Precision Parties in bad faith under color of D.C. law. ¶ 109. The deletion of the PCS business

profile and consumer reviews was in furtherance of the conspiracy to weaponize, enhance and sustain the government's stigma. The First Amendment commercial speech suppression and the knowingly false and defamatory press release form a cohesive stigma–plus claim while at the same time independently violating First Amendment commercial speech rights. Plaintiffs properly set forth two distinct counts; Stigma–Plus and First Amendment Commercial Speech Violations because they are inextricably linked to the unopposed conspiracy claims in the SAC and command independent measures of relief, both of which are timely regarding the statute of limitations. The District, ANGI and Mr. Vogel collectively argue claim and issue preclusion with ANGI citing *Nader v. McAuliffe,* 593 F. Supp. 2d 95, 99 (D.D.C. 2009).

**The Claim Preclusion Argument Fails**

> "For claim preclusion to act as a complete bar to Plaintiffs' claims, this Court must find that: (1) there was a prior litigation "involving the same claims or cause of action," (2) "between the same parties or their privies," and (3) "there has been a final, valid judgment on the merits . . . by a court of competent jurisdiction." DCFS USA, LLC v. Dist. of Columbia, 820 F. Supp. 2d 1, 3 (D.D.C. 2011) (citing Smalls v. United States, 471 F.3d 186, 192 (D.C. Cir. 2006)). All three elements are satisfied." (ANGI Mot. 8 : 5–11)

The ANGI Defendants cite *McLaughlin v. Bradlee,* 803 F.2d 1197, 1201 (D.C. Cir. 1986) as their primary authority to achieve dismissal on claim preclusion grounds. However, *McLaughlin v. Bradlee* does not apply to bar the current stigma–plus claim because claim preclusion *(res judicata)* does not extend to causes of action that had not yet accrued at the time of the prior litigation. In *McLaughlin*, the court sanctioned a plaintiff for filing successive, repetitive lawsuits based on an identical, unchanging nucleus of operative facts that had already been fully adjudicated. In contrast, Plaintiffs' stigma–plus claim requires both a defamatory statement and a distinct, tangible alteration of legal status or employment. Because the "plus"

element had not yet occurred during the previous lawsuit in 2019 in *Precision Cont. Sols., ANGI Homeservices*, *Inc.,* the stigma–plus cause of action was legally non-existent and could not have been brought in that or any other court. Plaintiffs' stigma–plus claim relies on a fundamentally new, evolving set of facts that distinguishes it as an actionable independent claim from the impermissible claim-splitting and harassment targeted by the *McLaughlin* court.

**The ANGI issue preclusion, *collateral estoppel,* argument fails:**

> "First, the same central issues underlying Plaintiffs' claims against Angi have already been decided. Twice. One of those issues is whether Angi's removal of PCS's profile from Angie's List and HomeAdvisor was wrongful. In Sieber I, Judge Howell determined that Angi's removal of PCS's business profile was "well-justified" because the governing user agreements gave Angi total discretion to remove any content from their websites. Precision Cont. Sols., LP, 415 F. Supp. 3d at 123–24. Judge Howell further held that Angi's removal decision was reasonable in light of the allegations in the OAG's Enforcement Action." (ANGI Mot. 11 : 16–22)

All Defendants' reliance on the doctrine of collateral estoppel (issue preclusion) is fatally flawed because the factual assertions regarding the removal of ratings and reviews were never "actually litigated" or "judicially determined" beyond the pleading stage in *Precision Contr. Sols., LP v. ANGI Homeservices*, Inc. The final order of Judge Howell stated: *"ORDERED that the plaintiffs complaint, ECF No. 1-1, is DISMISSED, and that Count One of the complaint is DISMISSED with prejudice".* The District Court's explicit dismissal of the federal claim with prejudice, juxtaposed against its silent or simple dismissal of the remaining state law tort claims of all Defendants at the pleadings stage, operates as a dismissal without prejudice.

Defendant's citing *Strumsky v. Wash. Post Co.*, 922 F. Supp. 2d 96 (D.D.C. 2013) to invoke issue preclusion against the Plaintiff's Fifth Amendment stigma–plus claim is a profound misreading of the preclusion doctrine. When a federal court disposes of all claims over which it

possesses original jurisdiction at the initial pleading phase, its subsequent dismissal of pendent state law claims constitutes a discretionary declination to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3). Because such an action is rooted in a lack of subject-matter jurisdiction rather than an adjudication on the merits, it falls outside the default claim-preclusive scope of Federal Rule of Civil Procedure 41(b). The U.S. Court of Appeals for the D.C. Circuit has explicitly established that for issue preclusion to apply, the identical issue must have been genuinely contested by the parties and "actually and necessarily determined by a court", *Yamaha Corp. of America v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992. Because *Precision Contr. Sols., LP v. ANGI Homeservices*, *Inc.,* 415 F. Supp. 3d 113 (2019) was dismissed at the initial pleading stage without an evidentiary hearing, without a motion for summary judgment, and without any submission or stipulation of undisputed facts, no evidentiary weighing ever occurred. Under well-settled federal law, a court resolving a pre-discovery motion to dismiss under Rule 12(b)(6) is legally required to accept the complaint's allegations as true merely to test their legal sufficiency; it does not and cannot make binding, preclusive factual findings, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A procedural summary or recitation of allegations written on the face of a pre-discovery dismissal order carries zero preclusive weight, *Consolidated Edison Co. of New York v. Bodman*, 449 F.3d 1254, 1257–58 (D.C. Cir. 2006). Because Judge Howell did not dismiss the state law tort claims with prejudice and the merits of those claims were never litigated, *collateral estoppel* does not apply.

After the dismissal by the Federal Court, the Precision Parties refiled their claims in the Superior Court in *Sieber v. Vogel* 2020 CA 001596 B based on the honorable Judge Howell's without prejudice order. The Superior Court dismissed *Sieber v. Vogel* based on *res judicata* grounds and erred by citing the ruling in the federal court in *Precision Contr. Sols., LP v. ANGI*

*Homeservices*, *Inc. as "*with prejudice" and without any factual determination on the merits regarding any of its claims. Because all of the claims in *Precision Contr. Sols., LP v. ANGI Homeservices*, *Inc.* and *Sieber v. Vogel* 2020 CA 001596 B have never been factually adjudicated, issue preclusion does not apply to dismiss Counts II and III of Plaintiffs' SAC.

**The ANGI Assertion the SAC Does Not State a Claim under 12(b)(6) Fails**

ANGI's argument completely ignores the well-pled facts in the SAC. To begin, the ANGI Defendants fail to oppose the well-pled conspiracy claims in the SAC and they are therefore waived. *See Wannall v. Honeywell International, Inc.,* 775 F.3d 425, 428 (D.C. Cir. 2014). The same holds true with challenging the plausibility of Counts II and III in the SAC. ¶¶ 93–109, 366–70, but ANGI ignores these well pled facts when stating:

> For example, the Second Amended Complaint repeatedly alleges that "OAG, ANGI, Angie Hicks and Mr. Vogel" collectively reached a "meeting of the minds" and agreed to remove the PCS business profile, without identifying any specific communication, participant, timing, or conduct attributable to Angi itself. (See, e.g., SAC ¶¶ 104, 109, 122). (ANGI Mot. 13 : 3–6)

The SAC pleads: "Once OAG, ANGI and Mr. Vogel realized that all the PCS ratings and reviews were truthful and not misleading, an agreement was made to remove the PCS profile and all the 107 D.C. consumer ratings and reviews from the ANGI and HomeAdvisor websites to occur shortly after the OAG lawsuit and press release was published." ¶ 104. "This unlawful conspiracy to remove PCS's public profile and legitimate D.C. consumer ratings and reviews were essential to the co-conspirators because those consumer reviews flew in the face of the false catastrophic injury claims that were published by OAG." ¶ 105. "The unlawful conspiracy involved a one–two punch including OAG's knowing false claims of massive injury to consumers released to the public and a few days later having PCS's business profile and consumer ratings and reviews removed by ANGI and Angie Hicks from the internet at OAG's

direction and without public explanation." ¶ 107. "This one–two punch gave the public the false impression that PCS had posted fake reviews, supported by OAG's false claims of catastrophic damage to consumers published on the internet as the only public information available about PCS and the Precision Parties." ¶ 108. "This meeting of the minds and resulting coordinated actions by OAG and private actors ANGI, Angie Hicks and Mr. Vogel were specifically designed to defame and stigmatize the Precision Parties in bad faith under color of law. ¶ 109. On August 6, 2019, both S. Sieber and D. Sieber participated in a conference call with Shay who informed the Precision Parties that ANGI upper management had permanently removed the PCS business profile and consumer reviews at OAG's public interest request." ¶ 103. "After intense investigations by OAG and ANGI, all PCS ratings and reviews posted on ANGI, HomeAdvisor and the DCRA consumer ratings portal were found to be true and authentic postings and in no way misleading." ¶ 100. "Defendant ANGI's role in the unlawful conspiracy was that of a private company acting under color of law with Mr. Racine, OAG and Mr. Vogel to intentionally violate the First Amendment commercial free speech rights of Plaintiff D. Sieber by removing the PCS business profile with over 100 five-star PCS ratings and reviews from the ANGI and Home Advisor websites that were true and not misleading." ¶ 366. The ANGI motion to dismiss fails to oppose the SAC conspiracy claims except for a fleeting conclusory reference.

**ANGI and ANGI Hicks are Liable for Acting Under Color of D.C. Law**

The ANGI, Angie Hicks and Vogel Defendants have failed to dispute, except for an occasional conclusory statement, all the well-pled conspiracy claims in the SAC, therefore waiving any plausibility arguments. *Wannall v. Honeywell International, Inc.,* 775 F.3d 425, 428 (D.C. Cir. 2014). The first statement of fact it states: "*UNDER COLOR OF LAW: The following statement of facts is listed for each Count, describing the actions of each Defendant within each*

*Count. Defendants in all Counts acted under color of law with private actors conspiring with the Municipality and Municipal Employees to violate Plaintiffs' civil rights.* ¶¶ 341–70, 104–09.

The following facts appear in the SAC that meet and surpass the threshold of conspiracy pleading as to the who–what–when–where and how private co-conspirators ANGI, Angie Hicks and Kenneth Vogel came to the meeting of the minds they did to deprive Plaintiffs of the constitutional rights alleged. *Bell Atlantic Corp. v. Twombly* (2007) and *Ashcroft v. Iqbal* (2009). Private Attorney Kenneth Vogel. ¶¶ 79–131, 363–65. The District Defendants ¶¶ 362–70, Corporate Defendant ANGI. ¶¶ 79–131, 367–68, and Angie Hicks individually. ¶¶ 79–131, 369.

**This Court has Jurisdiction Over Angie Hicks**

Defendants' argument that this Court lacks jurisdiction over private entities under 42 U.S.C. § 1983 completely misconstrues the well-settled boundaries of the state action doctrine. The Supreme Court has established that a private citizen or corporation acts are "under color of state law" when they are a "willful participant in joint action with the State or its agents" *Dennis v. Sparks*, 449 U.S. 24, 27 (1980), or when the government has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of a state actor." *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

Plaintiffs' SAC moves far beyond speculative or conclusory assertions to plead the ultimate "smoking gun" of joint action: an explicit "public interest request" initiated by OAG targeting Plaintiff's digital footprint on the ANGI and HomeAdvisor websites. Crucially, Plaintiffs do not guess at this state involvement; rather, Plaintiffs explicitly allege that OAG's direct role was expressly disclosed to the Precision Parties by account manager "Shay" an ANGI employee ¶ 102–03. Armed with this internal corporate disclosure, Defendant Angie Hicks, acting in her specific operational capacity as Chief Consumer Officer ("CCO") managing

relationships with the OAG alongside ANGI upper management, affirmatively executed OAG's directive by stripping away PCS's business profile and 107 verified consumer reviews at OAG's request. ¶¶ 29, 93. The removal of the Precision Parties business profile and consumer ratings and reviews was not an independent corporate act; it was a state-initiated action, admitted to by an ANGI insider, and executed by Angie Hicks tasked with governmental relations with OAG, to inflict the "stigma" of the stigma–plus deprivation. Under *Twombly* and *Iqbal*, pleading an insider admission of government pressure builds upon the already established plausibility. Because OAG provided the motivating impetus and Defendant Hicks personally deployed her unique corporate power to carry out the state's objective, Defendant Angie Hicks and ANGI are fully liable as state actors under § 1983 and this Court maintains complete subject-matter jurisdiction over both ANGI and Angie Hicks.

**Kenneth Vogel is Liable for Acting Under Color of D.C. Law**

The Arguments of Mr. Vogel mirror the arguments of the ANGI Defendants regarding issue, claim preclusion and the statute of limitations in *Precision v. ANGI Homeservices*, *Inc.* and *Sieber v. Vogel* 2020 CA 001596 B. Therefore, there is no need to repeat the arguments and cases that have been thoroughly discussed on pages prior as to Counts II and III and incorporated herein. Mr. Vogel's attempts to dismiss Counts II and III based on claim preclusion, issue preclusion and the statute of limitations fail as a matter of law:

> "However, it is important to note at the outset that the allegations in this Second Amended Complaint have been fully litigated and dismissed on two occasions and are therefore barred by res judicata and/or collateral estoppel. Further, the alleged wrongs perpetrated by against Plaintiffs by Mr. Vogel occurred well over five years before this suit was even first initiated, thereby barring the Complaint against Mr. Vogel on statute of limitations grounds." (Vogel. Mot. 2 : 6–10)

Beyond these futile attempts to dismiss based on claim preclusion, issue preclusion and the statute, as previously addressed, Mr. Vogel argues that Plaintiffs have failed to state a claim under § 1983 for a violation of one's constitutional protections and that a complaint must allege facts sufficient to support a reasonable inference that (1) a person (2) acting under color of state, territorial, or District of Columbia law (3) subjected the plaintiff or caused the plaintiff to be subjected (4) to the deprivation of a right secured by the Constitution or laws of the United States. *Jones v. Delaney,* 610 F.Supp.2d 46, 49 (D.D.C. 2009). Like other Defendants, Mr. Vogel has ignored the well pled conspiracy claim in the SAC, therefore waiving any plausibility arguments, *Wannall v. Honeywell International, Inc.,* 775 F.3d 425, 428 (D.C. Cir. 2014), instantly defeating his motion to dismiss. ¶¶ 79–131, 363–65.

Mr. Vogel has been misrepresenting the truth to various courts dating back to 2016 when he filed a Verified Complaint in D.C. Superior Court masquerading as his client Mr. Toland *"Pro-se,"* claiming in his ghost-written Complaint that both D. Sieber and S. Sieber were shills and planted fake consumer reviews on the HomeAdvisor website. (*Toland v. Sieber, et al.,* Case No. 2016 CA 006458 B. ¶ 80. American Bar Association (ABA) Model Rules of Professional Conduct - Candor to the Tribunal (Rule 3.3) states: *A lawyer is prohibited from making false statements of material fact to the court.* ¶ 81. Mr. Vogel's Verified Complaint, pretending to be Mr. Toland *Pro-se,* was dismissed by D.C. Superior Court Judge John Mott in 2017 when Mr. Vogel admitted that he had no evidence to support paragraph 26 in the *Toland* Verified Complaint. ¶ 81. Mr. Vogel's counsel has also brought knowingly false statements of fact into this court seeking an early dismissal and causing this Court to issue orders in error.

> MS. HOWARD: "But they definitely went to trial with these consumers having issues and, then, they had a remedies phase and they put on evidence of the damages. There was a significant finding against Mr. Sieber."(Hr'g Tr. Feb. 4, 2025, 15 :10–13)

Mr. Vogel and his counsel Ms. Howard allowed this false statement to fester in in this Court for over a year until the truth was finally revealed over a year later on February 26, 2026 when *Pro-se* litigant S. Sieber challenged the false statements of Mr. Vogel's counsel:

> MR. SIEBER: "Okay. Well, I have a court order if that will suffice, pretrial court order from Judge McKenna, stating, her words, 'however, because the district is only seeking remedies in the form of civil penalties, restitution, injunctive relief, the Court's reference to damages as a potential remedy was in error.' . . Not once, anywhere in any jury instruction or verdict form is the jury tasked -- the jury's tasked with finding liability. They found no liability on injury or damages" (Hr'g Tr. Feb. 26, 2026, 7:22–8:13)

**Defendant Vogel is Flouting Paragraph 7(f) of the Court's Standing Order**

Defendant Vogel cannot bypass this Court's strict 7(f) pre-motion vetting process by cramming a full-blown summary judgment motion complete with an attachment of undisputed facts into the 12(b)(6) phase of the litigation. This in a transparent attempt to force backdoor summary judgment review without first requesting a pre-motion conference. Gamesmanship and disrespect for the Court's Standing 7(f) Order should not be rewarded but rather disregarded because it only serves to further complicate an already complex docket.

**COUNT IV**

**Fifth Amendment Denial of a Defense**

Fifth Amendment Denial of a Defense, Count IV, is brought against the District Defendants and co-conspirators ANGI, Angie Hicks and Kenneth Vogel for the reasonably foreseeable constitutional violations in furtherance of the conspiracy. *See Monroe*, 365 U.S. at 187; *Halberstam*, 705 F.2d at 482. The OAG Defendants and the Superior Court stripped the Precision Parties of their Fifth Amendment constitutional right to a meaningful defense. Judge Edelman, at the insistence of OAG, struck the OAG press release, lawsuit and supporting

witnesses from the Precision Parties defense-in-chief at trial regarding the publication's falsity, creation, lack of supporting evidence, content, and motives required for the Precision Parties to show the jury that OAG had acted in bad faith. ¶ 133, 144.

OAG brought its CPPA lawsuit based on knowingly false claims of widespread consumer injury. When discovery conclusively unmasked these claims as entirely false, OAG did not dismiss the case and instead pivoted to technical CPPA violations, ¶¶219–20 and leveraged its long-standing agreement with the Superior Court to completely strike any press releases from being challenged by any defendants in CPPA cases. ¶ 344. Exclusion of evidence that could explain a witness's bias or that supports a defendant's theory of the case violates due process. ¶ 134. OAG's online press release with lawsuit attached influenced witnesses and jurors, as testified to by OAG consumer witness Richard Sobiecki, who under cross-examination testified he believed the false statements he read published by OAG and concluded PCS was a "shady operation." ¶ 137. Mr. Sobiecki testified the only alternative to the OAG statements being false was that "the Attorney General fabricated the entire document" and that most people would conclude the false statements in OAG's lawsuit and press release were true based on the D.C. Governments' presumption of regularity. The Precision Parties were precluded by Judge Edelman from introducing the press release in rebuttal to show the statements in the press release that Mr. Sobeicki relied on and testified to were in fact false. ¶ 138.

It is a bedrock principle of procedural due process that a defendant in a civil action must be afforded a meaningful opportunity to present a complete defense. The United States Supreme Court has established that the Due Process Clause "[T]he Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged.", *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982). This constitutional guarantee is severely

compromised when a court arbitrarily excludes evidence that directly substantiates the defendant's core theory of liability or explains the hostile motivations of adverse witnesses. In enforcement actions brought under public interest or consumer protection frameworks, the right to offer an unhindered defense is paramount. As the Supreme Court has long recognized, a party "must be given opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense." *ICC v. Louisville & Nashville R. Co.*, 227 U.S. 88, 93 (1913). Stripping a defendant of the evidence necessary to build its narrative or rebut the government's claims reduces the trial to an unconstitutional, one-sided formality. Furthermore, a defendant's right to a fair hearing encompasses the right to expose the partiality or improper motives of the witnesses arrayed against them.

The D.C. Circuit has made clear that this evidentiary imperative is not confined to the criminal arena: "[t]he jury have the right both in civil and criminal cases to know the biased interest of a witness... Bias of a witness is always relevant." *Villaroman v. United States*, 184 F.2d 261, 262 (D.C. Cir. 1950). Because the credibility of a witness is a central issue for the finder of fact, preventing the defense from introducing evidence of a witness's personal animus, financial stake, or biased motivation is a direct violation of basic fairness. *See* Fed. R. Evid. 611(b). Because the evidence at issue here directly exposes witness bias and validates the Precision Parties theory of the case, its exclusion is constitutionally impermissible.

This excluded evidence was dispositive and had it been admitted, it would have exposed the District's bad-faith fraud necessitating the termination of the enforcement action by OAG. By conspiring to strike this vital press release evidence as a business-as-usual function involving OAG and the Superior Court, the Defendants erected an arbitrary, absolute barrier that insulated

government misconduct from the jury's view and stripped the Precision Parties of a meaningful opportunity to be heard applied via the Fifth Amendment, *Dennis v. Sparks*, at 28 (1980).

## COUNT V

### Fifth Amendment Violation of Right to a Fair Trial
### *Ex Parte* Jury Tampering and Destruction of Evidence

Denial of the Right to a Fair Trial, Count V, is brought against the District Defendants, as well as against co-conspirators Thomas Hedgepeth, ANGI, Angie Hicks and Kenneth Vogel for the reasonably foreseeable constitutional violations in furtherance of the conspiracy. *See Monroe*, 365 U.S. at 187; *Halberstam*, 705 F.2d at 482. The District attempts to dismiss Count V using two arguments: "(1) OAG has no control over the U.S. Marshals service and (2) Plaintiffs fail to allege facts that plausibly support the *ex-parte* contact took place." (Def's Mot. at 24 :18–25 :2) This flimsy response flies in the face of the detailed SAC statement of facts as to Count V, and the official transcript record of the case.

Official court transcripts and DNA share a common nucleus; they are one of the most reliable forms of authenticating evidence. That certainly holds true here, as Judge Edelman admits to "on the record" the jury tampering scheme conceived and executed by himself, OAG and Deputy Marshal Keven Spencer. Plaintiffs refer to the Count V statement of facts on pages 14–19 of this Opposition that pleads the jury tampering scheme created and implemented by the District Defendants and Judge Edelman in complete detail, ¶¶147–75, with excerpts cited below:

> MR LYLE: *"Well, why are the Marshals there."* ¶ 158.
>
> JUDGE EDELMAN: *"The marshals were -- again, were here at the request of the Office of the Attorney General or the Attorney General"* ¶ 159.

S. Sieber informed Judge Edelman that he witnessed Deputy Marshals interacting with the jury when courtroom clerk Mr. Lee exited the courtroom into the jury deliberation area.

> JUDGE EDELMAN: *"when you say interacted, what do you mean?* ¶ 161.
>
> S. SEIBER: *"Spoke with them"* ¶ 162.
>
> JUDGE EDELMAN: *"I don't think that that is correct. We can -- again, we're not going to resolve this now. If you want to raise an issue, we can do it post-trial, if necessary. Why -- let me ask you this: How did you even --they're behind a door"* ¶ 163.

In ¶ 164 below S. Sieber made sure that Judge Edelman was noticed on the record that security cameras would have captured Deputy Marshals speaking to the jury.

> S. SEIBER: *What happened is the door opened, there was three marshals right there, and the jury together and there was some, you know, like, looks and -- you got cameras back there, you can see it"* ¶ 164.

In ¶ 166 below, Judge Edelman admits on the record that he was directly involved in the *ex-parte* decision to allow Deputy Marshals to escort the jury from their deliberations.

> JUDGE EDELMAN: *"I agree with you that the party asking the marshals to escort the jury and the marshals doing that is problematic. I agree with you 100 percent on that. Essentially, if I weren't involved in that decision, that would be -- I agree with you on that,"* ¶ 166.
>
> S. SIEBER: *"But what about them talking to each other."* ¶ 168.
>
> JUDGE EDELMAN: *"Them talking, I guess, beyond more than chatting, if it was just like a hello as they came into -- it couldn't have been anything substantiative if they were walking with -- they came in 30 seconds after they left the room"* ¶ 169.
>
> S. SEIBER: *"We don't know what was said, Your Honor"* ¶ 170.
>
> JUDGE EDELMAN: *"True"* ¶ 171.
>
> MR. LYLE: *"From my understanding it was there was some interaction as the jurors came out. The logical question would be what's going on. If the marshal, some marshal said OAG asked us to come in, then there's a problem, because there's an inference that OAG is doing this to protect them against us."* ¶ 173.

JUDGE EDELMAN: *"What are you requesting"* ¶ 174.

S. SIEBER: *"A mistrial"* ¶ 175.

Plaintiff brings Count V to redress severe, independent constitutional injuries inflicted upon Plaintiff by the District Defendants and Judge Edelman acting under color of law. Count V, or any other Count in the SAC does not seek appellate review of any D.C. litigation judgment, that is for the D.C. Court of Appeals to examine, and they are, rather Count V challenges Defendants' independent jury tampering, bad-faith spoliation of subpoenaed records and a conspiracy cover-up which inflicted standalone constitutional injuries separate from the D.C. litigation outcome. During jury deliberations in the D.C. litigation, OAG, acting in concert with Judge Edelman and Deputy U.S. Marshal Kevin Spencer, initiated unlawful, *ex parte* contact with the jury. Under long-standing constitutional law, any private, extrajudicial communication or tampering directly or indirectly with a juror or jury during a trial about the matter pending before the jury is a distinct constitutional violation that triggers an immediate presumption of prejudice. *Remmer v. United States*, 347 U.S. 227, 229 (1954).

**Defendant Kevin Spencer's Direct Involvement**

Plaintiffs have dispositively addressed the immunity claims of Defendant Spencer and dismissed him from liability in Argument section (4) pages 37–8 of this Opposition, but the claims of his unlawful actions remain in the SAC. As a threshold matter, Marshal Spencer did not oppose Plaintiffs' conspiracy claims aimed directly at him as to the who–what–when–where and how his overt acts were in furtherance of the conspiracy that deprived the Precision Parties of a fair trial. ¶ 352. S. Sieber witnessed Marshal Spencer informing Judge Edelman's courtroom clerk, Mr. Dawayone Lee, that Deputy U.S. Marshals would be escorting jurors pursuant to orders from OAG, a party in the case, and without notice to the Precision Parties, a hearing, or a

court order. ¶ 150. Defendant Spencer asked Mr. Lee if Judge Edelman was in his chambers, and Mr. Lee said *yes*." ¶ 151. Mr. Spencer then stated: *"I'm just going to give him a heads up"* and exited the courtroom to speak to Judge Edelman, affirming *ex parte* contact among OAG, Marshal Spencer and Judge Edelman leaving the Precision Parties in the *ex parte* dark. ¶ 152. Once Mr. Spencer exited the courtroom into the chambers area, S. Sieber approached Mr. Lee who explained that OAG had ordered the Marshals to escort the jury ¶ 154.

The motion to dismiss of Marshal Kevin Spencer is a work of pure fiction. Rather than challenging the plausibility of Count V and conspiracy claims, Defendant Spencer has submitted a boilerplate brief raising questions if Defendant Spencer's counsel even read the SAC. First, Defendant Spencer argues Plaintiffs are only suing Mr. Spencer in his official capacity and appear oblivious that Plaintiffs sued Mr. Spencer in his personal capacity. In ¶ 22 of the SAC Plaintiffs explicitly sue Defendant Spencer and all the other Defendants in both their individual and official capacities ¶¶12–27, 29–30. In a second display of cavalier lawyering, Mr. Spencer's counsel falsely asserts at Spencer Mot. 1:10–21 that the underlying litigation in D.C. Superior Court was a criminal trial, *District of Columbia v. Precision Contracting Solutions L.P. et al,* 2019-CA-5047-B ("Superior Court litigation"). It was not. The Superior Court litigation was a civil enforcement action brought under the CPPA by OAG. So, either Mr. Spencer's counsel seeks to place a criminal cloud over Plaintiffs in the eyes of this Court or cannot distinguish between a civil consumer protection matter and a criminal prosecution. The third false statement at Spencer Mot. 2 : 4–9 claim that Plaintiffs' SAC alleges OAG escorted jurors during their deliberations and not the Marshals.

This trifecta of false statements to the Court in the first page and a half of Defendant Spencer's motion disgraces the professional code of conduct demanded by the Federal courts and

the honorable judges who serve within them. Indeed, Mr. Spencer's motion to dismiss remains silent on the plausibility of Plaintiffs Count V and the related conspiracy claims, apparently concluding its "hat trick" of false statements would have convinced this Court to dismiss Kevin Spencer. A federal court is not required to sift through an adversary's fictional narrative to find a salvageable argument. Under well-established U.S. Supreme Court precedent, this Court possesses the inherent authority to sanction counsel if they engage in bad-faith misconduct or misrepresents the foundational facts of a case. *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962). Chief among these inherent powers is the absolute right to protect the tribunal from bad faith and fraud.

**Defendant Thomas Hedgepeth's Direct Involvement**

Plaintiffs have dispositively addressed that Defendant Hedgepeth has no immunity in Argument section (5) pages 38–41 of this Opposition. Defendant Hedgepeth is the official administrative custodian of the Superior Court surveillance records and was served with a legal subpoena on August 17, 2024, commanding the preservation and production of the courthouse CCTV tapes months prior to their destruction. ¶¶194–97. Plaintiff S. Sieber placed Judge Edelman on notice in open court that the CCTV security footage would have captured the jury tampering events. ¶ 164. Despite notice to Judge Edelman and a binding, outstanding subpoena, Defendant Hedgepeth failed to protect jury tampering evidence in the form of "auto-deletion" of CCTV recordings that captured the *ex-parte* jury tampering events. ¶¶353–55.

The bad-faith destruction of material evidence by a Judge or security official after explicit notice constitutes an independent violation of the Fifth Amendment's Due Process Clause, *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). An adverse inference is fully warranted under Federal Rule of Civil Procedure 37(e)(2). The Defendant had a clear, unambiguous duty to

preserve the CCTV footage. Despite receiving actual notice of evidence via a lawful subpoena, Defendant Hedgpeth failed to take any steps to pause the automated deletion loop. Because this failure occurred after formal legal subpoena was recieved, the timeline strongly supports a finding of an intent to deprive, or at minimum, a willful disregard of the duty to preserve. Such conduct justifies an adverse inference for the purpose of this motion. See *Grosdidier v. Broadcasting Board of Governors*, 709 F.3d 19, 28 (D.C. Cir. 2013); *Talavera v. Shah*, 638 F.3d 303, 311–12 (D.C. Cir. 2011). Judge Edelman, being fully aware of his personal exposure when caught in the jury tampering scheme, deployed tactical administrative silence and the power of the bench to insulate his judicial misconduct from public exposure. Judge Edelman refused to issue protective orders to secure the record and left Defendant Hedgepeth on his own, by design, to allow critical jury tampering evidence to auto–delete to protect the District Defendants and Judge Edelman from their illegal conduct being exposed.

**Judge Edelman's Failure to Recuse Violated Plaintiffs' Right to a Fair Trial**

The Fifth Amendment's Due Process Clause strictly prohibits an official from sitting in judgment of an action where they possess a direct, personal, substantial stake in the outcome, or where the probability of actual bias is too high to be constitutionally tolerable. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876–77 (2009). By actively participating in a cover-up to allow self-implicating evidence to vanish, Judge Edelman acted outside the scope of legitimate judicial functions. This administrative collusion executed a textbook fraud upon his own court that represents an independent constitutional injury to Plaintiffs. Because this claim attacks the fraudulent process and illegal conduct of the actors rather than the judicial error of a judgment, it is a fully cognizable § 1983 claim. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S.

280, 293 (2005) (holding that *Rooker-Feldman* does not bar federal jurisdiction over independent claims challenging the wrongful conduct of adverse parties).

Judge Edelman had an absolute obligation to safe-keep and protect vital evidence relevant to a structural constitutional defect, *ex parte* jury tampering, even if the judge is the accused. By failing to order the preservation of the tapes and conspiring with Defendant Hedgepeth to hide behind a claimed "auto–deletion" while the same evidence was under subpoena, Judge Edelman abandoned his judicial role and instead acted as an accomplice to the destruction of evidence to protect his personal interests. The dispositive nature of ¶ 164 of the official court transcript leaves no doubt that Judge Edelman was put on notice that the CCTV footage would be evidence of the jury tampering scheme uncovered by Plaintiffs.

Finally, none of the Defendants challenge any SAC conspiracy claims that plead the who–what–when–where and how, ¶¶345–49, 352–362 or the plausibility of Judge Edelman's admissions, ¶¶147–75 in conformance with Supreme Court pleading standards in *Ashcroft v. Iqbal,* 556 U.S. 570, (2009). This failure constitutes a waiver under *Wannall v. Honeywell International, Inc.,* 775 F.3d 425, 428 (D.C. Cir. 2014) for the Rule 12(b)(6) phase of the case.

## COUNT VI

### Seventh Amendment Violation of Right to Jury Trial

Denial of the Right to a Jury Trial is brought against the District Defendants and co-conspirators Thomas Hedgepeth, ANGI, Angie Hicks and Kenneth Vogel for the reasonably foreseeable constitutional violations in furtherance of the conspiracy. *See Monroe*, 365 U.S. at 187; *Halberstam*, 705 F.2d at 482." Judge Edelman exits reality when making up from thin air claims of victimization and injury to consumers the jury did not find. Judge Edelman begins his pattern of false statements in his December 18, 2024, final order when stating, *"consumers have signed declarations that they were victims of deceptive practices"* (Final Order at 20:9, Dec 18,

2024). The declarations make no such statement of victimization and state only that consumer's did business with PCS. Judge Edelman's desire to distort the record and the jury's liability findings is in clear retaliation when Judge Edelman states:

> *"As the jury found, Defendants have acted in bad faith, performing shoddy work over a period of many years, relying on intentional misrepresentations as part of their standard business practices, and threatening consumers who complain,"* ¶229. (Final Order at 33:5-7 (Dec 18, 2024)

The jury did not find the Precision Parties acted in bad faith, ¶ 230. The jury did not find PCS "performed shoddy work over a period of many years" ¶ 231. In fact, the jury did not find any injury–in–fact to consumers or find any poor workmanship at all. ¶ 232. The jury did not find "PCS relied on intentional misrepresentations as part of their standard business practices, and threatening consumers who complain," ¶ 233.

Judge Edelman made continuing false statements in his December 18, 2024, final order by inserting his personal agenda in place of the jury's verdict when stating:

> *"They have inflicted substantial injury to the public over an extended period of time, amounting to millions of dollars in improperly obtained payments just from the few dozen consumers who submitted sworn declarations to the Court."* ¶234. (Final Order at 33:7-10 (Dec 18, 2024)

Despite the jury finding no injury–in–fact, Judge Edelman falsely asserts that the Precision Parties inflicted *"substantial injury to the public over an extended period of time amounting to millions of dollars in improperly obtained payments,"* ¶ 235. Judge Edelman's false statements contradicted the jury's verdict of no injury to consumers and violated the Precision Parties' right to a jury trial, ¶ 236. When a jury finds no injury, a judge cannot utilize post-trial administrative maneuvers to find one, *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355 (1962). It is a bedrock principle of constitutional jurisprudence that

any deprivation of property or imposition of civil penalties obtained through the deliberate deception of a court violates the Due Process Clause. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

While this traditionally applies to prosecutorial misconduct, its logic applies with equal, if not greater, force to the judiciary. Due process demands an impartial and objective arbiter whose orders are anchored in the truth of the record. When a final order relies on demonstrably false statements by the judge himself, it ceases to be a lawful judicial decree and becomes an instrument of judicial bad faith. Under the doctrine established in *North Carolina v. Pearce*, 395 U.S. 711, 725–726 (1969), any post-trial escalation of a defendant's penalties or liabilities must be justified by objective, identifiable information in the record. By deliberately bypassing the jury’s verdict and inventing an artificial scale of consumer injury, Judge Edelman’s order demonstrates a punitive animus that violates the core tenets of judicial ethics and justice.

The entire remedies order is infected, legally invalid, and violated the Seventh Amendment right to a jury trial. OAG and Judge Edelman engaged in; (1) conspiratorial *ex parte* jury tampering, ¶¶ 147–75; (2) undertook an open joint conspiracy to manufacture post-trial evidence ¶¶ 260–67; (3) falsified a jury's verdict in a final order, ¶¶ 228–39; and (4) executed an astronomical monetary judgment based on clear falsehoods and vindictive retaliation, ¶¶ 253–59. Judge Edelman stepped outside of the bifurcated trial agreement when he assumed the role of the jury during the remedies phase by allowing OAG to manufacture post-trial, out-of-court evidence to explicitly expand on the jury's verdict ¶¶ 260–67. Judge Edelman stepped outside the bounds of judicial decency unbefitting a Superior Court Judge by making knowingly false statements about the jury’s findings in his December 18, 2024, final order, ¶¶ 228–39 based not on the facts found by the jury, but rather on his own personal malice for

being exposed on the record to his and OAG's *ex-parte* jury tampering scheme by a *Pro-se* litigant.

The parties agreed to a bifurcated trial, wherein the jury would determine liability, and the trial court would determine remedies, ¶221. Before transferring the case to Judge Edelman for trial, Judge McKenna suggested a remedies conference and briefing be scheduled well in advance of trial to ensure the Precision Parties received adequate notice, ¶ 222. Under established jurisprudence, that factual findings of the jury concluded the liability and injury inquiry. The jury serves as the exclusive arbiter of injury and fact. Instead, Judge Edelman completely nullified the jury's verdict at his retaliatory whims and transformed the judicial remedies phase into a star-chamber manufacturing plant for $1,488,755.52 in phantom restitution with no injury–in–fact, $576,00 in civil penalties, $902,608.72 in OAG legal fees and a lifetime employment ban against a general contractor who had maintained an A+ rating at the Better Business Bureau for ten consecutive years with only one consumer complaint in its thirteen-year licensing history. ¶¶ 32–33.

Restitution is an equitable remedy meant to restore a party to the status quo after suffering an actual, quantifiable loss. It is not an instrument of judicial warfare. Because the trial record was entirely devoid of any evidence of consumer injury, OAG and Judge Edelman went outside the bounds of the litigation to engineer a bogus, manufactured class of "victims." ¶¶ 260–67. OAG aggressively canvassed former PCS customers using confidential proprietary contracts turned over during discovery and systematically contacted hundreds of perfectly satisfied consumers who had never filed a complaint, never testified at trial, and were completely oblivious to the litigation. ¶¶ 263–64. To execute this scheme, OAG fabricated boilerplate assembly-line declarations that enticed consumers with a "free money" proposition: simply sign

a pre-prepared statement confirming you did business with PCS and you can receive a massive financial windfall. Out of over 600+ canvassed past PCS customers, 39 signed, all of whom suffered no injury-in-fact, had no complaints and did not testify at trial. ¶ 260.

Judge Edelman accepted these boilerplate declarations and awarded consumers the full contract value of their construction projects, ¶ 262, that resulted in a staggering $1,488,755.52 restitution award, completely unmoored from the jury's explicit finding of no injury. ¶ 264. To reward OAG for its extrajudicial canvassing effort, Judge Edelman found an additional $576,000 in civil penalties and $902,608.72 in OAG legal fees paid to the District's treasury, and if that wasn't enough, issued a lifetime employment ban against the Precision Parties to punish them for exposing an *ex parte* jury tampering plot, demanding a mistrial, demanding his recusal, and demanding a mandatory *Remmer* hearing.

## <u>COUNT VII</u>

## Eighth Amendment Violations of the Excessive Fines Clause

Excessive Fine Clause Violations, Count VII, are brought against the District Defendants, as well as co-conspirators Thomas Hedgepeth, ANGI, Angie Hicks and Kenneth Vogel for the reasonably foreseeable constitutional violations in furtherance of the conspiracy. *See Monroe*, 365 U.S. at 187; *Halberstam*, 705 F.2d at 482. OAG and Judge Edelman designed and converted the remedies phase of a CPPA trial into an unconstitutional seizure of $2,967,364.24 and a lifetime employment ban conceived in bad faith in violation of the Fourth Amendment. When the District unlawfully interferes with an individual's control over his property without legitimate legal justification, an unlawful seizure has occurred, *Soldal v. Cook County*, 506 U.S. 56, 61 (1992). While originating in the criminal warrant context, *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978) establishes the foundational Fourth Amendment principle that a government seizure is unconstitutional if it is predicated on an official affidavit containing a knowing,

intentional, or reckless falsehood, provided that setting aside the false statement leaves the affidavit insufficient to establish probable cause, which is exactly what Judge Edelman's falsehoods did in his December 18, 2024, final order violating Supreme Court precedent. ¶¶ 229–38. The Fourth Amendment's protection of "effects" extends to intangible property interests that are clearly defined under District law, including an individual's right to engage in a chosen profession and operate a lawful business enterprise. By issuing a permanent injunction granting a lifetime employment ban, the trial court did not simply regulate a business, it permanently seized and extinguished Plaintiffs' possessory interest in their ongoing commercial livelihood without the required Superior Court Rule 65 evidentiary hearing.

Where a motion for a permanent injunction turns on sharply disputed material facts or credibility determinations, a proper evidentiary hearing is required before the court may grant such relief, Superior Court Rule 65. While Rule 65 allows a court to consolidate a preliminary injunction hearing with a final trial on the merits, Judge Edelman cannot strip the Precision Parties of their fundamental right to present oral testimony and cross-examine witnesses when material facts are fiercely contested regarding the permanent injunction. *Id.* Constitutional procedural due process protections apply if a government action or injunction deprives a citizen of a recognized liberty or property interest in their employment. Under *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573–74 (1972), a citizen has a protected liberty interest if the action imposes a stigma that forecloses their freedom to take advantage of other employment opportunities, or a protected property interest if they have a legitimate claim of entitlement.

To enter a permanent injunction against a licensed general contractor, ¶ 32, that maintained an A+ rating at the Better Business Bureau ("BBB") for ten consecutive years beginning in 2010, ¶ 33, with only one consumer complaint at the BBB and Department of

Consumer and Regulatory Affairs ("DCRA") during PCS's thirteen-year business history without a hearing is totalitarian injustice. The District, through the joint, bad-faith actions of OAG and the trial court, executed an unconstitutional seizure under the Fourth Amendment. The $2,967,364.24 judgment and the lifetime employment ban were built upon a falsified ratification of the jury's verdict, fabricated post-trial boilerplate declarations and retaliatory judicial animus, resulting in the unlawful extraction of property. Plaintiffs' effects and livelihood were unconstitutionally seized, rendering the entire remedies framework invalid under §1983.

**COUNT VIII**

**Fourth Amendment Property Seizure Violations**

Violations of Fourth Amendment Property Seizure, Count VIII, is brought against the District Defendants and co-conspirators Thomas Hedgepeth, ANGI, Angie Hicks and Kenneth Vogel for the reasonably foreseeable constitutional violations in furtherance of the conspiracy. *See Monroe*, 365 U.S. at 187; *Halberstam*, 705 F.2d at 482.

**The Rule:** D.C. Code § 28-3909(a). The D.C. Consumer Protection Procedures Act states that the D.C. Attorney General can only recover restitution for "property lost, or damages suffered by consumers as a consequence of the unlawful act or practice." If a contract is fully and successfully completed between a consumer and a licensed contractor with zero consumer injury, there is no "lost property" or "suffered damage" to measure. This is the Rule that Judge Edelman intentionally violated when finding imaginary injury the jury did not find to satisfy his retaliatory desires. As established in *Grayson v. AT&T Corp.,*15 A.3d 219, 244–45, 248, 251 (D.C. 2011), OAG has sovereign standing to sue for a "no-injury" technical violations, however OAG must actually prove a real-world financial consequence to trigger a financial return of funds to consumers, *Grayson* at 244–245.

OAG's bogus restitution scheme based on boilerplate declarations is a clear violation of Fourth Amendment Property Seizure, wherein; (1) consumers experienced no injury; (2) consumers were not complaining; and (3) consumers received the equity benefit of five-star construction services from PCS. The pled SAC facts and the D.C. litigation record expose the OAG press release and lawsuit as pretextual bad faith deception regarding a CPPA lawsuit brought without probable cause. ¶¶ 260–67. OAG's pursuit of massive civil penalties under the CPPA is a clear violation because they were obtained by fraud and improper means resulting from *ex parte* jury tampering and the alteration of D.C. Code § 28-3904(f) law from "fail to state a material fact if such failure tends to mislead" to "failed to state a material fact which has **any tendency to mislead,**" of which fraud stood at the pillars of the jury's verdict when finding technical violations. The final judgment entered in the D.C. litigation does not represent a lawful, objective application of regulatory statutes. Rather, astronomical consumer restitution, civil penalties, attorney's fee award and a lifetime professional employment ban were obtained through a corrupt judge and OAG who had to resort to making false statements in a final judicial order to create injury the jury did not find out of retaliatory malice.

## COUNT IX

### Unconstitutional CPPA Statutes Violate the First Amendment

Unconstitutional CPPA Statutes Under the First Amendment, Count IX, is brought against the District Defendants and co-conspirator Kenneth Vogel. *See Monroe*, 365 U.S. at 187; *Halberstam*, 705 F.2d at 482. The District Defendants argue:

> *"Instead, Plaintiffs ask this Court to broaden the standard under the void-for-vagueness doctrine to require the District to define every possible term in its statute with granular specificity, perfect clarity, and precise guidance—and then apparently ensure that same level of specificity in every jury instruction in every case bringing claims under the statute."* (Dist. Mot. 16 : 26–17 :6)

The District Defendants cite *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989) but fail to apply the three-part test to the CPPA in *Greyned v. City City of Rockford,* 408 U.S. 104, 108–09 (1972) cited in *Ward* that mandates; (1) Laws must give a person of ordinary intelligence a reasonable opportunity to know exactly what conduct is prohibited or required. (2) A statute must provide explicit, minimal standards for the police, judges, and juries who apply the law, and (3) When a vague law touches upon areas of protected expression (such as First Amendment rights), it must not create a "chilling effect" causing individuals to steer far wider of the unlawful zone than if the boundaries of the law were clearly marked.

While purely regulatory civil statutes enjoy the lowest level of vagueness review, the U.S. Supreme Court ruled in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) that a "quasi-criminal" law, one that carries severe civil punitive fines as in the CPPA, demands a much higher degree of statutory precision. The precedent case on vagueness in a civil penalty framework is *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–59 (2012). There, the Court invalidated enforcement actions against networks for "fleeting expletives" because the FCC's policy failed to provide fair notice before threatening massive financial penalties. Justice Kennedy established that "even if a statute does not carry prison time, the government cannot exact severe financial penalties based on a standardless rule."

**The CPPA is Unconstitutionally Vague:** D.C. Code § 28-3904(e), (f), (f-1) and (m) are unconstitutionally vague on their face and create instant constitutional violations when applied to jury instructions in CPPA litigation. ¶¶288–294, 318–336. Because the CPPA lacks definitions of any kind and fails to provide a "safe harbor" provision, it forces merchants to speculate on the legality of their commercial speech under threat of strict liability and treble damages. When a void–for–vagueness CPPA statute pollutes jury instructions, as in the case in D.C. litigation, it

can be extreamly damaging. A statute is void-for-vagueness under the Due Process Clause if it fails to give "a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" *see United States v. Harriss*, 347 U.S. 612, 617 (1954). Courts demand heightened precision where a statute imposes severe penal-style sanctions, such as the CPPA's statutory and treble damages without requiring proof of intent, reliance, actual consumer deception or injury *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982).

D.C. Code § 28-3904 subsections (e), (f), and (f-1) penalize misrepresentations or omissions of a "material fact" that has a "tendency to mislead." However, nowhere in D.C. Code § 28-3901 are the terms "material fact," "tendency," or "mislead" defined. By failing to anchor these terms to an objective commercial or common-sense standard, the statute creates an impermissible moving target, especially when no consumer injury–in–fact is present. A merchant cannot realistically discern what unstated background information a court or jury might retroactively deem a "material omission" under § 28-3904(f). Because the CPPA explicitly permits liability *"whether or not any consumer is in fact misled, deceived, or damaged thereby,"* the statute operates as a standardless liability dragnet for bad faith OAG enforcement for benign marketing variations and legal statements in the ordinary course of business, depriving merchants of fair notice in direct violation of due process. The unconstitutionality of the CPPA is exposed when comparing it to peer state consumer frameworks that successfully respect due process and the First Amendment. For example, the California Legislature provides a dedicated statutory chapter defining terms and enumerating explicit prohibited behaviors, Cal. Civ. Code §§ 1761, 1770. in conjunction with a mandatory pre–suit notice and cure window to prevent arbitrary enforcement liability. Furthermore, California courts recognize "safe harbor" under its

consumer protection framework, *Cel-Tech Comm. Inc. v. L.A. Angeles Cell Tele Co.*, 20 Cal. 4th 163, 973 P.2d 527, 83 Cal. Rptr. 2d 548 (1999). The CPPA's complete failure to provide these structural guardrails under § 28-3901 leaves merchants without fair notice or a compliance harbor, rendering §§ 28-3904(e), (f) and (f-1) unconstitutionally on its face as legislated.

**The CPPA Invites Subjective, Arbitrary, and Targeted OAG Enforcement**

To survive a due process challenge, a statute must provide explicit, objective standards to prevent arbitrary and discriminatory enforcement by judges, juries, and prosecutors *see Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). CPPA § 28-3904(m) prohibits threats to consumers other than litigation, while subsection (f-1) penalizes representations that create a misleading impression through "innuendo or ambiguity." Because the CPPA fails to define any material words or phrases or provide safe harbors within the CPPA § 28-3901 framework, enforcement under its subsections is driven by retroactive and political ad-hoc assessments by OAG. The Supreme Court has made clear that laws must not "abdicate the state's responsibility for setting the standards of the law" *see Smith v. Goguen*, 415 U.S. 566, 575 (1974). Granting OAG unchecked discretion to define "ambiguity" or "unconscionability" on a case-by-case basis would have been of major concern to the founders because the CPPA invites disparate and discriminatory adjudication against commerce that the founders sought to eliminate.

**The Lack of a Safe Harbor Provision**

Due process requires that a regulatory scheme afford entities a predictable mechanism to ensure compliance with concurrent legal boundaries. Unlike peer state statutes that maintain operational statutory "safe harbors" when business practices are explicitly authorized or heavily regulated by other laws (see, e.g., California's Unfair Competition Law framework) this creates

conformance, but the CPPA contains no comprehensive safe harbor providing the required check and balance to save an otherwise unconstitutional statutory framework. As a result, a merchant can be in absolute compliance with overlapping federal regulatory regimes, such as Federal Trade Commission guidelines, and still face strict liability under the open-ended and non-defined terms within § 28-3901. Forcing a commercial entity to operate under a local statute that penalizes conduct otherwise permitted or structured by concurrent federal regulatory authorities violates basic principles under the Fifth Amendment. Because § 28-3904 permits punitive-rate financial liability for entirely standardless violations, it fails to comport with constitutional safe harbor due process and must be struck as legislated.

**OAG and Judge Edelman Altered D.C. Code § 28-3904(f) *ultra vires***

The Defendants' *ex parte* modification of the statutory text of D.C. Code § 28-3904(f) within the jury instructions transformed a legislatively enacted consumer protection statute into an unconstitutional restriction on limitless protected speech. By replacing the statutory mechanism targeting deceptive omissions with a standard that punishes affirmative statements of truth, the instruction violates both the First Amendment and core constitutional Separation of Powers principles. Under long-standing Supreme Court precedent, commercial speech that is not inherently false or misleading if protected by the First Amendment *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 561 (1980).

The D.C. City Council enacted D.C. Code § 28-3904(f) without constitutional scrutiny by targeting a specific harm: the "fail[ure] to state a material fact if such failure **'tends to mislead'.**" This statutory language regulates pure omissions where silence creates a deceptive impression. By altering the statute to punish a party who state[s] a material fact that has **"any tendency to mislead,"** the District Defendants fundamentally inverted the law. This rewritten

prejudicial standard does not target deceptive omissions; instead, it explicitly penalizes the affirmative utterance of a "material fact." Because a “fact” is an item of certain verifiable truth, the modified instruction unconstitutionally allows a jury to impose liability for speaking the truth, simply because the District or a jury subjectively decides that the truth had a "tendency to mislead.”

The role of OAG is strictly to enforce laws as written, and the role of the judicial branch (the Court) is to interpret and apply them, not to rewrite them. A court's authority to shape jury instructions is limited to summarizing and accurately reflecting the law enacted by the legislature. It is a foundational tenet of the separation of powers that courts cannot “amend” clear statutory text under the guise of judicial interpretation or administration. *See* D.C. Circuit Statutory Rule, 819 F.3d 444, 450 (D.C. Cir. 2016): The D.C. Circuit laid down a definitive separation of powers restriction on both judges and agencies: “When a new situation arises outside the scope of an old statute, the proper approach under our system of separation of powers is for Congress to amend the statute, not for OAG and Judge Edelman to rewrite the statute beyond what the statute’s terms can reasonably bear.”

By abandoning the legislative boundaries of D.C. Code § 28-3904(f) and crafting a custom offense behind closed doors, the District Defendants effectively functioned as a lawmaking body, bypassing the strict constitutional checks and balances when OAG colluded with Judge Edelman to perform and explicitly legislative act *ultra vires.* This overreach was not only highly prejudicial, but it was also intentional and designed to deceive the jury as to the law. By lowering the statutory bar from a deceptive omission to *any* affirmative statement with *“any tendency to mislead,”* Defendants manufactured a brand-new legal standard in a jury instruction

designed to engineer a tainted verdict against the Precision Parties and all future CPPA litigants. This judicial usurpation stripped the right to be tried under the actual law of the land.

**D.C. Code § 28-3904(m) is Unconstitutional on its Face and as Applied**

D.C. Code § 28-3904(m) is facially unconstitutional under the First Amendment. A statute is facially invalid under the overbreadth doctrine if it "does not aim specifically at evils within the allowable area of state control but on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech" *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). The Supreme Court's controlling framework in *City of Houston v. Hill*, 482 U.S. 451, 461–2, 467 (1987) mandates that a statute must be invalidated on its face if it is drafted so broadly that it criminalizes or penalizes a substantial amount of constitutionally protected speech or conduct. In *Hill*, the Court struck down a municipal ordinance that made it unlawful to "interrupt" a police officer, ruling that the law was unconstitutionally overbroad because it lacked narrow, objective limits and effectively criminalized verbal speech.

D.C. Code § 28-3904(m) suffers from the exact same structural defect as *Hill*, operating as a blanket, content and viewpoint-based prohibition on commercial, contractual, and political speech. The statutory text penalizes anyone who *"harasses or threatens a consumer with any act other than legal process."* By restricting "any act other than legal process," the statute explicitly strips citizens of their right to engage in peaceful, non-violent out-of-court speech, dispute resolution, corporate or political grievances or seeking redress for government misconduct. The catastrophic overbreadth of § 28-3904(m) is not hypothetical; it is starkly demonstrated by the D.C. litigation's application of the statute against the Precision Parties across three distinct, protected sectors of speech: (1) The Superior Court ruled the Precision

Parties violated § 28-3904(m) for stating their intention to charge for work performed under a contractual change order. Expressing a standard commercial position or warning of a potential result of an impending billing adjustment under a binding contract is a fundamental exercise of protected commercial speech. By reclassifying routine, out-of-court commercial negotiations as an actionable *"threat,"* the statute chills basic marketplace communications. (2) More chillingly under a *Hill* analysis, the Superior Court found a violation of § 28-3904(m) because Plaintiffs stated an intention to file a formal complaint with the superiors of an FBI officer who was actively utilizing his color of law to intimidate project inspectors. The First Amendment explicitly guarantees citizens the absolute right to petition the government for a redress of grievances. Therefore, reporting or threatening to report a law enforcement official's corruption to his chain of command sits at the absolute pinnacle of protected speech.

A statute that transforms the reporting of government intimidation into a statutory violation is a textbook violation of *City of Houston v. Hill*. (3) The Superior Court applied the statute to penalize the Precision Parties for stating their intention to file an executive-level complaint with Facebook management regarding its employee who used his corporate credentials to hack into Plaintiffs' account. Warning a wrongdoer that their corporate employer will be notified of a severe digital privacy invasion is a lawful, protective, and non-violent communication. By outlawing this out-of-court avenue of private accountability, the statute acts as a shield for corporate bad actors. Under *City of Houston v. Hill*, if a statute is drafted so broadly that its enforcement routinely ensnares protected contractual dialogue, the right to petition the government, and the right to report corporate misconduct, it cannot be saved by narrowing interpretations. D.C. Code § 28-3904(m) lacks any requirement for actual fraud, extortion, or true threats of violence. Because § 28-3904(m) places an unconstitutional premium

on "legal process while outlawing virtually all other forms of non-violent dispute communication, it is excessively overbroad and must be declared unconstitutional on its face.

**CONCLUSION**

Based on the well pled facts in the SAC, case law cited, and Defendants' failure to oppose the plausibility and conspiracy claims alleged, Plaintiffs respectfully request this Court deny the motions to dismiss of all Defendants and procced to a scheduling order and the discovery phase of the litigation.

Respectfully submitted, July 31, 2026

*/s/ Stephen C. Sieber, Pro-se*

*Stephen C. Sieber,
1805 45th Street NW
Washington D.C 20007
*Email,* *marcostevie@gmail.com*
Phone 240- 432-3265

*/s/ Edward W. Lyle*

Edward W. Lyle, D.C. Bar 25700
1250 Connecticut Avenue N.W., Suite 700
Washington D.C. 20036
Tel: (202) 333-4280
Fax: (202) 333-4282
Email: *ewlyle@west1805.com*
*Attorney for Precision Contracting Solutions, LP and Derrick Sieber, individually*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of July 2026 that a true copy of Plaintiffs Consolidated Opposition the Defendants Motion to Dismiss was filed through the Court's e-filing system and served upon all registered participants.

*/s/ Stephen C. Sieber*
Stephen C. Sieber